| | | |
|---|---|---|
| **DAN NEIL, CORIE BROWN, HENRY WEINSTEIN, WALTER ROCHE, JR., MYRON LEVIN and JULIE MAKINEN, individuals, on behalf of themselves and on behalf of all others similarly situated,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **No. 08 C 6833** |
| **SAMUEL ZELL; GREATBANC TRUST COMPANY, a Delaware corporation; EGI-TRB, L.L.C, a Delaware corporation; TRIBUNE COMPANY EMPLOYEE BENEFITS COMMITTEE, GERALD AGEMA, HARRY AMSDEN, CHANDLER BIGELOW, MICHAEL BOURGON, DONALD GRENESKO, JAMES KING, LUIS E. LEWIN, RUTHELLYN MUSIL, SUSAN O'CONNOR, JOHN POELKING, NAOMI SACHS, IRENE SEWELL, GARY WEITMAN, JEFFREY S. BERG, BRIAN L. GREENSPUN, BETSY D. HOLDEN, WILLIAM A. OSBORN, WILLIAM PATE, MARY AGNES WILDEROTTER, MARK SHAPIRO, FRANK WOOD, DENNIS J. FITZSIMONS,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Judge Rebecca R. Pallmeyer** |
| **Defendants.** | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs are six current and former employees of Tribune Company who participated in the company's Employee Stock Option Plan ("ESOP"), which was created in 2007 as part of a deal that converted Tribune Company from a publicly traded company to a private company wholly owned by the ESOP. They seek to represent a class of participants in the ESOP. Defendants include GreatBanc, the trustee of the ESOP; members of the committee that oversaw the ESOP; members of Tribune Company's Board of Directors; and Samuel Zell. Zell was instrumental in structuring the going-private deal, which made him the CEO of Tribune Company after the deal was completed in December 2007. Tribune took on $8.3 billion in new debt to finance the deal but was unable to

repay that debt when profits declined, and the company is now in bankruptcy.

In Claim One, Plaintiffs allege that, by carrying out the transaction, Defendants violated their fiduciary duties under the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Among other allegations, Plaintiffs allege that the deal was imprudent because of the great amount of debt Tribune took on. In Claim Two, Plaintiffs allege that several parts of the deal were prohibited transactions under ERISA. They allege that the ESOP paid too much for its shares of Tribune Company, that the purchase was improper because those shares were not immediately marketable, that Tribune Company paid too much for the shares it bought to take the company private, that it was improper for the ESOP to bargain away its voting rights to Zell, and that a voting agreement with the Company's biggest shareholder was impermissible. Defendants have moved to dismiss both counts. For the reasons that follow, Defendants' motion is granted in part and denied in part. Claim One is dismissed, except for the claim of fiduciary breach against Defendant GreatBanc and the claim of knowing participation in a fiduciary breach against Defendants Zell and EGI-TRB. Claim Two is dismissed as well, except for the claims that GreatBanc breached its fiduciary duty by agreeing to the direct and indirect purchases of Tribune stock and by agreeing to the Investor Rights Agreement and the claim that Zell and EGI-TRB knowingly participated in an ERISA violation.

## FACTUAL BACKGROUND

On June 10, 1847, the Chicago Tribune printed its first edition on a hand press in a run of 400 copies. Tribune Company :: History, http://www.tribune.com/about/history.html (last visited Dec. 7, 2009). By 2006, Tribune Company was a publicly traded company worth billions that owned, among other assets, 10 daily newspapers, 25 television stations, more than 50 websites, significant real estate holdings, and, most importantly to some readers, the Chicago Cubs. (Compl. ¶ 59.) As the media industry reacted to the rise of the internet, profits at Tribune and its competitors declined and shareholders began to agitate for change. Katharine Q. Seelye, *Tribune to Consider*

*Selling Some Media Assets*, N.Y. TIMES, Sept. 22, 2006, at C1. In response, in September 2006, Tribune created a special committee of its Board of Directors to consider structural changes to the company, including a sale of some or all of its assets. *Id.*; (Compl. ¶ 60). Over the next six months, the Board and the Committee considered several options, including various plans to sell the company; a plan to spin-off the Broadcasting and Entertainment Group; and an ESOP transaction, proposed by Samuel Zell, that would take the company private and make the employees the owners. (Compl. ¶¶ 62, 65, 75.)

An ESOP is "a type of pension plan intended to encourage employers to make their employees stockholders." *Steinman v. Hicks*, 352 F.3d 1101, 1103 (7th Cir. 2003). Congress has encouraged the creation of ESOPs by "giving tax breaks and by waiving the duty ordinarily imposed on trustees by modern trust law . . . to diversify the assets of a pension plan." *Id.* Significantly, Congress intended ESOPs to serve dual purposes, as both "an employee retirement benefit plan and a technique of corporate finance that would encourage employee ownership." *Martin v. Feilen*, 965 F.2d 660, 664 (8th Cir. 1992) (internal quotation omitted). Employees may be involved in the decision to create an ESOP, but, because the ESOP is a technique of corporate finance and because of the generally voluntary nature of the system governed by ERISA, no such employee input is required. *See* Michael W. Melton, *Demythologizing ESOPs*, 45 TAX L. REV. 363, 381 n.86 (1991). Employee ownership does not require direct employee control; instead, control can be given to the plan's fiduciary, who must manage the plan prudently under ERISA § 404, 29 U.S.C. § 1104. In February 2007, because it was considering Zell's ESOP plan, Tribune Company hired GreatBanc to serve as trustee of the possible ESOP. (Compl. ¶¶ 43, 69.) Presumably, Tribune intended to avoid a conflict between its own interests and that of its employees, who would become owners of the company if the deal went through.

After considering the options, Tribune decided on Zell's ESOP deal. (*Id.* ¶ 75.) The deal involved several parts, all of which were formally agreed to on April 1, 2007. First, the ESOP Trust

was established effective February 7, 2007, and the ESOP Plan was established with an effective date of January 1, 2007. (Defs' Ex. 15, at 1, Ex. 20, at 1.) The document establishing the Plan states that the Company's Board of Directors is responsible for appointing the Plan's trustee as well as the members of the committee responsible for administering the Plan. (Defs' Ex. 20, at 1-2.) That committee, the Employee Benefits Committee ("EBC"), was given discretion to authorize the trustee to act without the committee's direction with regard to "any matter concerning the purchase, sale, or voting of Company Stock, including the financing and other matters incidental to such purchase or sale." (*Id.* at 53.)

Second, the ESOP bought 8,928,571 newly issued shares of Tribune Company's common stock from Tribune Company at $28 per share. (Compl. ¶ 89.) The ESOP paid for the purchase with a promissory note in the principal amount of $250 million to be paid to Tribune Company over 30 years. (*Id.*) Thus, the transaction created a leveraged ESOP in which "[t]he loan, including interest, is repaid by the trustee from the cash contributions of the employer." Dan M. McGill & Donald S. Grubbs, Jr., FUNDAMENTALS OF PRIVATE PENSIONS at 678 (6th ed.1989). Those cash contributions were made possible by Tribune's elimination of matching contributions to the Company's 401(k) Plan. (Compl. ¶ 109, 114.) As a condition of the stock purchase, the ESOP was prohibited from reselling its shares. (*Id.* ¶ 90.) As required by the purchase agreement, GreatBanc obtained an analysis of the deal from an outside consulting firm. That analysis, set forth in a letter by the consultant, Duff & Phelps, LLC, concluded that "the terms and conditions of the Proposed Transaction are fair and reasonable to the ESOP from a financial point of view." (Defs' Ex. 25, at 7.)

Third, EGI-TRB, an entity controlled by Zell, invested $250 million in Tribune Company in exchange for 1,470,588 shares of Tribune Company's common stock and a promissory note from the Company in the principal amount of $200 million, which the Company repaid after the merger. (Compl. ¶¶ 44, 91.) The difference between EGI-TRB's investment and the principal of the

promissory note, $50 million, represents a share price of $34 per share. Also in exchange for EGI-TRB's investment, the parties agreed to the Investor Rights Agreement, which gave Zell and EGI-TRB rights of corporate governance following the merger. (*Id.* ¶¶ 78, 93.) That is, although the ESOP would have complete ownership of the Company, Zell would have the power to manage it under the Investor Rights Agreement, which requires the ESOP to vote its shares in favor of Zell and two directors of his choosing. (*Id.* ¶ 169.) As part of the Agreement, Zell was appointed to the Tribune Board on May 9, 2007. (*Id.* ¶ 95.) In another agreement, the Chandler Trusts, Tribune Company's then-largest shareholders, agreed to vote their shares in favor of the deal. (*Id.* ¶ 92.) Tribune Company filed a shelf-registration statement as part of the agreement with the Chandler Trusts.[1] Presumably, the statement allowed the Trusts' later sale of their shares, but Plaintiffs have not explained in detail how the Trusts benefitted from the agreement. (*Id.*)

On April 25, 2007, after the ESOP and EGI-TRB acquired their shares, the Tribune Company began a tender offer to repurchase 126 million shares of publicly traded stock at $34 per share. (Compl. ¶ 94.) That price represented a premium over the trading value of Tribune Company; the stock closed at $32.78 on April 25. The offer expired on May 24, 2007, and on June 4, 2007, those 126 million shares were retired. (*Id.*) In all, the tender offer cost Tribune Company $4.284 billion, financed by new debt. (*Id.* ¶¶ 104-105.) As a result of the tender offer Tribune Company, the ESOP, and EGI-TRB together controlled more than 50% of the Tribune's shares. (*Id.* ¶ 97.)

The final aspect of the transaction challenged in this lawsuit was the Merger Agreement, also entered into on April 1, 2007. Pursuant to that Agreement, the ESOP merged with Tribune

---

[1] A shelf-registration statement allows securities to "be registered for an offering to be made on a continuous or delayed basis in the future." 17 C.F.R. § 230.415. The securities are, in other words, figuratively placed on a shelf and can be taken down and sold at a later time. *See generally* 1 Thomas Lee Hazen, TREATISE ON THE LAW OF SECURITIES REGULATION § 3.11 (6th ed. 2009).

Company on December 20, 2007. (Compl. ¶ 97.) As part of the merger, Tribune borrowed yet another $4 billion to retire, at $34 per share, the 118 million shares of common stock remaining after the tender offer that were not owned by the Company or by the ESOP. (*Id.* ¶ 97; Def's Ex. 18, at 47.) After the merger, the Company became wholly owned by the ESOP, and was able to convert from a C-corporation to an S-corporation, thereby avoiding most corporate taxes.[2] (Compl. ¶¶ 80, 97, 99.) In addition to paying EGI-TRB for the shares EGI-TRB had acquired on April 1, Tribune repaid the $200 million promissory note it had given EGI-TRB, with interest. (*Id.* ¶ 98.) Also as part of the merger, Zell loaned the company another $225 million and paid $90 million for a warrant allowing him, after ten years, to purchase 40% of the company for $500 million. (Compl. ¶ 102.) After the merger, Tribune's total outstanding debt—before borrowing to complete the merger, the company already owed billions—was $12.8 billion.

Conditions did not improve at Tribune following the merger: sales and revenues declined, thousands of jobs were cut, and Tribune had difficulty meeting its debt obligations. (Compl. ¶¶ 115-126.) Plaintiffs filed this lawsuit in September 2008, just three months before Tribune filed for Chapter Eleven bankruptcy. (*Id.* ¶ 127.) In Claim One, Plaintiffs allege that all Defendants, except EGI-TRB, acted as fiduciaries of the ESOP, and violated their fiduciary duties. In Claim Two, Plaintiffs allege that several pieces of the deal were prohibited transactions under ERISA. Defendants have moved to dismiss both claims.

## ANALYSIS

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Detailed factual allegations are

---

[2]     For a C-corporation, "profits are taxed at the corporate level and then shareholders recognize income subject to taxation when they receive distributions of the net corporate profits as dividends." *Colo. Gas Compression, Inc. v. CIR*, 366 F.3d 863, 865 (10th Cir. 2004). For an S-corporation, though, profits and losses are "passed through to the shareholders without taxation at the corporate level." *Id.*

not required, but the plaintiff must provide enough facts "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The plaintiff must present "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*; *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). As explained below, Defendants urge that Plaintiffs' 53-page complaint fails this test.

## A.      Breach of Fiduciary Duty

Plaintiffs' first claim is that all Defendants, except EGI-TRB, were fiduciaries of the ESOP at some time, and that all of them breached their fiduciary duties either by agreeing to the deal, by failing to stop it, or by failing to remedy the damage caused by the deal. (Compl. ¶¶ 146-59.) Defendants move to dismiss this claim, arguing that the only Defendant who had a fiduciary duty to Plaintiffs was GreatBanc, and that Plaintiffs have not alleged facts that, if proven, would show that GreatBanc breached that duty.

To be an ERISA fiduciary, a party must be named as a fiduciary in the plan or meet ERISA'S functional definition:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21), 29 U.S.C. § 1002(21). The court considers below whether each group of Defendants qualifies under this definition, and, if so, whether Plaintiffs have stated a claim for breach of fiduciary duty under ERISA §§ 409, 502(a)(2), 29 U.S.C. §§ 1109, 1132(a)(2).

### i.    GreatBanc

GreatBanc is named as the ESOP's fiduciary in the plan documents, so there is no dispute that it had a fiduciary duty to the ESOP.  Defendants argue, however, that Plaintiffs' allegations and certain documents that the court may consider demonstrate that GreatBanc did not violate its fiduciary duty.  (Defs' Br. at 25.)  The statute describes the scope of the duty owed by an ERISA fiduciary in broad terms: the fiduciary is expected to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(1)(B), 29 U.S.C. § 1104(1)(B).  Case law imposes on an ESOP fiduciary a still more demanding duty of prudence than a typical ERISA fiduciary because an ESOP holds employer stock only, making diversification impossible.  *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 732 (7th Cir. 2006).

Defendants assert that GreatBanc acted prudently, as a matter of law, because the ESOP paid $28 per share, which Plaintiffs do not dispute was lower than the market price.  (Defs' Br. at 25-26.)  In support of this assertion, Defendants cite case law holding that, under ERISA § 408(e), 29 U.S.C. § 1108(e), an ESOP is not presumptively prohibited from buying company stock so long as it pays less than the market price.  *See In re Radioshack Corp. ERISA Litig.*, 547 F. Supp. 2d 606, 617 (N.D. Tex. 2008); *In re Coca-Cola Enterprises Inc. ERISA Litig.*, No. 1:06-CV-0953, 2007 WL 1810211, at *17 (N.D. Ga. 2007).  That proposition—that purchases of company stock at a below-market price is not *per se* improper—is all that the cases Defendants cite stand for, however. Defendants cite no cases holding, as a matter of law, that a purchase of employer stock at below market rate is always a prudent decision.  In fact, two circuit courts have held to the contrary, observing that an ESOP transaction that satisfies the exceptions of § 408(e) is not automatically a prudent transaction under § 404.  *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 425 (6th Cir.

2002); *Martin v. Feilen*, 965 F.2d 660, 665 (8th Cir. 1992).[3]  This court concludes that the fact that GreatBanc purchased shares at $28 per share does not automatically insulate it from liability for fiduciary breach.

Defendants next argue that Plaintiffs' allegations, together with documents attached to the motion to dismiss, show that GreatBanc did meet its fiduciary obligations.  (Defs' Br. at 28.)  Those documents are opinion letters from a firm employed by GreatBanc, which supposedly show that the deal was a prudent one.  (Defs' Exs. 23-25.)  Even assuming that the court can properly consider those letters at this stage of the case, *see generally Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009), the letters are not enough to support a motion to dismiss.  As the Fifth Circuit has explained in a widely quoted formulation, "An independent appraisal is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled." *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983).  Moreover, the court is reluctant to rely on opinion letters absent discovery regarding the analysis that supports the conclusions stated in them.

Defendants next argue that even if Plaintiffs' claim against GreatBanc does not fail as a matter of law, it must be dismissed because Plaintiffs' complaint fails to allege sufficient facts to raise a right to relief above the speculative level.  Plaintiffs' allegations include, among others, that the deal saddled Tribune with so much debt that the company was very unlikely to succeed, that GreatBanc failed to ensure that the expert advice it sought was reasonable, and that GreatBanc

---

[3]        Both courts relied on rules proposed by the Department of Labor, which explain that the "applicability of section 408(e) to a transaction does not relieve a fiduciary with respect to the plan from the general fiduciary responsibility provisions of section 404 of the Act, [29 U.S.C. § 1104]."  Rules and Regulations for Fiduciary Responsibility, Proposed Regulation Relating to the Statutory Exemption for Certain Acquisitions, Sales, or Leases of Property, 44 Fed. Reg. 50367, 50369 (proposed Aug. 28, 1979).  "Thus, while a plan may be able to acquire qualifying employer securities under the provisions of section 408(e) and this regulation, if the acquisition were not prudent (because, for example, of the poor financial condition of the employer), the appropriate plan fiduciaries would remain liable for any loss resulting from a breach of fiduciary responsibility."  *Id.* at 50369 n.13.

failed to conduct its own thorough review of the deal. (Compl. ¶ 110-11, 151.) Defendants impugn these allegations as "wild shots at GreatBanc's work." (Defs' Reply Br. at 19.) The court finds that they are not so wild that the claim must be dismissed. In particular, Plaintiffs' allegations raise serious questions regarding whether GreatBanc adequately considered the risk created by the great amount of debt Tribune would take on in the deal. *Armstrong*, 446 F.3d at 733 (7th Cir. 2006) (ESOP fiduciary must consider obvious risk of liquidity problem caused by taking on great amount of debt); *Steinman v. Hicks*, 352 F.3d 1101, 1106 (7th Cir. 2003) (discussing hypothetical case where ESOP fiduciary would be imprudent by failing to adequately respond to a very high debt-equity ratio). Thus, on the issue of GreatBanc's prudence in agreeing to the deal, the court is satisfied that Plaintiffs have pleaded sufficient facts to nudge their claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Accordingly, Defendants' motion is denied on the issue of GreatBanc's prudence in agreeing to the deal.

Plaintiffs also argue that their claim against GreatBanc includes a claim for fiduciary breach committed during the time between Step One, the agreement to the deal in April 2007, and Step Two, the consummation of the merger in December 2007. (Pls' Br. at 7-8.) In addition to the allegations of imprudence they attach to the original agreement to the deal, Plaintiffs also point to Tribune Company's declining fiscal health between Steps One and Two, and allege that GreatBanc's failure to blow the whistle at that time was a fiduciary breach. (Compl. ¶¶ 84-85.) Defendants argue that Plaintiffs have pleaded themselves out of court on this issue by alleging the following: "Although the Step Two Purchase Transaction closed in December 2007, the ESOP's fiduciaries committed to Step Two at the time of the Step One Purchase Transaction in April 2007." (Compl. ¶ 88.) Plaintiffs' language can be read to mean that all relevant decisions were made by April 2007, but the court believes that Defendants read too much into the word "committed." In their brief in opposition to the motion, Plaintiffs suggest that even though GreatBanc committed to the deal in April 2007, it might have withdrawn its commitment by exercising the Merger Agreement's

Company Material Adverse Effect clause. (Pls' Br. at 21-22.) This suggestion is arguably vague: Plaintiffs do not explain what the grounds would be for such an exercise. Plaintiffs also point out, however, that GreatBanc could have stopped the merger by orchestrating a shareholder vote against the merger. (*Id.* at 21.) Thus, Plaintiffs' claim that GreatBanc acted imprudently extends to the time between the agreement in April 2007 and the merger itself in December 2007.

### ii. Sam Zell and EGI-TRB

Defendants assert that Zell cannot be liable for any breach of fiduciary duty because he could not have been a fiduciary before April 1, 2007, when the deal was made. (Defs' Br. at 20-21.) Before that time, argue Defendants, Zell could not have had responsibility for the ESOP because he was negotiating adversely to it; that is, Zell was on the other side of the table. Plaintiffs respond that Zell functioned as a fiduciary even before the deal was made in that he dictated the terms of the deal. (Pls' Br. at 23.) Plaintiffs note that a person may become a plan fiduciary by exercising control over a fiduciary function. *E.g. Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.*, 793 F.2d 1456, 1460 (5th Cir. 1986) (parties that lacked authority under plan's terms could still be found to be fiduciaries if they exercised such control over the plan's trustees so as to cause the trustees to "relinquish their independent discretion").

Whether a person is a fiduciary is indeed determined by a functional test, but proposing a deal that a plan fiduciary adopts is a far cry from exercising control over the fiduciary's decision. Plaintiffs rely on a case from the Eighth Circuit holding that accountants hired by an ESOP had fiduciary responsibilities to the plan because "they recommended transactions, structured deals, and provided investment advice to such an extent that they exercised effective control over the ESOP's assets." *Martin v. Feilen*, 965 F.2d 660, 669 (8th Cir. 1992). That case is distinguishable, though, because Zell was not *working* for the ESOP, he was *negotiating* with it. *See also Keach v. U.S. Trust Co., N.A.*, 234 F. Supp. 2d 872, 882-83 (C.D. Ill. 2002) (members of company's board and executive committee who "exercised control over the structure and orchestration of the ESOP

transaction" were fiduciaries of the ESOP), *aff'd*, 419 F.3d 626 (7th Cir. 2005).  The accountants in *Martin* were insiders who captured control of the ESOP.  So were the board members in *Keach*.  Plaintiffs here do not allege that Zell, an outsider, exercised any kind of control over the ESOP before it agreed to his proposal.

If merely proposing a deal to an ESOP were sufficient to create a fiduciary duty, then *anyone* proposing a deal to an ESOP would have the same conflict of interest that Plaintiffs attempt to pin on Zell.  (Pls' Br. at 24.)  In short, adopting Plaintiffs' argument would make it impossible for anyone to negotiate a transaction with an ESOP for fear that it might be deemed unfavorable to the plan beneficiaries.  The court concludes that Zell was not a fiduciary before April 1, 2007.  Plaintiffs' argument that Zell became a fiduciary after he became a Tribune Board member on May 9, 2007, is considered in the next section.

Although Plaintiffs do not allege that EGI-TRB was a fiduciary of the ESOP, (Compl. ¶ 44), they allege that it and Zell are liable for knowing participation in fiduciary breaches.  (*Id.* ¶ 173).  That non-fiduciaries can be liable as knowing participants in fiduciary breaches under ERISA 502(a)(3), 29 U.S.C. § 1132(a)(3), follows from the Supreme Court's opinion in *Harris Trust & Savings Bank v. Salomon Smith Barney*, 530 U.S. 238 (2000) (where plan allegedly engaged in prohibited transaction with nonfiduciary party in interest, § 502(a)(3) allowed a suit against the party in interest for knowing participation in a prohibited transaction).  Defendants argue that the rule of *Harris Trust* applies only to parties in interest, but their argument is belied by the language of § 502(a)(3), which allows an action "by a participant . . . to enjoin any act or practice which violates any provision" of ERISA.  As the Court explained in *Harris Trust*, § 502(a)(3) "admits of no limit . . . on the universe of possible defendants." *Harris Trust*, 530 U.S. at 246; *see also Daniels v. Bursey*, 313 F. Supp. 2d 790, 808 (N.D. Ill. 2004) (to state a claim under § 502(a)(3), "the plaintiff must allege only that a fiduciary violated a substantive provision of ERISA and the nonfiduciary knowingly participated in the conduct that constituted the violation").

Although § 502(a)(3) does not limit the class of defendants, it does limit the type of available relief to "appropriate equitable relief." *Sereboff v. Mid Atlantic Med. Servs., Inc.*, 547 U.S. 356 (2006); *Harris Trust*, 530 U.S. at 249-51. Typical equitable relief against a party that knowingly participates in a fiduciary breach would be an order requiring the party to return whatever plan assets it obtained in the transaction. *E.g. Landwehr v. DuPree,* 72 F.3d 726 (9th Cir. 1995). Here, though, the only entity that directly obtained any plan assets is Tribune Company, which is not a party. Thus, whatever equitable relief may be available against Zell and EGI-TRB is more complicated. The court need not resolve the difficulty of determining appropriate relief at this stage, however. Plaintiffs have stated a claim against Zell and EGI-TRB for knowingly participating in a fiduciary breach.

### iii.    Members of the Board of Directors

Three Defendants—Betsy Holden, William Osborn, and Dennis FitzSimons—were members of the Board of Directors on April 1, 2007, when the deal was made; Zell joined the board after the deal was made but before the merger; and six—Jeffrey Berg, Brian Greenspun, Mary Wilderotter, William Pate and Frank Wood—joined the board after the merger. Defendants argue that members of the Board had no fiduciary responsibility to the Plan because they had no control over GreatBanc's decision, as the ESOP's fiduciary, to enter into the deal. (Defs' Br., at 21-22.) The Board decided to create the ESOP and decided, on behalf of Tribune Company, to do the deal, but Defendants argue that those decisions were outside of ERISA's scope. (*Id.* at 15-16.) Generally speaking, the act of creating a plan and decisions leading up to that act are not fiduciary acts. *Pegram v. Herdrich,* 530 U.S. 211, 226-27 (2000); *Akers v. Palmer*, 71 F.3d 226 (6th Cir. 1995) ("the decision to create an ESOP and fund it with newly-issued stock is a settlor function"). Neither are business decisions, even when they affect a plan's financial health. *Ames v. Am. Nat'l Can Co.*, 170 F.3d 751, 757 (7th Cir. 1999); *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 665 (6th Cir. 1998).

Plaintiffs do not argue that the Directors exercised a fiduciary function by establishing the ESOP; they argue instead that the Directors exercised a fiduciary function when they agreed to the complicated transaction by which the ESOP became the sole owner of Tribune because entering into that transaction implemented the Directors' decision to establish the ESOP. (Pls' Br., at 13-14.) Courts have held that ERISA's restrictions apply to the implementation of certain decisions that are themselves beyond ERISA's scope. *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 295-96 (5th Cir. 2000) (decision to terminate plan not covered by ERISA, but fiduciary's acts in implementing the termination are covered); *Waller v. Blue Cross of Cal.*, 32 F.3d 1337, 1342 (9th Cir. 1994) (same). These cases are distinguishable, though, because the implementation of Tribune's decision to create the ESOP was complete when the Directors, on behalf of Tribune, and GreatBanc, on behalf of the ESOP, agreed to the deal.

By appointing GreatBanc as fiduciary, the Board of Directors removed itself from direct responsibility for the ESOPs actions. (The court considers a separate claim regarding the Directors' exercise of their fiduciary responsibilities in appointing and monitoring GreatBanc below.) Unlike the companies in *Bussian* and *Waller*, the Board did not make a business decision and then implement it. The board made a non-fiduciary decision as settlor to create the ESOP, then made a non-fiduciary business decision on Tribune Company's behalf to enter into the deal, and, finally, GreatBanc, acting on behalf of the ESOP, made an independent decision to also enter into the deal. Plaintiffs themselves acknowledge that the documents creating the ESOP did not require the ESOP to agree to the deal, (Pls' Br. at 15), and Plaintiffs' complaint does not allege that the Directors influenced GreatBanc's decision in any way. Accordingly, Defendants Holden, Osborn, and FitzSimons, who were members of the Board on April 1, 2007, did not exercise a fiduciary function when they agreed to the deal.

Defendants next argue that the five Defendants who did not join the Board of Directors until December 2007 had no fiduciary responsibility for the deal, which was made and finalized before

14

their association with Tribune. (Defs' Br. at 21.) In response, Plaintiffs argue that these Defendants are liable as successor fiduciaries who failed to investigate and remedy breaches by their predecessors. (Pls' Br. at 28-29.) The obvious stumbling block for this theory is ERISA § 409(b), 29 U.S.C. § 1109(b): "No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary." ERISA § 409(b), 29 U.S.C. § 1109(b). Plaintiffs nevertheless insist that the breach they are alleging with respect to these defendants—failing to investigate and remedy the earlier breach—is an independent one defined by ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), which holds fiduciaries liable when they have "knowledge of a breach by such other fiduciary" but fail to make "reasonable efforts under the circumstances to remedy the breach." Putting aside the dearth of facts pleaded on these claims, they must ultimately be dismissed because co-fiduciary liability applies only to fiduciaries. Plaintiffs cannot hold these Defendants liable as co-fiduciaries without first showing that they are fiduciaries. Thus, the Defendants who joined the board of directors in December 2007—Berg, Greenspun, Wilderotter, Pate and Wood—had no fiduciary duty to remedy the alleged fiduciary breach committed before their tenure on the board. This reasoning also relieves the Defendants who served on the board before December 2007—Holden, Osborn, FitzSimons, and Zell—of any liability under a "failure to remedy" theory.

Finally, the court turns to Plaintiffs' argument that, even though the members of the Board of Directors had no fiduciary responsibility for the decisions that GreatBanc or the EBC made, they had a duty to monitor GreatBanc and the EBC based on their powers of appointment and removal. *Baker v. Kingsley*, 387 F.3d 649, 663-64 (7th Cir. 2004). Defendants acknowledge this duty, but argue that Plaintiffs have failed to allege sufficient facts to support their claim for breach of the duty to monitor. (Defs' Br. at 23-24.) Indeed, Plaintiffs allege only in the most general terms that the Members of the Board of Directors breached their duty to monitor GreatBanc. (Compl. ¶¶ 152, 155.) They expand on that allegation modestly in their brief, arguing that, based on the short

amount of time between GreatBanc's appointment and the deal, the members of the Board should have known that GreatBanc could not adequately exercise its responsibilities. (Pls' Br. at 25.) But this is nothing more than speculation, and Plaintiffs' allegations with respect to the EBC go no further. (Compl. ¶ 155.) Without more, Plaintiffs' allegations that the Board breached its duty to monitor is no more than conceivable; it fails *Twombly*'s plausibility requirement. *Twombly*, 550 U.S. at 570.

Plaintiffs seek to rely on this court's ruling in *Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079, 1099 (N.D. Ill. 2004), that whether director defendants breached their duty to monitor was "a question that will require extensive discovery and factual development." *Howell* is distinguishable, though, because the plaintiffs' complaint in that case contained more than a bare assertion that the defendants breached their duty to monitor; it contained factual allegations about *how* the defendants breached that duty. *Id.* at 1083-84. Accordingly, Claim One is dismissed with respect to all conduct by Defendants serving on the Tribune's Board of Directors, aside from Zell, against whom, as explained above, Plaintiffs have stated a claim for knowing participation in a fiduciary breach.

### iv. The Employee Benefits Committee and its Members

The EBC is designated in plan documents as the plan's administrator and given the power, which it exercised, to "authorize the Trustee to act without the direction of the [EBC] with regard to any matter concerning the purchase, sale, or voting of Company Stock." (Defs' Ex. 20, at 53.) The plan documents also state that if the EBC so authorizes the Trustee, the EBC "shall have no authority or responsibility whatsoever with regard to the matters so delegated to the Trustee." (*Id.*) In light of these limitations on the EBC's liability, Plaintiffs' claim against the EBC and its members focuses on the powers that the EBC was not permitted to delegate, that is, matters not concerning the purchase, sale, or voting of Company Stock. (Pls' Br. at 27-28.) In Plaintiffs' estimation, two side agreements that were part of the deal fall under those powers retained by the EBC. The first

is the Voting Agreement made between the Chandler Trusts and Tribune Company, but that Agreement—a copy is attached to Defendants' motion—did not involve the ESOP, so the EBC had no say in the parties' decisions to enter into it. (Def's Ex. 14.) The other "side agreement" identified by Plaintiffs is the ESOP's agreement to vote its shares in favor of Zell, but decisions on the voting of Company Stock was one of the duties that the EBC in fact delegated to GreatBanc. (Defs' Ex. 20, at 53.) Accordingly, Plaintiffs have failed to allege a fiduciary breach by the EBC or its members.

The analysis that the court applied above to claims against members of the Board of Directors for breaching the duty to monitor and the duty to remedy past breaches also applies to members of the EBC. Accordingly, Claim One is dismissed with respect to the EBC and all Defendants who served on the EBC.

**B.     Prohibited Transaction**

Plaintiffs' second claim is that, understood correctly, the deal challenged in this case involved five transactions that are prohibited by ERISA § 406(a), 29 U.S.C. § 1106(a). Under § 406(a), an ERISA plan is barred, with some important exceptions, from buying company stock or engaging in most transactions with the employer or any party in interest. A fiduciary that engages in a prohibited transaction is liable for a fiduciary breach under ERISA §§ 502(a)(2), 409, 29 U.S.C. §§ 1132(a)(2), 1109. And under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(2), a non-fiduciary who participates in a prohibited transaction is liable for equitable relief. *Harris Trust & Savings Bank v. Salomon Smith Barney*, 530 U.S. 238 (2000). The five transactions that Plaintiffs allege were prohibited are (1) the ESOP's direct stock purchase from Tribune Company, (2) Tribune Company's stock purchase from Zell and from some Director Defendants at the time of the merger, (3) Tribune Company's stock purchases through the Tender Offer and stock cancellation, (4) the Investor Rights Agreement, and (5) the Voting Agreement with the Chandler Trusts. (Compl. ¶¶ 167-73.) The court examines these transactions in turn.

### i.     The ESOP's Direct Stock Purchase from Tribune

ERISA § 406(a)'s bar on purchasing company stock, 29 U.S.C. § 1106(a)(1)(E), has an exemption to allow for the establishment of ESOPs: a plan may purchase "qualifying employer securities" for "adequate consideration."  ERISA §§ 407(d)(4), 408(e)(1), 29 U.S.C. §§ 1107(d)(4), 1108(e)(1).  One "qualifying employer security" is stock, *id.* § 407(d)(4), § 1107(d)(4), and adequate consideration

> means (A) in the case of a security for which there is a generally recognized market, either (i) the price of the security prevailing on a national securities exchange . . . or (ii) if the security is not traded on such a national securities exchange, a price not less favorable to the plan than the offering price for the security as established by the current bid and asked prices quoted by persons independent of the issuer and of any party in interest; and (B) in the case of an asset other than a security for which there is a generally recognized market, the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary.

*Id.* § 402(18)(A)(I), § 1002(18)(A)(I).

Plaintiffs' principal argument is that the price paid by the ESOP for the shares of Tribune stock on April 1, 2007, was not adequate consideration.  (Compl. ¶ 167.)  Defendants respond that the $28 per share that the ESOP paid was adequate consideration because it was less than "the price of the security prevailing on a national securities exchange," that is, the $32.81 per share closing price on the New York Stock Exchange that day.  (Defs' Br. at 33-34.)  To overcome this hurdle, Plaintiffs assert that the market price was not a fair measure of the value of the shares sold to the ESOP because they were not shares "for which there is a generally recognized market."  (Pls' Br. at 32-33.)  The shares at issue were indeed not bought on the market; they were issued to the ESOP from Tribune.  They were not registered, so they could not be sold on an exchange. Moreover, the ESOP was prohibited from reselling them at all.  *Cf. Pietrangelo v. NUI Corp.*, No. Civ. 04-3223, 2005 WL 1703200, at *13 (D.N.J. 2005) (dismissing prohibited-transaction claim because it was "undisputed that the Plans purchased the NUI securities at market price from a qualifying national securities exchange").  Defendants may be correct that the restrictions

18

themselves are unremarkable when it comes to creating a leveraged ESOP, (Defs' Br. at 26-27), but that does not affect the application of ERISA's "adequate consideration" requirement.

In determining whether the "adequate consideration" requirement is met, Defendants argue that the market price is the right metric because, despite the resale restriction, the ESOP's shares represented an ownership stake in the Tribune equivalent to that of the publicly traded shares. (Defs' Reply Br., at 13.)  The court is uncertain what an ownership stake has to do with whether there was a legitimate market for the shares.  Defendants cannot seriously argue that a trading restriction has no affect on the value of shares.  Indeed, one of the valuation letters that Defendants attached to their motion to dismiss suggests using a 5% discount for securities that are not marketable.  (Defs' Ex. 24, at 5.)  Defendants also point out that the ESOP paid less for its shares than Zell paid and urge that the ESOP's shares actually represented a greater ownership stake than other shares because the ESOP's shares entitled it to an eventual 100% ownership of the company.  (*Id.*; Defs' Br. at 34.)  Ultimately, though, the ESOP's purchase price should not be directly compared to the price paid by other parties because no other party could bring to the table what the ESOP brought: an end to millions of dollars worth of corporate taxes based on the conversion from a C-corporation to an S-corporation.  Thus, the shares bought by the ESOP were not "a security for which there is a generally recognized market."

In the case of an asset that is not publicly traded, adequate consideration is defined as the asset's fair market value as determined in good faith.  ERISA § 402(18)(A)(I); 29 U.S.C. § 1002(18)(A)(I).  Defendants argue that even under this definition, Claim Two must be dismissed for the same reasons that they argued, under Claim One, that GreatBanc, as the ESOPs fiduciary, acted prudently.  (Defs' Reply Br. at 14-15.)  The court has already ruled that those arguments are not sufficient to grant the motion to dismiss Claim One.  Thus, the motion to dismiss is denied as to Plaintiffs' claim that the stock purchase was a prohibited transaction under 29 U.S.C. § 1106(a)(1)(E).  Whether the ESOP paid adequate consideration for the stock it bought from

Tribune Company is a question of fact, not one for which Defendants are entitled to judgment as a matter of law.

Plaintiffs also argue that the ESOP's stock purchase was a prohibited transaction for another (and far more complicated) reason. (Pls' Br., at 34-35.) Under ERISA § 408(e), 29 U.S.C. § 1108(e), to qualify for the exception, the plan must pay adequate compensation, and it must be an eligible individual account plan as defined in ERISA § 407(d)(3), 29 U.S.C. § 1107. One such eligible individual account plan is an ESOP, which is defined in the same section as an "individual account plan—(A) which is a stock bonus plan which is qualified, or a stock bonus plan and money purchase plan both of which are qualified, under section 401 of Title 26, and which is designed to invest primarily in qualifying employer securities, and (B) *which meets such other requirements as the Secretary of the Treasury may prescribe by regulation.*" ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6) (emphasis added). Those other requirements are found at 29 C.F.R. § 2550.407d-6, but subsection (c) of that regulation requires an ESOP to meet yet more requirements that the Treasury Secretary can prescribe under certain Internal Revenue Code provisions. *See* IRC § 4975(e)(7)(B), 26 U.S.C. § 4975(e)(7)(B). *Those* other requirements are listed at 26 C.F.R. § 54.4975-11, which lists conditions for an ESOP including satisfying IRC § 4975(e)(7)(A), 26 U.S.C. § 4975(e)(7)(A). That subsection requires the plan to qualify under IRC § 409(l), 26 U.S.C. § 409(l), which mandates that the securities purchased by an ESOP be "common stock issued by the employer . . . which is readily tradable on an established securities market." *Id.* § 409(l)(1).

The most obvious reading of § 409(l)(1) is that an ESOP holds readily tradable shares only if it can sell the shares on the market immediately. Under that reading, the sale here was prohibited. In a letter sent one day before oral argument, Defendants suggested that the court adopt the IRS's reading of "readily tradeable" as meaning "publicly traded," as defined in 26 C.F.R. § 54.4975-7(b)(1)(iv). *See* I.R.S. Priv. Ltr. Rul. 200237026. Under that regulation, "'publicly traded' refers to a security that is listed on a national securities exchange registered under section 6 of the

Securities Exchange Act of 1934 (15 U.S.C. 78f) or that is quoted on a system sponsored by a national securities association registered under section 15A(b) of the Securities Exchange Act (15 U.S.C. 78o)." That *some* Tribune shares were publicly traded, however, does not mean that the shares the ESOP acquired were also publicly traded. Nor is the court moved by Defendants' reference to 26 C.F.R. § 54.4975-7(b)(10). That provision is addressed to the distribution of an employer security with a "trading limitation," but the status of the security at the time it is distributed to a plan participant is a separate question from the status of that security at the time it is purchased by the ESOP. The court concludes that Plaintiffs have adequately alleged that GreatBanc violated its fiduciary duties by agreeing to a stock purchase that was a prohibited transaction.

ii.    **Tribune Company's stock purchase from Zell and Directors at the time of the merger**

Plaintiffs also contend that Tribune Company's purchase of stock from Zell, EGI-TRB, and the Tribune Directors before December 2007 were prohibited transactions because those sellers were parties in interest under ERISA 3(14)(H), 29 U.S.C. § 1002(14)(H), and the $34 paid per share was greater than "adequate consideration." (Pls' Br. at 37.) At the time of the purchases, the stock was indeed trading below $34 per share, but it was Tribune, not the ESOP, that was the buyer. ERISA § 406, 29 U.S.C. § 1106, refers to "direct or indirect" transactions, however; Tribune Company's purchase of stock that would eventually be transferred to the ESOP was, Plaintiffs contend, a transaction that involved the ESOP indirectly. (Pls' Br. at 37.) Section 406 specifically includes indirect transactions in order to prevent parties from avoiding its restrictions through "the interjection of a third party into an otherwise prohibited transaction." *Brock v. Citizens Bank of Clovis*, 841 F.2d 344, 347 (10th Cir. 1988). For example, just as a plan could not purchase an aircraft from a party in interest, neither could it buy the aircraft from a third party that had purchased it from the party in interest in an attempt to avoid ERISA's restrictions. *McDougall v. Donovan,* 552 F. Supp. 1206, 1216 (N.D. Ill. 1982).

Plaintiffs' challenge to this aspect of the transaction survives if the ESOP was an indirect purchaser of the shares purchased from Zell, EGI-TRB, and the Tribune Directors before December 2007, and if the $34 paid per share was more than adequate consideration under ERISA 408(e)(1), 29 U.S.C. § 1108(e)(1). Construing the stock purchase at issue here as an indirect purchase arguably furthers the Congressional purpose of preventing parties in interest from enriching themselves in a going-private transaction. Defendants insist that the ESOP was not in fact an indirect purchaser because the ESOP did not pay anything in the purchase. (Defs' Reply Br. at 24.) That argument ignores the $250 million payment the ESOP made at the time it agreed to the merger.[4] The motion is denied with respect to this portion of Claim Two.

### iii. Tribune Company's stock purchases through the Tender Offer and stock cancellation

Plaintiffs contend that Tribune Company's stock purchases from the public at large through the Tender Offer and the stock cancellation immediately before the merger were also prohibited transactions because they too represented an indirect purchase by the ESOP of the employer's stock for more than adequate consideration. (Pls' Br., at 37.) Again, Defendants' only argument against this claim is that the ESOP paid nothing in the purchases. (Defs' Reply Br. at 24.) The court has already rejected that argument; Defendants motion is denied with respect to this portion of Claim Two as well.

### iv. The Investor Rights Agreement

Plaintiffs also attack the Investor Rights Agreement, under which the ESOP agreed to vote its shares in favor of Zell and his chosen directors, as an impermissible transaction because it constitutes the use of a plan asset for a party in interest. ERISA § 406(a)(1)(D), 29 U.S.C.

---

[4] It may be that the ESOP is not an indirect purchaser of the shares for a different reason: even though the ESOP eventually gained the ownership stake that had been represented by the shares, it never actually acquired the shares because Tribune Company retired them before the merger. Defendants themselves have not presented such an argument, however, and the court is reluctant to develop it without the benefit of briefing.

§ 1106(a)(1)(D). Defendants first argue that Zell was not a party in interest when the agreement was made, (Defs' Reply Br. at 15), but the language of § 406(a)(1)(D) does not refer to the agreement; it refers to the "transaction." At the time of the "transaction," that is, when the ESOP voted its shares in favor of Zell as required by the agreement, Zell was a member of the board and, therefore, a party in interest. ERISA § 3(14)(H); 29 U.S.C. § 1002(14)(H).

Defendants next argue that, even though the shares themselves were a plan asset, the Plan's agreement to vote them for Zell was not barred by § 406(a)(1)(D) as a direct or indirect "use" of a plan asset for the benefit of a party in interest because, as a matter of law, the right to vote ESOP stock is not a plan asset at all. (Defs' Br., at 36; Defs' Reply Br. at 24.) The Sixth Circuit so held, over a dissent, in *Grindstaff v. Green,* 133 F.3d 416 (6th Cir. 1998), although two other courts have ruled to the contrary, *Newton v. Van Otterloo*, 756 F.Supp. 1121, 1127-28 (N.D. Ind. 1991) (Miller, J.); *O'Neill v. Davis*, 721 F.Supp. 1013, 1014-16 (N.D. Ill. 1989) (Nordberg, J.).

The *Grindstaff* court relied on the outcome of the vote at issue, reasoning that because Congress anticipated that company managers would also run ESOPs, when those managers, acting as members of the ESOP committee, voted for themselves as managers in an uncontested election, they did not breach their fiduciary duty to the ESOP. *Id.* at 424-25. From this narrow holding, the court extrapolated that "the right to vote, or direct the voting of an ESOP's shares, even when used to perpetrate[5] one's own incumbency, does not, by itself, constitute a plan asset." *Id.* at 425. As the dissenting judge pointed out, though, the majority ignored ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), which defines fiduciary conduct under ERISA to include "any authority or control respecting management or disposition of" a plan's assets. *Grindstaff*, 133 F.3d at 432. Even if the right to vote a share is not a plan asset, the share itself is an asset, so voting that share

---

[5]    Presumably the court's intended word was "perpetuate." *See* Brett McDonnell, *ESOPs' Failures: Fiduciary Duties When Managers of Employee-Owned Companies Vote to Entrench Themselves*, 2000 COLUM. BUS. L. REV. 199, 212 n.59.

must be "management" of the asset.  *Newton*, 756 F. Supp. at 1128; *O'Neill*, 721 F. Supp at 1015.

Moreover, the common law of trusts applies a duty of proper care to voting decisions by trustees,

*Grindstaff*, 133 F.3d at 432 (citing RESTATEMENT (SECOND) OF TRUSTS § 193, cmt. a (1959)), and

courts routinely look to the common law to interpret ERISA.  *Id.* (citing *Firestone Tire & Rubber Co.*

*v. Bruch*, 489 U.S. 101, 109-11 (1989)).  Finally, in regulations interpreting ERISA,  the Department

of Labor has concluded that "[t]he fiduciary act of managing plan assets that are shares of

corporate stock includes the voting of proxies appurtenant to those shares of stock." 29 C.F.R.

§ 2509.08-2 (2009); 29 C.F.R. § 2509.94-2 (1995).  For all these reasons, the court respectfully

declines to adhere to the broad language of the majority opinion in *Grindstaff*.  The reasoning of

the dissenting judge as well as that of the courts in *Newton* and *O'Neill* is more convincing.  Voting

of shares held by the ESOP constitutes the "management" or "use" of plan assets.  Thus, Plaintiffs

have stated a claim that by agreeing to the Investor Rights Agreement, GreatBanc breached its

fiduciary duty and Zell and EGI-TRB knowingly participated in an ERISA violation.

### v.    The Voting Agreement with the Chandler Trusts

The final part of the deal that Plaintiffs allege was a prohibited transaction was the Voting

Agreement made between the Chandler Trusts and Tribune Company.  (Compl. ¶ 92, 171.)  Among

other promises, the Trusts agreed to vote their shares in favor of the ESOP deal.  Plaintiffs argue

that, because the ESOP was an indirect party to the agreement, and because the agreement was

made for Zell's benefit, it was a prohibited transaction under ERISA.  (Pls' Br., at 38.)  The

agreement may have indirectly affected the ESOP, but Plaintiffs have not explained how the ESOP

indirectly "engaged" in the transaction between the Chandler Trusts and Tribune Company.  ERISA

406(a)(1), 29 U.S.C. § 1106(a)(1).  The ESOP could not even have become a party to the Voting

Agreement through the merger because the agreement, by its terms, terminated at the time of the

merger.  (Defs' Ex. 14, at 2, 6).  Accordingly, Claim Two is dismissed as to the Voting Agreement.

### CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint [110] is granted as to Claim One except for the claim of fiduciary breach against Defendant GreatBanc and the claim of knowing participation in a fiduciary breach against Defendants Zell and EGI-TRB.  As to Claim Two, the motion is denied with respect to the claims that GreatBanc breached its fiduciary duty by agreeing to the direct and indirect purchases of Tribune stock and by agreeing to the Investor Rights Agreement and the claim that Zell and EGI-TRB knowingly participated in an ERISA violation.  The motion to dismiss Claim Two is otherwise granted.

ENTER:

Dated:  December 17, 2009

_____
REBECCA R. PALLMEYER
United States District Judge