## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

DAN NEIL, ERIC BAILEY, individuals, on ) 
behalf of themselves and on behalf of ) 
all others similarly situated, )     Case No. 08-cv-06833 
                             ) 
           Plaintiffs, )     Hon. Rebecca R. Pallmeyer 
                             ) 
  vs. ) 
                             )     CLASS ACTION 
SAMUEL ZELL; )     THIRD AMENDED COMPLAINT 
GREATBANC TRUST COMPANY, ) 
a Delaware corporation; ) 
EGI-TRB, L.L.C., a Delaware ) 
corporation; and EQUITY GROUP ) 
INVESTMENTS, L.L.C., a ) 
Delaware corporation, ) 
                             ) 
          Defendants. ) 

Plaintiffs Dan Neil and Eric Bailey, by and through their attorneys, individually and on behalf of all others similarly situated, complain and allege as follows:

## I.    INTRODUCTION

*The only security of all is in a free press. The force of public opinion cannot be resisted when permitted to be freely expressed. It is necessary, to keep the waters pure.*

Thomas Jefferson to Lafayette, 1823.

*Grave dancing is an art that has many potential benefits. But one must be careful while prancing around not to fall into the open pit and join the cadaver.*

Sam Zell, 1976[1]

1.     This case is about a corporate take-over done through a series of carefully manipulated complex financial transactions involving an Employee Stock Ownership Plan. Zell

---

[1]    Zell, Sam. *The Grave Dancer: A Guide to the Risky Art of Resurrecting Dead Properties.* Real Estate Review (1976).

– with the help of the other Defendants – made the Tribune Employee Stock Ownership Plan ("the ESOP") the linchpin in an enormously complex and risky transaction.  As a result, Tribune Company ("Tribune") was burdened with $13 billion in debt and went bankrupt in less than a year.  Although Zell stood to reap a huge reward if his gamble paid off, the Tribune ESOP and its employee participants have suffered much of the losses from its failure. ███████████

███████████████████████████████████

███████████████████████████

2.      In 2006, Samuel Zell developed a plan to take over the Tribune Company by risking other people's money in the hope that he would receive the reward.  His plan was described in his own words:

> **Dear Partners,**
>
> **When we closed the going-private transaction in December [2007], our total debt increased to nearly $13 billion.  I put $315 million behind that debt . . . .  The employees - you - then acquired 100 percent of the company.  I acquired an option to buy 40 percent of the company for $500 to $600 million within the next 15 years.**
>
> **● ● ●**
>
> **In the end, you and I together will own a collection of assets worth billions of dollars.**
>
> Sam Zell, 2008.[2/]  (See **<u>Exhibit A</u>**, attached hereto and incorporated herein).

3.      The Leveraged ESOP Transaction was unprecedented and for good reason. Tribune's primary business lines – newspaper publishing and broadcast television – were facing declining revenues and a bleak outlook due to a paradigm shift in the media industry.  As stated by one of Zell's lieutenants, "this is a tough collection of assets to rationalize so buying right is key."  Nevertheless, the deal was leveraged to the hilt.  Aggressive Leveraged Buyout ("LBO") deals typically use leverage of 70% - 80%.  The Leveraged ESOP Transaction, however, had a

---

[2]      February 2008 edition of Tribune News Special ESOP Edition.

debt-to-equity ratio in excess of 95%, ballooning Tribune's debt to over 10 times its operating earnings, and left the ESOP owning an insolvent company.

4.     Now, Zell and his accessories threaten to destroy the Tribune Company and its assets, which include some of the nation's oldest and best daily newspapers, including the Los Angeles *Times*, the Chicago *Tribune*, and the Baltimore *Sun*, along with several other great daily newspapers.  They are doing so without consideration for the employee-owners or respect for the institution.

5.     As part of his takeover of the Tribune Company, Sam Zell's illegal and irresponsible actions and public statements have damaged the reputation and business of the company he purports to want to preserve.  Through the structure of his takeover, Zell and his accessories have diminished the value of the employee-owned company to benefit himself and his fellow board members, while bankrupting the Company.  Through their self-dealing at the expense of employees, Zell, and plan fiduciaries and parties-in-interest have repeatedly breached their ERISA fiduciary duties or knowingly participated in such breaches and engaged in prohibited transactions, as more fully set forth below.

6.     In April 2007, the Tribune Company announced that it had accepted Zell's bid to acquire the Company in a complicated deal that used the Employee Stock Ownership Plan (the "Tribune ESOP") to allow Zell to avoid making a significant equity investment of his own (the "Leveraged ESOP Transaction").  The deal included borrowing billions against the Company's assets - Tribune Company's debt surged from approximately **$4 billion** to approximately **$13 billion**.  Further, approximately $10.6 billion of new debt was at variable rates of interest.  If interest rates were to increase, the Tribune ESOP debt service obligations would increase.  The Company was also converted from a C-corporation to an S-corporation, a tax strategy intended to allow Zell to avoid paying most corporate taxes.  Using the ESOP, a structure allegedly designed to benefit employees, Zell took over a highly valuable company, imposed on it the most encumbered balance sheet in the newspaper industry, and avoided any real personal risk or

responsibility, all while enjoying the benefits of a tremendously valuable tax structure and letting employee "owners" bear the damaging consequences going forward.

7.      Despite the legal mandate to administer the Tribune ESOP (the Tribune Company's only shareholder) solely in the interests of the employee-owners, Zell and his accessories orchestrated a highly leveraged and imprudent purchase by the Tribune ESOP. It was a deal designed to benefit corporate insiders at the ESOP and employees' expense.

8.      Not only was the imprudence of this transaction clear, but its consequences were easily foreseeable. After engineering the transaction, Zell redirected the Company's operations from running newspapers to *servicing the new debt*. Predictably, the Company's cash flow could not service its new, crushing debt burden. The Company filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on <u>December 8, 2008,</u> less than one year after the Leveraged ESOP Transaction closed.

9.      As was widely reported by industry analysts, the price paid for Tribune stock by the ESOP during the Leveraged ESOP Transaction was too high given the debt burden imposed on the Company by Zell. On <u>November 2, 2007</u> - over one month before the deal closed - a Lehman Brothers' Newspaper Valuation and Stock Scorecard clearly presented the impact of Zell's debt on the fair market value of the Tribune Company's stock: "Should the Tribune privatization deal break and not occur, we believe that fair value on the stock, if it were to remain an ongoing public entity, would be significantly less than the current stock price. ***Given the added $7 billion in debt to repurchase 126 million shares in the tender offer, we think fair value on the stock would be $7-$8*** per share based on our detailed sum-of-the-parts analysis..." (emphasis added). (See **<u>Exhibit B</u>**, attached hereto and incorporated herein by this reference.) One month later, all outstanding Tribune stock (except that held by the ESOP) was repurchased for $34 a share with borrowed funds under Zell's plan, and the Tribune Company, now wholly-owned by the ESOP, ended up over $13 billion in debt.

4

10.     After the Leveraged ESOP Transaction closed, Goldman Sachs provided another indication of the deal's imprudence: "Tribune's $34 go-private price represents... [a] very rich valuation in the context of the cyclical and secular challenges facing the industry."  That report also predicted the measures Zell would take to service the imposed debt: "the transaction leaves very little room for error, particularly given the extremely challenging industry backdrop.  The company could potentially face a liquidity crunch fairly quickly... [w]e wouldn't be surprised to see additional asset sales beyond the announcements to date..." (See **Exhibit C**, attached hereto and incorporated herein by this reference.)

11.     In March, 2008, Standard & Poor's cut the Company's credit rating to "B-," stating that the cut "reflects the concern that Tribune might violate [loan agreements] in the near term... as early as December."  The Tribune Company's credit rating was reduced after the Leveraged ESOP Transaction and, soon thereafter, some of its bonds traded at $0.35 on the dollar.  A report from Fitch Ratings in late August 2008 indicated that the Company's credit rating was further lowered to junk level "CCC," indicating a "real possibility" the issuer could default and that the Company's ability to meet financial commitments "is vulnerable to deterioration in business and economic conditions."  This report stated that there is reason to be "concerned about the company's ability to generate cash to meet its interest payments, principal amortization and maturities under its debt obligations."

12.     No prudent fiduciary would have agreed to the Leveraged ESOP Transaction, adding $8.4 billion in new debt to Tribune's balance sheet, particularly when industry analysts reported that fair market value of the stock was at least $20 per share *less* **than the price paid**, and when those analysts predicted the significant challenges that would continue to face the industry.  By orchestrating an imprudent transaction, Zell, his accessories, and the Tribune ESOP trustee, GreatBanc, breached their fiduciary duties to the employee-owners,  engaged in prohibited transactions, and/or knowingly participated in fiduciary violations.

13.     As a result of the Leveraged ESOP Transaction, the ESOP on which employees depend for their retirement income had as its sole asset stock in a company that was both disastrously over-leveraged and managed in a way contrary to the purpose of ESOP-owned companies: to benefit and encourage the participation of employees in their company.  Prior to the bankruptcy, Zell and his accessories maintained complete control over the Company through a Voting Agreement and other agreements, even though employees of the Tribune Company technically own the Company through the Tribune ESOP.  Having no power over Tribune's operations, the ESOP participants suffered the direct consequences of Zell's folly.  The ESOP participants watched helplessly as Zell drove the Tribune Company's most valuable assets - newspapers - into the ground.

14.     Plaintiffs bring this class action on behalf of themselves and a class consisting of those individuals who are participants in and beneficiaries of the Tribune ESOP, whose rights were and are being violated by Defendants.

15.     Defendants include the ESOP Trustee, GreatBanc, which engaged in numerous, repeated, and continuing breaches of fiduciary duties.  As a result, the Tribune ESOP became the sole shareholder of a disastrously indebted company that is essentially controlled by one man: Sam Zell.  As stated in the Company's 10-K filed with the SEC on December 30, 2007:

> We have significant debt and other financial obligations as a result of Leveraged ESOP Transactions.... Our significantly increased debt level and related debt service obligations:
>
> •     Require us to dedicate a substantial portion of our cash flows to the payment of principal and interest on our debt which will reduce the funds we have available for other purposes;
>
> •     Limit our liquidity and operational flexibility and our ability to respond to the challenging general and industry-specific economic and business conditions that currently exist or that we may face in the future;
>
> •     May require us in the future to defer planned capital expenditures, further reduce the size of our work force, reduce discretionary spending, dispose of assets or forego acquisitions or other strategic opportunities, any of which decisions may affect our revenues and place us at a competitive disadvantage compared to our

competitors with less debt or with comparable debt at more favorable interest rates and who, as a result, may be better positioned to withstand economic downturns or pursue key acquisitions or other strategic opportunities;

• Impose on us additional financial and operational restrictions;

• Expose us to increased interest rate risk because a substantial portion of our debt obligations are at variable interest rates; and

• Subject us to market and industry speculation as to our financial condition and the effect of our debt level and debt service obligations on our operations, which speculation could be disruptive to our relationships with customers, suppliers, employees, creditors, and other third parties.

As a result, Zell and his accessories, through the Leveraged ESOP Transaction, placed the Company in a position where it would not be able to generate sufficient cash to service or make required repayments of its indebtedness and it would be forced to take other actions to satisfy its obligations under its indebtedness, which had a high probability of not being successful.

16. In this action, Plaintiffs and the class seek to recover all the losses to the Tribune ESOP caused by Defendants' fiduciary violations. In addition, Plaintiffs seek disgorgement of any of Defendants' ill-gotten profits for such breaches and an accounting. Finally, Plaintiffs seek the removal of Defendants, and each of them, from their fiduciary positions and an order barring them from serving as fiduciaries of other ERISA plans.

17. The claims of Plaintiffs and the class arise under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 et seq. ("ERISA"). Plaintiffs and the class seek compensatory damages and/or equitable relief as applicable, including injunctive relief.

## II.   JURISDICTION AND VENUE

18. The claims of Plaintiffs and the proposed class arise under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001et seq. ("ERISA"). Plaintiffs seek to enjoin acts and practices which violate the provisions of Title I of ERISA, to make good to the Plan losses resulting from fiduciary violations, restore to the Plan any profits which have been made by the breaching fiduciaries through the use of Plan assets, to obtain other

7

appropriate equitable and legal remedies in order to redress violations and enforce the provisions of Title I of ERISA.

19.     This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

20.     Venue is properly laid in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the employee benefit plan at issue was administered in this District during the relevant time, some or all of the events or omissions giving rise to the claims occurred in this District, and one or more of the Defendants may be found in this District.

## III.     <u>PARTIES AND RELATED ENTITIES</u>

21.     Plaintiff **DAN NEIL** was employed by the Tribune Company in the County of Los Angeles, California, as a journalist at the Los Angeles *Times* from 2003 until 2010.  In 2004, Neil was awarded the Pulitzer Prize for criticism.  He is a citizen of the State of North Carolina and resides in North Carolina. At all relevant times, Plaintiff **NEIL** has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Tribune Employee Stock Ownership Plan (the "Tribune ESOP").

22.      Plaintiff **ERIC BAILEY** was employed by the Tribune Company in the County of Los Angeles, California, as a journalist at the Los Angeles *Times* from 1983 until 2010.  He is a citizen of the State of California and resides in California.  At all relevant times, Plaintiff **BAILEY** has been a participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), in the Tribune ESOP.

23.     The Tribune Company (the "Tribune Company" or "Company") is the Sponsor of the TRIBUNE EMPLOYEE STOCK OWNERSHIP PLAN ("Tribune ESOP"), within the meaning of ERISA § 3(16)(B).  The Tribune Company established the Tribune ESOP on <u>April 1, 2007,</u> with an effective date of <u>January 1, 2007</u>.  The Tribune Employee Stock Ownership Trust ("ESOT") for the Tribune ESOP was established pursuant to an agreement between the Tribune Company and Defendant GreatBanc Trust Company on <u>April 1, 2007</u>, with an effective date of

<u>February 7, 2007</u>.  The Tribune Company at all relevant times was a fiduciary of the Tribune ESOP under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or discretionary control respecting management of the Tribune ESOP and/or exercised authority or control respecting management or distribution of the Tribune ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Tribune ESOP.  The Tribune Company is also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).  On <u>December 8, 2008</u>, after Plaintiffs filed their original Complaint, the Tribune Company filed a voluntary petition under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, Case No. 08-13141.  Pursuant to Section 362 of the Bankruptcy Code, there is an automatic stay as to the Tribune Company. Therefore, Plaintiffs acknowledge that this action is stayed as to the Tribune Company only and Tribune Company is not named as a Defendant herein.

24.     At all relevant times, Defendant **GREATBANC TRUST COMPANY** ("GreatBanc" or "Trustee") has been the Trustee of the Tribune ESOP.  Pursuant to the ESOT, GreatBanc accepted appointment as the Trustee of the Tribune ESOP effective on or about <u>February 26, 2007</u>.  According to a GreatBanc press release, the bank's role in the Leveraged ESOP Transaction was to act as a "watchdog" for the participants in the Tribune ESOP, and its sole purpose as ESOP Trustee is to serve the best interests of participants in the Tribune ESOP. Defendant GreatBanc at all relevant times was a "fiduciary" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or discretionary control respecting management of the Tribune ESOP and/or exercised authority or control respecting management or distribution of the Tribune ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Tribune ESOP.  Defendant GreatBanc at all relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14).  Defendant GreatBanc is a Delaware corporation headquartered in Illinois.

25.     Defendant **EQUITY GROUP INVESTMENTS, L.L.C.** ("EGI") is the apex of Defendant Zell's pyramid of business holdings. EGI controls a multi-billion dollar mix of private and public businesses around the world.  Defendant Zell is the Chairman of EGI and controls EGI.  Upon information and belief, at all relevant times, EGI was a "party in interest" as defined in ERISA § 3(14), 29 U.S.C. § 1002(14), *inter alia*, because 50 percent or more of its stock is owned directly or indirectly by Defendant Zell, and a knowing participant in breaches of fiduciary duty.  EGI is a Delaware limited liability company located in Illinois.

26.     Defendant **EGI-TRB, L.L.C.** ("EGI-TRB" or "Zell Entity") was formed solely for the purpose of entering into and consummating the Leveraged ESOP Transaction discussed herein.  Defendant ZELL is the founder and President of the Zell Entity.  The Zell Entity is wholly-owned by Sam Investment Trust, an Illinois trust established for the benefit of Zell and his family, and is disregarded as an entity separate from Sam Investment Trust for Federal tax purposes. ███████████████████████████████████████████████████
████████████████████████████████████████████████████████ The Zell Entity has no board of directors or similar board of managers.  Upon information and belief, the Zell Entity has no office or employees of its own; instead, at all times relevant herein the employees Defendant EGI have acted on behalf of EGI-TRB and run EGI-TRB as part of EGI's business from EGI's office.  Upon information and belief, at all relevant times, the Zell Entity was a "party in interest" as defined in ERISA § 3(14), 29 U.S.C. § 1002(14), *inter alia*, because 50 percent or more of its stock is owned directly or indirectly by Defendant Zell and/or it is owned by a trust whose beneficiaries are Defendant Zell and his relatives, and a knowing participant in breaches of fiduciary duty.  The Zell Entity is a Delaware limited liability company located in Illinois.

27.     Defendant **SAMUEL ZELL** was elected to the Board of Directors of the Tribune Company in or about <u>May 2007</u> and remains a member of the Board.  In <u>December 2007</u>, Zell became Chairman of the Board of Directors of the Tribune Company, as well as President and

CEO. Zell was a fiduciary of the Tribune ESOP at some relevant times, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or discretionary control respecting management of the Tribune ESOP and/or exercised authority or control respecting management or distribution of the Tribune ESOP's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Tribune ESOP, including but not limited to the appointment and monitoring of the Trustee of the ESOP and the Tribune Employee Benefits Committee. Zell at some relevant times was also a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14), *inter alia*, because he was a Director and officer of Tribune, and a knowing participant in breaches of fiduciary duty.

## IV. FACT UAL BACKGROUND

### A.        Company History

28.      On <u>June 10, 1847</u>, the Tribune Company published its first edition of the Chicago *Tribune* in Chicago. In <u>1983</u>, the Tribune Company became a public company with an initial offering of 7.7 million shares valued at $206 million. At the time, it was one of the largest IPOs ever made. On <u>June 12, 2000</u>, the Tribune Company and the (Los Angeles) Times Mirror Company merged. This merger added seven daily newspapers to the Tribune Company's fold, including the Los Angeles *Times* and *Newsday* in New York.

29.      Prior to the Leveraged ESOP Transaction at issue, the Company's assets included the Los Angeles *Times*, the Chicago *Tribune*, the Baltimore *Sun*, *Newsday*, and other daily newspapers. In addition, the Company owned over 50 web sites; 25 television stations; a 31% stake in the Food Network; the Chicago Cubs baseball team; and significant holdings in real estate across the country.

### B.        The Strategic Alternatives Review Process

30.      In or about <u>September 2006</u>, the Tribune Company announced the creation of a "Special Committee" to oversee the process of evaluating strategic alternatives for the Company. Shortly thereafter, the Special Committee (through co-advisors Merrill Lynch and CitiGroup

Global Markets, Inc. ("Citi")) began inviting interest in an acquisition of the Company. Merrill Lynch and Citi requested preliminary bids by <u>October 27, 2006</u>. On <u>November 8, 2006</u>, Defendant EGI-TRB signed a confidentiality agreement with the Company, indicating its interest in pursuing a bid to acquire the Company.

31.     Merrill Lynch and Citi received approximately $35.8 million and $37 million, respectively, for their roles as advisors to the Special Committee. These companies received other financial benefits from the deal: after advising the Special Committee to select Zell's bid to take the Tribune Company private, both Merrill Lynch and Citi were among the companies that lent Zell the money to complete the transaction. For their role on that side of the deal, Merrill Lynch and Citi shared $47 million in fees with other banks involved in financing Zell's deal.

32.     By <u>December 12, 2006</u>, five parties maintained interest in purchasing the Company. Additional groups showed interest in purchasing parts of the Company. One such group, shareholder Chandler Trusts, proposed a spinoff of the Tribune Company's Broadcasting and Entertainment Group followed by an acquisition of the rest of the Company.

33.     After <u>December 12, 2006</u>, Merrill Lynch and Citi contacted the remaining interested parties to request final bids by <u>January 12, 2007</u>. Merrill Lynch and Citi also invited Chandler Trusts to formalize their proposal.

34.     On <u>January 20, 2007</u>, the Special Committee met to review the proposals that had been submitted to the Company. The Special Committee reviewed three proposals (including the proposal from Chandler Trusts) and a letter submitted by two major shareholders requesting that the Company continue as a public company, unless a transaction for the whole Company at a substantial premium with minimal closing risk could be obtained. The Special Committee determined that none of the proposals were satisfactory and directed the Company's financial advisors to seek improvements in the proposals, and also to analyze alternatives that the Company could implement on its own.

35.     On January 27, 2007, the Special Committee received an update on the process. Each of the three groups submitted improved proposals.  Management and the Company's advisors also reviewed a possible leveraged recapitalization of the Company and spin-off of the Broadcasting and Entertainment Group, under which the Company would pay a special dividend of $20 per share in cash prior to the spin-off.  On February 2, 2007, the Special Committee received a letter from two Foundations that were large shareholders expressing their preference for the recapitalization and spin-off plan and stating that they would consider increasing their ownership in the Company under that plan.

36.     ███████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ Nils Larsen, Managing Director of EGI, has also taken credit for coming up with the idea of an S-Corporation owned by an ESOP, claiming that he came up with the idea during a cell phone call with a colleague while he was in Miami in February 2007 to attend the Super Bowl.  Defendants Zell, EGI, and EGI-TRB designed most of the key features of the Leveraged ESOP Transaction, including the use of a leveraged ESOP as the linchpin for the Transaction, the Investor Rights Agreement to provide Zell with control of Tribune, and Zell's synthetic equity rights.  Defendants Zell, EGI, and EGI-TRB were involved in negotiating and drafting all of the Agreements comprising the Leveraged ESOP Transaction, even when they were not direct signatories to the Agreements. ██████ ████████████████████████████████████████████████ ██████████████████████████████████████████

37.     Defendants Zell, the Zell Entity, and EGI designed the key features of the 2007 Leveraged ESOP Transaction. In a press release dated December 19, 2007, Dennis FitzSimons, who was then CEO of Tribune, stated that "[i]t was Sam's creativity, personal commitment and investment that made this transaction possible."

13

38.    Zell's goals were to take control of Tribune with very little of his own money at risk, and then to avoid paying taxes at any level by turning Tribune into an S-Corporation that was owned by a tax-qualified ESOP.  Thus, on <u>February 2, 2007,</u> Defendants Zell and EGI-TRB proposed a leveraged buyout transaction using an ESOP in which they would take control of the Company at a price of $30 per share.

39.    On <u>February 12, 2007</u>, the Special Committee met and reviewed the alternatives available to the Company.  The Tribune Company management recommended proceeding with the recapitalization and spin-off plan.  At this meeting, Company management also reviewed revisions to the Company's financial outlook and shared this revised outlook with the parties that had submitted acquisition proposals.  In particular, management revised the outlook for the Company's publishing business ***downward***.

40.    While the bidding process was moving forward, Tribune's management and members of the Special Committee expressed concern about any deal that would require Tribune to take on a large debt load given the weakening business outlook for newspapers.  Contemporaneous news reports noted that the already depressed newspaper market was deteriorating even further.  For instance, a March 26, 2007 New York Times article reported that "[f]or newspapers, February was the cruelest month . . .[s]o far" because "[r]evenue from advertising was in striking decline . . . compared with February a year ago, and [] generally weaker than analysts had expected."  The New York Times went on to note that "the February results were 'not a blip on the screen'" and that "[i]t's fundamental, what's going on with newspapers." "Mirroring the slide in ad revenue is a long slow decline in circulation."  The article noted that newspaper circulation had reached its peak in 1984 and that circulation "losses have accelerated over the last two years."

41.    ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

███████████████████████████████████  ████████████

████████████████████████████

███████████████████ Larsen had previously stated that "this is a tough collection of assets to rationalize so buying right is key." In the end, Defendants Zell, EGI and EGI-TRB were willing to overlook the risks in the Transaction because Zell would be investing very little of his own money and because of the expected tax savings from the ESOP.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████

42.     Following the February 12, 2007 meeting, the Special Committee determined to recommend to the Board that the Company proceed with the recapitalization and spin-off plan, and that the Company not continue to pursue any other proposals, with the exception of the EGI-TRB proposal. On February 13, 2007, the Board authorized the Company to move forward with the recapitalization and spin-off plan.

43.     During this period, the Company's management and financial advisors continued to develop the potential ESOP transaction proposed by Defendants Zell, EGI, and EGI-TRB. The Company retained counsel to advise it on ESOP matters and hired Defendant GreatBanc on February 26, 2007 as the Trustee for a possible ESOP transaction. █████████████

███████████████████████████████████

███████████████████████ Tribune did not request that GreatBanc represent the ESOP as Trustee for purposes of the Leveraged ESOP Transaction proposed by Defendant Zell until March 28, 2007 – a mere four days before the Leveraged ESOP Transaction was signed.

44.     ███████████████████████████████████

███████████████████████████████████



45. GreatBanc retained Duff & Phelps as its financial advisor for the ESOP's proposed Transaction on or about March 8, 2007.

46. Through the end of February 2007, the Special Committee reviewed proposed terms of the ESOP transaction, as well as the proposed recapitalization and spin-off plan. The Special Committee sought the views of major shareholders the Chandler Trusts and the Foundations with respect to the EGI-TRB proposal. The Chandler Trusts and the Foundations

each expressed concerns about the timing and execution risk of the proposed ESOP transaction, and encouraged the Company to pursue the recapitalization and spin-off plan.

47.    On March 1, 2007, Defendant Zell made his first public statement acknowledging that he was working on a bid for Tribune. Defendant Zell confirmed that his plan involved creating an employee stock ownership plan (ESOP) and that the ownership would be "a partnership between myself and the ESOP."

48.    In early March 2007, Company representatives continued to discuss the terms and structure of the proposed transaction with representatives of Defendants EGI and EGI-TRB. On March 10, 2007, the Company informed Defendant EGI-TRB that it was reconsidering its comfort with the proposed ESOP transaction, including the level of leverage contemplated by the ESOP transaction. The Company began reconsidering the recapitalization and spin-off plan, due to its lower levels of leverage.

49.    At a meeting on March 21, 2007, the Company's advisors informed the Special Committee that the ESOP transaction involved substantially more debt than the recapitalization and spin-off transaction, although the two plans would be comparable with regard to cash flow available for debt repayment. The Company's advisors also informed the Special Committee that they expected that the credit rating agencies would rate the Company's debt in the proposed recapitalization and spin-off plan one level higher than they would rate the Company's debt in the proposed ESOP transaction.

50.    █████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████

51.    ███████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

17



52.

53.

54.

55.     Instead of a Solvency Opinion, on or about <u>April 1, 2007</u>, Duff & Phelps provided Defendant GreatBanc a so-called "Viability Opinion" that repeatedly states it is not a "solvency opinion" and does "not include the standard analyses and determinations typically included in a standard Duff & Phelps solvency opinion." Given that Duff & Phelps could not provide a "Solvency Opinion," GreatBanc could not rely on the "Viability Opinion" to conclude that Tribune Company would be solvent following the proposed Leveraged ESOP Transaction. ■

█████████████████████████████████████████████ should have set off alarm bells at GreatBanc.

56.    █████████████████████████████████████████

████████████████████████████████████████ Tribune, however, did not have this option – Tribune was required to obtain a Solvency Opinion as a condition for the proposed Transaction.  Therefore, Tribune needed to find a financial advisory company that would provide a Solvency Opinion on short notice.

57.    █████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████

58.    ████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████████
██████████████████████████

59.    ██████████████████████████████████████
██████████████████████████████████████-
████

60.    ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

19

██████████████████████████████████████████████████████████

██████

61.    ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████

62.    VRC issued two Solvency Opinions in connection with Step One of the Leveraged ESOP Transaction, one on <u>May 9, 2007</u>, and the other on <u>May 24, 2007</u>. The May 9 and May 24, 2007 Opinions analyzed Step One of the Transaction in a vacuum without factoring in any effects of Step Two. In other words, VRC concluded that Tribune would be solvent after purchasing 126 million shares for $4.3 billion in the Tender Offer. Obviously, the ESOP could take little comfort in knowing that Tribune would be solvent after Step One of the Transaction if the Company would be insolvent after Step Two.

63.    ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Two weeks before the Merger closed, the Wall Street Journal reported that VRC's projected EBITDA for 2008 was already off by 24%.

64.    ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

20



65. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████

66. ███████████████████████████████████
████████████████████████████████████████████
████████████████████████████

67. ████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

68.     Both Defendant GreatBanc and Duff & Phelps either reviewed VRC's Solvency Opinions or should have reviewed VRC's Solvency Opinions. █████████████████
████████████████████████████████████████████
████████████ Defendants Zell, EGI-TRB and EGI either reviewed VRC's Solvency Opinions or should have reviewed VRC's Solvency Opinions. █████████████████
████████████████████████████████████████████
██████████████

69. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████



70.     On <u>March 30, 2007,</u> the Special Committee and the Board of Directors met to review the two potential transactions. The Special Committee determined that the proposed Tribune ESOP transaction was more attractive, in particular due to the fact that the proposed price for the Tribune ESOP transaction was at the high end of the valuation ranges presented for the recapitalization and spin-off plan.

71.

**C.      The Leveraged ESOP Transaction**

72.     On <u>April 1, 2007,</u> after further negotiations between the Special Committee and the Board of Directors, Defendant EGI-TRB, and the ESOP Trustee, Defendant GreatBanc, the Board of Directors of the Tribune Company approved a proposed acquisition for $34 per share offered by Defendants Zell and EGI-TRB. On that date, Tribune, Defendant GreatBanc, Defendant Zell, Defendant EGI, Defendant EGI-TRB, and certain other parties, executed six

Agreements as part of the Leveraged ESOP Transaction: the ESOP Purchase Agreement, EGI-TRB/Zell Purchase Securities Agreement, the Voting Agreement, the Investor Rights Agreement, the Merger Agreement, and the Registration Rights Agreement (collectively "Leveraged ESOP Transaction"). The Leveraged ESOP Transaction consisted of a series of transactions to take place in two Steps, with Step One commencing on April 1, 2007, and Step Two closing on December 21, 2007, which resulted in the Tribune's shareholders being cashed out at $34 per share, Zell taking control of Tribune, and the ESOP assuming ownership of an insolvent Company.

73.     The Tribune Company's official press release on April 2, 2007, emphasized Defendant Zell's role in the Transaction. Tribune stated "Sam Zell is supporting the transaction with a $315 million investment." Defendant Zell is quoted in the press release as saying "I am delighted to be associated with Tribune Company . . . . As a long-term investor, I look forward to partnering with the management and employees as we build on the great heritage of Tribune Company."

74.     The Leveraged ESOP Transaction involved a complex series of interrelated agreements. Although the ESOP was not a party to each of these agreements, each agreement was part of the Leveraged ESOP Transaction and served as consideration for the overall Transaction, so that no single agreement within the Leveraged ESOP Transaction can be viewed in isolation. Each agreement referenced and incorporated other agreements that were part of the Leveraged ESOP Transaction. For example, the Tender Offer was included as one of the terms of the Merger Agreement between the Tribune ESOP, the Tesop, Tribune Company, and EGI-TRB. In addition, the ESOP Trustee, Defendant GreatBanc, participated in the negotiation of agreements on behalf of the Tribune ESOP even when the ESOP was not a direct party to the agreement, e.g., the terms of the Tender Offer.

## 1.     Step One Transaction: ESOP Purchase Agreement and Related Agreements

75.    On <u>April 1, 2007</u>, the ESOP bought 8.9 million unregistered shares from Tribune at $28 per share for a total payment of $250 million pursuant to the ESOP Purchase Agreement. These shares were not readily tradable.  The shares were imprinted with a legend stating that they could not be sold on the market.  Further, the Trustee agreed not to tender any ESOP shares as part of the upcoming Tender Offer.  At the time the Tribune ESOP purchased 8.9 million shares of unregistered stock from Tribune, there were over 240 million shares of Tribune trading on the New York Stock Exchange (NYSE).  Tribune shares continued to trade on the NYSE until the Step Two Transaction closed on <u>December 21, 2007</u>.  Upon consummation of the Merger in December 2007 (as described below), the 8,928,571 shares of the Company's common stock held by the Tribune ESOP were converted into 56,521,739 shares of common stock and represented all the outstanding shares of capital stock of the Company after the Merger.

76.    Although the Tribune ESOP purchased unregistered stock from Tribune Company on <u>April 1, 2007</u>, at less than the then-market price for Tribune's registered common stock, the ESOP's stock had restrictions which greatly diminished the value of the stock purchased by the ESOP, such that the ESOP paid more than adequate consideration.  The Tribune ESOP purchased shares that were unregistered and not readily marketable.  Unlike other shareholders (including EGI-TRB), the Tribune ESOP would not be eligible to participate in the Tender Offer Share Repurchase (described below).  Unlike other shareholders (other than EGI-TRB), the Tribune ESOP was subject to the Investor Rights Agreement (described below) restricting its ability to sells its shares (and also its power in corporate governance despite the fact that the ESOP owned 100% of the Company stock).  Unlike other shareholders, the Tribune ESOP was required to continue holding the stock after the completion of the Step Two Purchase Transaction, i.e., owning the stock of the Tribune Company after the Company was weighed down with billions of dollars in additional debt and would likely face serious liquidity problems.

77.    At the time the Tribune ESOP acquired approximately 9 million Tribune shares as part of the Step One Purchase Transaction, cash flow was down 12% through Q3, 2007, and

management had decided to eliminate the profit sharing plan contribution. The Company borrowed $7 billion (refinancing approximately $3 billion in existing debt and taking on approximately $4 billion in new debt) to redeem shares at $34 per share.

78.     On April 23, 2007, pursuant to the purchase agreement dated April 1, 2007 (the "Zell Entity Purchase Agreement"), Defendant EGI-TRB made an initial investment of $250 million in the Company in exchange for: (a) 1,470,588 shares of the Company's common stock at a price of $34 per share (which were repurchased as part of the Merger); and (b) an unsecured subordinated exchangeable promissory note of the Company in the principal amount of $200 million, which the Company repaid as part of the Merger (as described below). EGI-TRB received interest on the promissory note at the rate of 4.81% per annum paid quarterly prior to the close of the Step Two Transaction. Zell personally guaranteed EGI-TRB's investment under the Agreement. In addition, Tribune agreed to pay EGI-TRB's expenses for the Leveraged ESOP Transaction after the closing of the Step One and Step Two Transactions up to a total of $5 million. Pursuant to the Purchase Agreement, Zell was appointed as a member of the Tribune Board of Directors on May 9, 2007.

79.     The Voting Agreement dated April 1, 2007 provided that the Chandler Trusts (which owned approximately 20% of Tribune stock before the Transaction) would vote in favor of the Leveraged ESOP Transaction in consideration for the Trusts being able to sell their shares prior to the closing of the deal. The Chandler Trusts sold their Tribune shares in June 2007.

80.     On May 17, 2007, Tribune entered into a credit agreement with the bank lenders for a new $8 billion senior secured credit facility to provide the funds necessary for the stock repurchases for Step One and Step Two of the Leveraged ESOP Transaction.

81.     Pursuant to the Registration Rights Agreement, Tribune granted EGI-TRB and the ESOP the right to register their shares in the event that the Merger did not close. The ESOP would not be able to exercise its registration rights for one year.

82.    On <u>April 1, 2007</u>, the Tribune Company, EGI-TRB, and the Tribune ESOP entered into the Investor Rights Agreement granting Zell and EGI-TRB effective control over Tribune through special rights following the Merger relating to corporate governance, future stock transfers or sales, and certain corporate transactions despite the fact that the Tribune ESOP would own 100% of the Company stock after the Merger.  The Investor Rights Agreement guaranteed Zell at least two seats on the new company's nine-person Board of Directors, the election of himself as Chairman of the Board and Chief Executive Officer, and veto rights over any significant corporate transaction. Under the Investor Rights Agreement, Zell and EGI-TRB effectively held voting power over important corporate transactions.

83.    Specifically, the Company cannot engage in any of the following actions without Defendant Zell's approval pursuant to the Investor Rights Agreement:

(a)    amend, alter or repeal any provision of the Certificate of Incorporation or By-laws of the Company;

(b)    create, or authorize the creation of, or issue or obligate itself to issue shares of, any additional class or series of capital stock other than shares issued and sold to the Tribune ESOP at fair market value solely for purposes of maintaining its 51% equity ownership of the Company, on a fully diluted basis;

(c)    liquidate, dissolve or wind-up the business and affairs of the Company, or consent to any of the foregoing;

(d)    purchase or redeem (or permit any subsidiary of the company to purchase or redeem) or pay or declare any dividend or make any distribution on, any shares of capital stock of the Company other than (i) repurchases of stock from former employees, officers, directors, consultants or other persons who performed services for the Company or any subsidiary in connection with the cessation of such employment or service, (ii)

26

dividends or distributions necessary to enable the Tribune ESOP to make all payments due under the terms of the ESOP Loan Agreement as they come due, and (iii) repurchases of stock from the Tribune ESOP as required by the terms of the Tribune ESOP plan document;

(e)     engage in transactions with affiliates other than in their capacity as a stockholder, director, officer or employee of the Company, including any transaction, contract, agreement or arrangement between the Tribune ESOP and the Company, or any amendment or waiver thereof, other than the Investor Rights Agreement, the Merger Agreement, the ESOP Purchase Agreement, the ESOP Loan Agreement and the ESOP Pledge Agreement, and the transactions contemplated thereby;

(f)     make, or permit any subsidiary to make, any loan or advance to any subsidiary or other corporation, partnership or other entity unless it is wholly owned by the Company;

(g)     make, or permit any subsidiary to make, any loan or advance to any person, including, without limitation, any employee or director of the Company or any subsidiary of the Company except: (i) advances and similar expenditures in the ordinary course of business or under the terms of an employee stock option plan approved by the Tribune Board, (ii) notes that may be issued by the Company to participants of the Tribune ESOP under the terms of the Tribune ESOP, and (iii) financing provided to the Tribune ESOP;

(h)     guarantee, directly or indirectly, or permit any subsidiary of the Company to guarantee, directly or indirectly, any indebtedness except for trade accounts of the Company or any subsidiary of the Company arising in the ordinary course of business;

27

(i)    incur any aggregate indebtedness in excess of $250 million that is not already included in the Company's annual budget approved by the Tribune Board, other than trade credit incurred in the ordinary course of business;

(j)    acquire any assets or securities of any person in a transaction resulting in payments by the Company in an aggregate amount in excess of $250 million;

(k)    sell, assign, license, pledge or encumber any assets of the Company for an amount in excess of $250 million;

(l)    enter into any corporate strategic relationship involving the payment, contribution, or assignment by the Company or to the Company of money or assets greater than $250 million;

(m)    change the fiscal year of the Company; or

(n)    elect not to qualify, or continue to qualify as an S corporation.

84.    On April 1, 2007, the Tribune Company entered into a Voting Agreement with Chandler Trust No. 1 and Chandler Trust No. 2, pursuant to which Chandler Trust No. 1 and Chandler Trust No. 2 agreed, among other things, to vote their Tribune Company shares in favor of the Leveraged ESOP Transaction and not to support or solicit alternative transactions in consideration for registration rights.  On April 25, 2007, Tribune Company filed a shelf registration statement in connection with the Voting Agreement.

85.    On April 1, 2007, the Tribune ESOP, the Tesop Corporation (a subsidiary of the ESOP), the Tribune Company, and EGI-TRB entered into a Merger Agreement whereby the Tesop Corporation would be merged with and into the Company following the Tender Offer, with the remaining Tribune shareholders (other than the ESOP but including Zell/EGI-TRB) again receiving $34 per share for a total payment of approximately $4 billion.

86.    The Company's April 2, 2007 press release announcing the merger had the headline "Tribune to Go Private for $34 Per Share; Employee Stock Ownership Plan (ESOP)

28

Created; Sam Zell to Invest, Join Board; Chicago Cubs and Comcast SportsNet Interest to be Sold," and stated, in relevant part as follows:

> "With the completion of its strategic review process, the Company today announced a transaction which will result in the company going private and Tribune shareholders receiving $34 per share. Sam Zell is supporting the transaction with a $315 million investment. Shareholders will receive their consideration in a two-stage transaction.
>
> "Upon completion of the transaction, the company will be privately held, with an Employee Stock Ownership Plan ('ESOP') holding all of Tribune's then-outstanding common stock and Zell holding a subordinated note and a warrant entitling him to acquire 40 percent of Tribune's common stock. Zell will join the Tribune board upon completion of his initial investment and will become chairman when the merger closes.
>
> "The first stage of the transaction was a cash tender offer for approximately 126 million shares at $34 per share. The tender offer will be funded by incremental borrowings and a $250 million investment from Sam Zell... The second stage is a merger expected to close in the fourth quarter of 2007 in which the remaining publicly-held shares will receive $34 per share. Zell will make an additional investment of $65 million in connection with the merger, bringing his investment in Tribune to $315 million.
>
> "The board of directors of Tribune, on the recommendation of a special committee comprised entirely of independent directors, has approved the agreements and will recommend Tribune shareholder approval."

87.     Upon information and belief, valuation reports and other financial reports prepared in the course of the negotiations described above projected that the Tribune Company's financial results would continue to deteriorate.

88.     In an SEC filing on April 5, 2007, the Company disclosed that Zell would effectively have voting power over all major decisions, even though the ESOP owned 100% of the Company. Under the terms, transactions with a value of more than $250 million, among others, would require the approval of directors chosen by Zell.

89.     ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████

90.    On April 13, 2007, according to several sources, a letter was sent from Tribune CEO Dennis FitzSimons to the Wall Street Journal, indicating that the ESOP Trustee obtained a fairness opinion on both the price of the shares purchased by the Tribune ESOP and the relative price Defendant Zell "will have to pay to obtain his 40% stake in the company."

91.    Reaction to the Leveraged ESOP Transaction was swift and decidedly negative. Both Standard & Poor's and Fitch downgraded Tribune's credit rating and both rating agencies stated that they would downgrade further if the transaction proceeded as outlined.  On April 4, 2007, the Wall Street Journal questioned how Tribune would pay its debt after the Leveraged ESOP Transaction, stating: "The big question hanging over Tribune's $8.2 billion buyout deal unveiled Monday is this: How do they plan to do that, given that the newspaper industry faces uncertain prospects?  Financed almost entirely by debt, the buyout will leave the newspaper and TV concern staggering under more than $12 billion in debt, when existing borrowings are included.  That is about 10 times Tribune's annual cash flow, a ratio several times higher than typically carried by most media businesses."

92.    The same article quoted a Barclays Capital analyst as stating, "[w]e think it is possible that Tribune is leveraged higher than the total assets of the company after taxes."

93.    On April 3, 2007, the Wall Street Journal quoted an analyst with Gabelli & Co. as stating:  "I certainly hope no one else is thinking of doing what Tribune has done.  It's a mess." Further, on April 6, 2007, the New York Times called the Leveraged ESOP Transaction "one of the most absurd deals ever. . . ."

94.    On April 25, 2007, the Tribune Company commenced a Tender Offer to repurchase up to 126 million shares of the Company's common stock that were then outstanding at a price of $34 per share in cash (the "Tender Offer") for a total payment of about $4.3 billion. Although the Tender Offer was nominally made by the Tribune Company, the Tender Offer was part of the Leveraged ESOP Transaction.  Thus, the SEC Registration for the Tender Offer was filed by the Tribune Company, Sam Zell, EGI-TRB, the ESOP, and the Tesop Corporation.  The

30

$34.00 per share consideration in the Tender Offer and the Merger and other terms and conditions of the Merger Agreement resulted from negotiations among the Tribune Company, the Tribune ESOP, and EGI-TRB. The Tender Offer expired on May 24, 2007, and 126 million shares of the Company's common stock were repurchased and subsequently retired on June 4, 2007, returning approximately $4.3 billion of capital to shareholders and utilizing proceeds from the Credit Agreement. The Tender Offer was subject to the completion of financing arrangements, receipt of a solvency opinion and other customary conditions.

95.     On May 2, 2007, Tribune and Defendant Zell filed applications seeking the Federal Communications Commission ("FCC") consent to the transfer of control of Tribune, its subsidiaries, licenses, and authorizations to Zell, the Sam Investment Trust, and the ESOP.

96.     On May 9, 2007, Defendant Zell was appointed as a member of the Tribune Board, pursuant to the Zell Entity Purchase Agreement.

97.     At Tribune's annual shareholder meeting on May 9, 2007, a representative of the International Brotherhood of Teamsters, which at the time represented approximately 2,000 Tribune workers, asked Dennis FitzSimons, Tribune's CEO, whether the risks inherent in the Leveraged ESOP Transaction were being shared equally by Defendant Zell and Tribune workers, and expressed concern that Zell's equity investment was too small. FitzSimons responded: "We think that Sam's interests and the employees' interests are really aligned because employees will do well if Sam does well and vice versa." FitzSimons further stated that Zell will have put $315 million into the deal when it closes. The Teamsters representative responded by stating that "for employees, it's their livelihoods and their retirements, and for Mr. Zell it's one of many investments."

98.     A May 18, 2007 Financing Update to the Tribune Board of Directors (which now included Defendant Zell), stated that "the banks were having trouble selling the [$7.3 billion] term loan [to institutional investors] due to the size . . . and complexity of the transaction, as well as [Tribune's] advertising revenue decline in April." The bank lenders exercised their option to

raise the interest rate for the term loan and took the "highly unusual" step of selling the bonds at less than par value, thereby forfeiting almost half of their underwriting fees. Some observers questioned Zell's ability to close the Transaction. Randy Michaels forwarded a business journal report titled "Analyst Voices Doubt About Tribune Deal" to Pate and Larsen, along with his own comment – "I heard the bond market is getting dicey."

### 2. Step Two Purchase Transaction: August 2007 Merger Vote and December 2007 Merger

99.     Zell and EGI-TRB's only irrevocable commitment after the Merger was a loan of $225 million to the new company, less than 3% of the takeover price. EGI-TRB also purchased a warrant for $90 million which could be transferred to Zell and would allow Zell after ten years to purchase 40% of the new Tribune Company for $500 million (i.e., a strike price valuing Tribune's equity at $1.25 billion) with the ESOP to hold about 52% (the rest being reserved for management stock plans). The warrant's exercised price would increase by $10 million per year for the first ten years, for a maximum price of $600 million.

100.    Upon information and belief, the deterioration of the Company's financial performance accelerated between the Step One and Step Two of the Leveraged ESOP Transaction, as more fully described hereafter. Similarly, the "challenging industry backdrop" cited in the December, 2007 Goldman Sachs reports deteriorated further.

101.    As part of the Leveraged ESOP Transaction, Tribune shareholders had to approve the proposed Merger for Step Two of the Transaction to proceed. Pursuant to Delaware law, a majority of shares eligible to vote (approximately 127 million shares following the Tender Offer) was required.

102.    ████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████

32



103.    The shareholder vote on the Merger was held on <u>August 21, 2007</u>.  By then, Tribune's quarterly report for the quarter ending June 30, 2007, had been issued (on August 16, 2007) and the results painted a bleak picture.  As compared to 2006, operating profits for the first six months were down 28% and net cash flow was down over 40% from $472 million to $277 million.

In addition, Tribune's debt was trading at less than 80 cents on the dollar, meaning that the market believed that there was a serious risk of insolvency and implying that Tribune's stock would likely have no value if the Transaction went through.  GreatBanc, however, announced in the Proxy Statement that it would vote for and otherwise support the Merger.

104.

105.    Only about 58% of the outstanding shares (excluding shares owned by the ESOP) voted in favor of the Merger.  Upon information and belief, the Merger would not have been approved if GreatBanc had opposed the Merger.

106.    In the months between the Tender Offer and the close of the Merger, many of the parties with an interest in the Leveraged ESOP Transaction had second thoughts about the deal, but apparently not GreatBanc. █████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████

107.    GreatBanc had the right to halt Step Two of the Transaction.  The Merger Agreement itself allowed GreatBanc to terminate the Agreement thereafter under certain circumstances.  Sections 7.1(f),  7.1(a), 6.3(a), 3.9, and 3.1 of the Agreement in essence provide that if a "Company Material Adverse Effect" occurs before the closing of the Merger (which ultimately occurred on December 21, 2007), GreatBanc could terminate the Merger Agreement.  As a prudent trustee, GreatBanc was obliged to consider this alternative before the Merger closed.  Upon information and belief, GreatBanc never considered whether it was in the ESOP's best interest to halt the Merger.

108.    GreatBanc should have halted Step Two of the Transaction due to Company Material Adverse Effects.

109.    Tribune was insolvent when the Merger closed, which would have been obvious to GreatBanc if it had obtained a Bring-Down Opinion. ████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████████████

110.    In addition, Tribune breached one or more Company Representations, including a material representation about the ESOP.  The Company Representations in the Merger

34

Agreement include: "(i) each material Company Benefit Plan has been maintained and administered in compliance with . . . applicable Law, including ERISA and the Code to the extent applicable thereto, and in each case the regulations thereunder, . . . (vii) [the Company has not] engaged in a transaction in connection with which the Company . . . reasonably could be subject to either a civil penalty assessed pursuant to Section 409 or 502(i) of ERISA or a material Tax imposed pursuant to Section 4975 or 4976 of the Code. . . ." However, the ESOP did not comply with ERISA or the Code, and the Company violated both ERISA Section 409 and IRC Section 4975 by selling unregistered stock to the ESOP on April 1, 2007. Therefore, GreatBanc had the right to terminate the Merger Agreement due to Tribune's breach of its Representations.

111. On December 20, 2007, the Tribune ESOP completed the Merger. Pursuant to the terms of the Merger Agreement, each share of common stock of the Company, par value $0.01 per share, issued and outstanding immediately prior to the Merger, other than shares held by the Company, the Tribune ESOP, or the Merger Sub immediately prior to the Merger (in each case, other than shares held on behalf of third parties) and shares held by shareholders who validly exercised appraisal rights, was cancelled and automatically converted into the right to receive $34, without interest and less any applicable withholding taxes, and the Company became wholly owned by the Tribune ESOP.

112. Thus, on December 20, 2007, using only $315 million of his own money, Zell closed the $8.2 billion deal taking the Company private through an S corporation. An S Corporation is a "pass-through tax entity" taxed under Chapter 1, Subchapter S of the Internal Revenue Code. Profits of an S corporation are passed through to individual tax returns, and the profits are therefore reported and taxed by their shareholders. This structure thereby allowed the Company to avoid most corporate taxes, freeing up cash flow to pay down debt (which surged by billions as a result of the Leveraged ESOP Transaction). The Company thus became the largest 100% ESOP-owned S corporation, and the fifth largest majority employee-owned company in the United States.

35

113.    After the close of the Leveraged ESOP Transaction on December 20, 2007, Zell stated "I think the message is there's a new sheriff in town."

114.    In connection with the closing of the Leveraged ESOP Transaction, Zell held a press conference at which he referred to the transaction as the "deal from Hell."

115.    The Leveraged ESOP Transaction was characterized by Goldman Sachs as follows: "With an estimated annual interest expense (before adjustments for asset sales) of $1 billion and 2008 EBITDA of $1.147 billion, the transaction leaves little room for error, particularly given the extremely challenging industry backdrop."

116.    In commenting on the valuation paid by the Tribune ESOP, Goldman Sachs stated: "Based on our 2008 estimate of EBITDA, and assuming the company's other assets (Chicago Cubs, Food Network interest, CareerBuilder stake, etc.) are worth approximately $2.2 billion, Tribune's $34 go-private price represents a multiple of about 9.0x EBITDA. We view this as a very rich valuation in the context of the cyclical and secular changes facing the industry."

117.    According to industry analyst reports, the Tribune ESOP vastly overpaid in its acquisition of the Tribune Company. As stated by Lehman Brothers in its November 2, 2007 report on the publishing industry: "Should the Tribune privatization deal break and not occur, we believe that fair value on the stock, if it were to remain an ongoing public entity, would be significantly less than the current stock price [$34 per share]. Given the added $7 billion in debt to repurchase 126 million shares in the tender offer, we think fair value on the stock would be $7-$8 per share on our detailed sum-of-the-parts analysis...." Among the issues cited by Lehman Brothers in its November 2007 Publishing report are: "declining readership and circulation, declining advertising market share, a weak newspaper advertising revenue outlook (estimated down 8.0% in 2007 and down 5% in 2008), a total decoupling of newspaper advertising growth from nominal GDP growth, very tight cost containment already over the past seven years, and margins that are currently at pre-1990's levels on average due to secular issues."

36

118.    On <u>December 28, 2007</u>, the Company's SEC filing indicated that Zell, the Special Committee, and the Board of Directors created a $25 million pool for a management equity incentive plan to provide incentives for Tribune executives to complete the going-private transaction and retain them over a transition period.  Notably, then-Tribune CEO Dennis FitzSimons received about $3 million from this pool and a total of approximately $17.7 million in severance and other payouts.

119.    In the Merger, Defendant EGI-TRB received cash for the shares of the Company's common stock it had acquired pursuant to the Zell Entity Purchase Agreement and the Company repaid the exchangeable promissory note held by Defendant EGI-TRB, including approximately $6 million of accrued interest.  In addition, the Company paid to Defendant EGI-TRB a total of $5 million in legal fee reimbursements, of which $2.5 million was previously paid following the Share Repurchase described above.

120.    In this second step of the Leveraged ESOP Transaction, the Company was converted from a C corporation to an S corporation.  The Company then borrowed an additional $3.7 billion, and it acquired all outstanding shares not held by the Tribune ESOP, leaving the Company as a 100% privately owned S corporation.  The Company also redeemed Zell's initial $250 million loan.

121.    The Step Two Purchase Transaction had the effect of making the Tribune ESOP the ultimate purchaser of the Company's remaining shares at the price of $34 per share and, because the ESOP was the Company's sole remaining shareholder, left the ESOP with the risk created by the massive additional debt taken on to finance the highly-leveraged transactions.

122.    ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

 Duff & Phelps stated that the fair market value of the ESOP's 56,521,739 shares of new Tribune common stock was approximately $593 million.

123. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As of December 2007, Tribune's subordinated debt was trading at only 31.5% of face value. The subordinated debt traded at a steep discount because investors believed that Tribune would likely default on its debt obligations and subordinated debt-holders would receive little or no value in bankruptcy. Since even the subordinated debt-holders stood ahead of shareholders in the event of bankruptcy, the December 2007 market price of Tribune's subordinated debt implied that Tribune equity – the stock held by the ESOP – had no value whatsoever. ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

124. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

125. Upon the closing of the Merger, S&P and Moody's again lowered Tribune's bond rating. Moody's lowered its rating for some Tribune debt to "Caa2," which means the bonds are

of "poor standing," "may be in default," or there "may be present elements of danger with respect to principal and interest." In short, the Leveraged ESOP Transaction led both ratings agencies to doubt Tribune's viability as a going concern.

**D.     Zell's Synthetic Equity**

126.    As part of the Step Two Purchase Transaction, Zell and EGI made a $315 million investment in the form of a $225 million subordinated note with an 11- year maturity and the purchase of a warrant for $90 million upon completion of the Merger through Defendant EGI-TRB. EGI-TRB can transfer the warrant to Zell. The warrant can be exercised anytime within 15 years of issuance and gives Zell and EGI, through Defendant EGI-TRB, the right to acquire 40% of the Company (approximately 43,478,261 shares of common stock) from the Tribune ESOP. The exercise price of the warrant starts at $500 million (or approximately $11.50 per share) and increases by $10 million a year until it reaches $600 million, where it remains until it expires. Thereafter, Defendant EGI-TRB assigned minority interests in the subordinated promissory note and the warrant to certain of Zell's family, employees of EGI, and other business associates of Zell.

127.    The exercise price of the warrant provides a much lower value to the Company than reflected in the share prices paid by the Tribune ESOP as part of the 2007 Leveraged ESOP Transaction.

**E.     Credit Agreements**

128.    Prior to the Leveraged ESOP Transaction, the Company had approximately $4 billion in debt. After the Leveraged ESOP Transaction, the Company was approximately $13 billion in debt.

129.    On May 17, 2007, the Company entered into a **$8.028 billion** senior secured credit agreement, as amended on June 4, 2007 (collectively, the "Credit Agreement"). The Credit Agreement consisted of the following facilities: (a) a $1.5 billion Senior Tranche X Term Loan Facility (the Tranche X Facility"); (b) a $5.515 billion Senior Tranche B Term Loan

Facility (the "Tranche B Facility"); (c) a $263 million Delayed Draw Senior Tranche B Term

Loan Facility (the "Delayed Draw Facility"); and (d) a $750 million Revolving Credit Facility

(the "Revolving Credit Facility"). The Credit Agreement also provided a commitment for an

additional $2.105 billion in new incremental term loans under the Tranche B Facility (the

"Incremental Facility"). Accordingly, the aggregate amount of the facilities under the Credit

Agreement equaled **$10.133 billion in new debt**. On <u>June 4, 2007</u>, proceeds from the Tranche X

facility and the Tranche B Facility were used by the Company to consummate the Share

Repurchase and to refinance the Company's former five-year credit agreement and former bridge

credit agreement.

130.    On <u>June 29, 2007</u>, the Company repaid $100 million of the $1.5 billion of

borrowings under the Tranche X Facility. The remaining principal balance of the Tranche X

Facility was required to be repaid in an aggregate amount of $650 million on <u>December 4, 2008</u>,

and the remaining outstanding amount of the Tranche X Facility, if any, was required to be

repaid on <u>June 4, 2009</u>.

131.    On <u>December 20, 2007</u>, the Company entered into an agreement to obtain an

**additional $3.705 billion** in debt which was used by the Company to consummate the Merger.

F.    <u>**Probable Risk Factors Resulting from the Leveraged ESOP Transaction**</u>

132.    Defendants GreatBanc, Zell, EGI and EGI-TRB, and each of them, designed and

implemented the Leveraged ESOP Transaction for the benefit of Zell, not for the benefit of the

Tribune employees who are the participants in the Tribune ESOP. For example, in a

presentation to Chicago Tribune employees in early 2008 (as well as on other occasions), Zell

referred to himself as the "owner" of the Tribune Company even though the employees

themselves were ostensibly the owners of the Company. In this same presentation, Zell stated

that he was so rich that his lifestyle would not be affected if the Tribune ESOP transaction failed,

but acknowledged that the Tribune ESOP participants had much more at stake. For the Tribune

ESOP participants, the risk was that the Tribune Company would "go right down the elevator

40

shaft." Zell was willing to take great risks in the Tribune ESOP transaction because he personally had so little downside risk, but Plaintiffs and the ESOP participants were much more vulnerable if the Tribune ESOP failed.

133.    The Tribune Company eliminated employer matching contributions to the Tribune Company 401(k) Plan as a result of the Leveraged ESOP Transaction. Under the 401(k) Plan, the Tribune Company had contributed 4% of eligible pay and an additional company contribution ranging from 2% to 5% of eligible pay based upon Tribune Company's financial performance. Zell informed Tribune ESOP participants that "What would have been discretionary company contributions to 401(k) accounts going forward are what's financing the ESOP."

134.    As a result of the Leveraged ESOP Transaction, Zell and his accessories placed the Company in an unnecessarily insecure position, where probable risk factors could materially and adversely affect the Company's business, operating results, or financial condition.

135.    Among the material risks related to the Company's capital structure were significantly increased debt level and related debt service obligations. As a result, it was anticipated that the Company probably would not be able to generate sufficient cash to service or make required repayments of its indebtedness and it probably would be forced to take other actions to satisfy its obligations under its indebtedness which other actions may not be successful.

136.    Defendants GreatBanc, Zell, EGI, EGI-TRB, and each of them, failed to adequately consider the effect on the Tribune Company and the Tribune ESOP of the Company having taken on a crushing debt burden as part of the Leveraged ESOP Transaction. These Defendants recognized or should have recognized the risk of a serious liquidity problem caused by increased debt payments and the risk of default.

137.    In 2007, publishing represented 72% of the Company's consolidated revenues; advertising accounted for about 78% of those revenues. Also in 2007, publishing operating

41

revenues decreased 9% primarily due to a decrease in advertising revenue.  Planning for 2008, the Company anticipated that it would experience accelerating decline in publishing operating revenues.  The Company's increased leverage and the anticipated decline in publishing operating revenues materially exposed the Tribune ESOP to increased risk, particularly during periods of downturns in the Company's business or in the economy generally.  Because the Company's cash flows would likely decrease in 2008, material risk to the Tribune ESOP was heightened as its required principal repayments in respect of indebtedness were not anticipated to change, and its interest expense obligations were anticipated to increase due to increases in interest rates.

### G.    The Company's Operations Continued to Deteriorate Following the Merger

138.    On February 12, 2008, Zell announced to employees that the Company would eliminate all employer contributions to the 401(k) plan.

139.    Since the Leveraged ESOP Transaction, the Tribune Company eliminated over 4,000 jobs in several staff cuts at its newspapers, particularly the Los Angeles *Times*.

140.    On February 13, 2008, Zell suggested in a memo that the moves reflected the reality of the Tribune Company's significant debt levels.  Zell announced that the Tribune Company would cut its staff by 2%, including approximately 150 jobs from the Los Angeles *Times*.  In May 2008, the Company announced its quarterly earnings for the First Quarter of 2008.  Newspaper sales declined 11%.  All print advertising categories showed some acceleration of their decline in the first quarter compared to the fourth quarter of 2007.  Newspaper EBITDA fell 37%.

141.    On April 4, 2008, *Reuters* reported that the Tribune Company faced serious risk of defaulting on its debt as early as October, 2009.  The report cited the nearly $4 billion in debt and interest payments due by the end of 2009, and the Company's credit rating, which was lowered by Standard and Poor's on March 17, 2008 from "B" to "B-" with a negative outlook.

42

142.    In June 2008, the Company announced that the Los Angeles *Times* building and the Chicago Tribune Tower were up for sale. The Company also announced that it would reduce by 500 the number of pages dedicated to news each week across all of its newspapers.

143.    On July 1, 2008, the Company and one of its subsidiaries borrowed $225 million under a trade receivables securitization facility.  On July 3, 2008, the Company used the net proceeds of that facility to repay borrowings under its Tranche X Facility.

144.    On July 2, 2008, the Tribune Company announced another round of mass layoffs, including 250 from the Los Angeles *Times*.  On July 13, 2008, David Hiller resigned as publisher of the Los Angeles *Times* and Ann Marie Lipinski resigned as editor of the Chicago *Tribune*.

145.    On July 14, 2008, the Associated Press reported that the Los Angeles *Times* planned to cut 250 positions.  It also stated that: "Last December, Tribune bought out its public shareholders in an $8.2 billion deal orchestrated by real estate mogul Sam Zell.  Now, he and the company are struggling to service that debt."

146.    On August 13, 2008, the Company reported its Second Quarter results. Company revenues decreased 6%, with publishing operating revenues down $83 million, or 11%, from its 2007 level.

147.    On August 16, 2008, the Chicago *Tribune* reported that 80 editorial positions would be eliminated.

148.    On October 27, 2008, the Los Angeles *Times* fired an additional 75 members of the editorial staff as part of a 200 employee reduction that began the week of October 20, 2008. The reduction represented 10% of the paper's editorial staff, and left its total newsroom staff at approximately 660, according to a *Times* report.

149.    On November 7, 2008, the Wall Street Journal and other publications reported that the Tribune Company announced that it was willing to sell a smaller share of the Chicago Cubs than it had previously planned.  As early as April 2007, Zell had discussed his plan to sell a 95% stake in the Chicago Cubs and Wrigley Field in order to help finance the debt acquired in

the go-private transaction.  The <u>November 7, 2008</u> reports noted that, given the credit crisis, the Company would potentially be willing to sell a 50% stake in the Cubs franchise.

150.    On <u>November 11, 2008</u>, Standard & Poor's lowered the Tribune Company's credit rating two levels - eight levels from its initial investment grade -  from "B-" to "CCC," or highly speculative, with a negative outlook. Citing the difficulty of further asset sales and the Tribune Company needs to repay debt, Standard & Poor's noted the likelihood that the Tribune Company could violate a debt covenant in the current quarter by stating: "Leverage levels are high enough, and expected EBITDA declines large enough, that Tribune is unlikely to continue to service its current capital structure over the intermediate term, even with significant asset sales."

151.    On <u>December 8, 2008</u>, the Tribune Company filed a voluntary petition under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, Case No. 08-13141, because the Company was unable to service the crushing debt burden created by the ESOP transactions.

152.    Both the U.S. Department of Labor and the Internal Revenue Service have commenced investigations of the 2007 Leveraged ESOP Transaction.  Upon information and belief, the Department of Labor and the IRS are investigating possible violations of ERISA fiduciary duties and the Internal Revenue Code, respectively, arising out of the 2007 Leveraged ESOP Transaction.  Upon information and belief, the Department of Labor, *inter alia*, has subpoenaed documents from the Tribune Company, Defendant GreatBanc, and Duff & Phelps.

**H.    The Zell Entity is an Alter Ego of Zell and/or EGI**

153.    At all relevant times, Zell was and is the President of the Zell Entity and its controlling executive officer.  At all relevant times, Zell was the Chairman of EGI and its controlling officer.

154.    There exists, and at all times herein mentioned, there existed, a unity of interest between Zell and the Zell Entity (EGI-TRB), and between EGI and EGI-TRB, such that any

44

individuality and separateness between Zell and the Zell Entity or between EGI and EGI-TRB has ceased, and the Zell Entity is the alter ego of Zell and/or EGI. EGI-TRB is wholly-owned by the Sam Investment Trust, ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████. The Zell Entity has no board of directors. Zell is the President and one of only three executive officers. The other two executive officers work for Zell at EGI. Upon information and belief, EGI-TRB has no employees. ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████ In addition, EGI's attorneys represented EGI-TRB in the Leveraged ESOP Transaction. EGI has also been paying EGI-TRB's attorneys fees for this action. On information and belief, Zell and/or EGI control the Zell Entity.

155.    Defendant Zell stated that he personally was the "investor" in the Leveraged ESOP Transaction rather than EGI-TRB. Tribune Company also identified Zell as making an investment in Tribune as part of the Transaction.

156.    Defendant EGI-TRB was created by Defendants Zell and/or EGI solely for the purpose of Zell taking control of Tribune and with the intent to shield Zell and/or EGI from liability for legal violations in the Transaction, including claims for violations of ERISA and claims for fraudulent conveyance.

157.    Defendant EGI-TRB has little or no capitalization or insurance, and was not adequately capitalized for its undertakings in the Leveraged ESOP Transaction. As a result, Tribune required Defendant Zell to personally guarantee monetary commitments by EGI-TRB as part of the Transaction.

158.    Adherence to the fiction of the separate existence of the Zell Entity as an entity distinct from Zell and/or EGI would permit an abuse of corporate privilege and would promote injustice. Indeed, the Zell Entity is, and at all times mentioned herein was, a mere shell,

45

instrumentality, and conduit through which Zell and/or EGI carried on their business in the corporate name, while exercising complete control and dominance of such business to such extent that any individuality or separateness of the Zell Entity does not, and at all times herein mentioned did not, exist.

## V.    CLASS ACTION ALLEGATIONS

159.    Plaintiffs seek certification, under Fed. R. Civ. P. 23 (a) and (b), of a class as identified below.

160.    Plaintiffs bring this action on behalf of themselves and a putative class consisting of:

> **All individuals who are or, at any time on or after the 2007 Leveraged ESOP Transaction, were (1) participants in the Tribune ESOP who received or were entitled to an allocation to their ESOP Stock Account and/or ESOP Cash Account; or (2) beneficiaries of such participants.  Excluded from the class are Defendants and their affiliates; the officers and directors of any Defendant or of any entity in which a Defendant has a controlling interest; and legal representatives, successors, and assigns of any such excluded persons.**

161.    The members of the proposed class are so numerous that joinder of all members is impracticable.  While the exact numbers of members in the proposed class are unknown to Plaintiffs at this time, such information can be ascertained from records maintained by Defendants and their agents.  As of December 31, 2007, the Tribune ESOP had over 10,000 participants according to the 2007 Form 5500 filed with the U.S. Department of Labor by Tribune Company. Plaintiffs estimate that the putative class encompasses over 10,000 of the Tribune Company's current and former employees.

162.    Common questions of law and fact exist as to all members of the putative class, including, *inter alia*:

> a.    whether Defendant GreatBanc breached its fiduciary duties under ERISA;

46

b.    whether Defendants Zell, EGI-TRB and EGI knowingly participated in breaches of fiduciary duties under ERISA;

c.    whether Defendants engaged in prohibited transactions in violation of ERISA;

d.    whether the Tribune ESOP paid more than adequate consideration for the Tribune stock purchased in the 2007 Transactions; and

e.    The appropriate measure of injunctive relief, restitution and/or damages.

163.   There are no substantial individual questions among the class claims on the merits of this action, and Plaintiffs are not aware of any conflicts between themselves and the putative class members.

164.   Plaintiffs' claims are typical of the claims of the members of the putative class, as Plaintiffs and all other members of the putative class were harmed by Defendants' wrongful conduct. Plaintiffs are aggrieved by the breaches of fiduciary duties they and all other class members have suffered at Defendants' hands, and are intent on seeing such wrongs remedied. Plaintiffs therefore are committed to fairly, adequately, and vigorously representing and protecting the interests of the members of the class, and have retained counsel competent and experienced in class action litigation of this nature for this purpose. Neither Plaintiffs nor their counsel have any interests that might cause them to refrain from vigorously pursuing the claims in this class action. Thus, Plaintiffs are adequate representatives of the class.

165.   Class certification of Plaintiffs' Claims for Relief is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

47

166.     Class certification of Plaintiffs' Claims for Relief also is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole.  The members of the Class are entitled to declaratory and injunctive relief to remedy Defendants' fiduciary violations.

167.     On information and belief, the names and addresses of the class members are available from Defendants, and adequate notice can be provided to members of the class to the extent required by Fed. R. Civ. P. 23.

## VI.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**[Breach of Fiduciary Duty Under ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3) Against Defendant GreatBanc, and Knowing Participation in Breaches of Fiduciary Duty Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) Against Defendants Zell, EGI, and EGI-TRB]**

168.     Plaintiffs incorporate Paragraphs 1-167 as though set forth herein.

169.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires, *inter alia,* that a plan fiduciary discharge his, her, or its duties with respect to a plan solely in the interest of the participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

170.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia,* that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

171.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring an action for relief under ERISA § 409.

172.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring an action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

173.    Defendant GreatBanc breached its duties of loyalty and prudence under ERISA § 404(a), 29 U.S.C. § 1104(a).  These breaches include but are not limited to the following: using the Tribune ESOP as a takeover vehicle for Zell; causing the Tribune ESOP to implement the Leveraged ESOP Transaction even though it was not in the Tribune ESOP participants' best interests; causing the Tribune ESOP to pay more than fair market value for Tribune stock in the 2007 Leveraged ESOP Transaction; failing to conduct a thorough and independent review and adequately consider whether the 2007 Leveraged ESOP Transaction was in the best interests of the ESOP participants; rushing the 2007 Leveraged ESOP Transaction to accommodate a timeframe imposed by Tribune; including terms in the 2007 Leveraged ESOP Transaction that were not in the Tribune ESOP participants' best interests, but rather were included for the benefit of Zell and other parties; ███████████████████████████████████  ███████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████ failing to make certain that reliance on any and all valuation experts' advice was reasonably justified under the circumstances of the 2007 Leveraged ESOP Transaction; failing to make certain that reliance on any and all other experts' advice was reasonably justified under the circumstances of the 2007 Leveraged ESOP Transaction; failing to adequately consider how the massive debt and excessive leverage taken on to finance the 2007 Leveraged ESOP Transaction affected the value of the Tribune stock acquired by the Tribune ESOP; failing to adequately consider the risk posed by the massive debt and excessive leverage taken on to finance the 2007 Leveraged ESOP Transaction and how this risk affected the prudence of the proposed transaction; failing to adequately consider the serious

liquidity problems the Tribune Company would likely face following the 2007 Leveraged ESOP Transaction; failing to adequately consider whether the Tribune Company would be able to continue or expand its business operations and also service the enormous debt created by the 2007 Leveraged ESOP Transaction; failing to adequately consider the Tribune Company's ability to service the enormous debt created by the 2007 Leveraged ESOP Transaction given that financial projections available at the time of the 2007 Leveraged ESOP Transaction predicted that the Company's income and other financial measures would continue to deteriorate;

██████████████████████████████████████████████████████

█████████████████; ████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████; proceeding with the Leveraged ESOP Transaction even though the bond market and rating agencies indicated that the Transaction would create a serious risk of insolvency; failing to adequately consider whether the 2007 Leveraged ESOP Transaction was prudent in light of the deterioration of the general economy, the newspaper and media industries, and/or the Tribune Company's operations; failing to adequately consider whether the Tribune ESOP should proceed with the Step Two Purchase Transaction in light of the accelerating deterioration of the general economy, the newspaper and media industries, and/or the Tribune Company's operations between the date of the Step One Purchase Transaction and the Step Two Purchase Transaction; failing to terminate the Merger due to a "Company Material Adverse Effect;" failing to obtain a Bring-Down Opinion prior to the close of the Transaction; failing to terminate the Merger even though Tribune Company was insolvent at the close of the Merger; failing to adequately consider the prudence of the 2007 Leveraged ESOP Transaction in light of the difficulties in placing the debt for the transaction; and failing to make an honest, objective effort to read the valuation reports and/or solvency opinions,

50

understand them, and question the methods and assumptions that did not make sense; failing to act with an eye single to the best interest of the ESOP participants; and failing to act solely in the interest of ESOP participants.

174.    Defendant GreatBanc is also liable as a co-fiduciary with respect to each fiduciary violation by any other fiduciary of the Plan under ERISA § 405, 29 U.S.C. § 1105, to the extent that:  (a) such fiduciary has participated knowingly in, or has knowingly undertaken to conceal, an act or omission of any other fiduciary, knowing such action is a breach; (b) by his, her, or its failure to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), he, she, or it has enabled such other fiduciary to commit a breach; or (c) if he, she, or it has had knowledge of a breach by any other fiduciary, unless he, she, or it has made reasonable efforts under the circumstances to remedy the breach.

175.    Defendants Zell, EGI and EGI-TRB knowingly participated in the prohibited transactions and breaches of fiduciary duty alleged herein in violation of ERISA § 502(a)(3), 29 U.S.C. §1132(a)(3).  Defendants Zell, EGI and/or EGI-TRB's knowing participation included but was not limited to coming up with the idea of a leveraged buyout of Tribune using an S-Corporation owned by an ESOP; designing the Leveraged ESOP Transaction; using the Tribune ESOP as a takeover vehicle for Zell; designing the Leveraged ESOP Transaction to shift the financial risks of the Transaction to other parties; applying for a transfer of Tribune's FCC licenses as part of the Transaction; █████████████████████████████████████ ██████████████████████████████ ████████████████████████ ██████████████████████████████████ ███████████████████████████████████ ████████████████████████████ ██████████████████████████████████ ████████████ ████████████████████████

51

██████████████████████████████████████████████████; and

proceeding with the Transaction even though the excessive debt and leverage created a severe

risk of insolvency for Tribune following the Transaction.

176.     Defendants Zell, EGI and EGI-TRB profited from the fiduciary violations alleged

herein in an amount to be proven at trial by receiving payment of approximately $5 million in

expenses from Tribune pursuant to the Zell Entity Purchase Agreement, by receiving payment of

interest on the $200 million promissory note given by Tribune as part of the Step One

Transaction, by receiving payment of interest on the $225 million promissory note given by

Tribune as part of the Step Two Transaction, and/or by receiving more than fair market value for

Tribune shares as part of the Step Two Transaction.

177.     Defendants Zell, EGI and EGI-TRB profited from the fiduciary violations alleged

herein in an amount to be proven at trial by selling Tribune stock as part of the Step Two

Transaction.

178.     The actions of Defendant GreatBanc caused millions of dollars of losses to the

ESOP in an amount to be proven more specifically at trial.

### SECOND CLAIM FOR RELIEF
### [Engaging in Prohibited Transaction Forbidden by ERISA §§ 406(a)-(b), 29 U.S.C. §§ 1106(a)-(b), Against All Defendants]

179.     Plaintiffs incorporate Paragraphs 1-178 as though set forth herein.

180.     ERISA § 406(b), 29 U.S.C. § 1106(b), mandates that a plan fiduciary shall not

"act in any transaction involving the plan on behalf of a party (or represent a party) whose

interests are adverse to the interests of the plan or the interests of its participants," or "deal with

the assets of the plan in his own interest or for his own account," or "receive any consideration

for his own personal account from any party dealing with such plan in connection with a

transaction involving the assets of the plan."

181.     ERISA § 406(a), 29 U.S.C. § 1106(a), requires that a plan fiduciary "shall not

cause the plan to engage in a transaction, if he knows or should know that such transaction

constitutes a direct or indirect sale or exchange, or leasing of any property between the plan and a party in interest," or a "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."

182.    ERISA § 406(a), 29 U.S.C. § 1106(a) further states "Except as provided in [ERISA § 408]: (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title."

183.    ERISA § 408(e), 29 U.S.C. § 1108(e), provides a conditional exemption from the prohibited transaction rules for sale of employer securities to or from a (1) "an eligible individual account plan," (2) the stock purchased was a "qualifying employer security", and (3) the sale is for no more than adequate consideration.

184.    The statutory definition of "employee stock ownership plan," ERISA § 407(d)(6), incorporates "such other requirements as the Secretary of Treasury may prescribe by regulation." In addition, the applicable Department of Labor Regulation, 29 C.F.R. § 2550.407d-6, provides that "[a] plan constitutes an ESOP for a plan year only if it meets such other requirements as the Secretary of Treasury may prescribe by regulation under section 4975(e)(7) of the [IRC]." IRC § 4975(e)(7), in turn, requires an employee stock ownership plan to "invest primarily in qualifying employer securities," and IRC § 4975(e)(8) defines "qualifying employer security" to mean "an employer security within the meaning of [IRC] section 409(l)." IRC section 409(l) requires that an ESOP purchase "common stock issued by the employer . . . which is readily tradable on an established securities market." 26 U.S.C. § 409(l). An ESOP is only permitted to purchase unregistered shares "if there is no readily tradable common stock."

185.    ERISA § 3(18)(B) defines adequate consideration as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary." ERISA's legislative history and existing case law make clear that ERISA § 3(18)(B) requires that the price paid must reflect

the fair market value of the asset, and the fiduciary must conduct a prudent investigation to determine the fair market value of the asset.

186.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia,* that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

187.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring a suit for relief under ERISA § 409.

188.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring a suit to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

189.    Defendant GreatBanc engaged in a prohibited transaction by causing the Tribune ESOP to purchase unregistered stock from Tribune at a time that readily-tradable stock was available on the New York Stock Exchange.

190.    Defendant GreatBanc engaged in a prohibited transaction in violation of ERISA §§ 406(a)-(b), 29 U.S.C. §§ 1106(a)-(b), by failing to ensure that the Tribune ESOP paid no more than adequate consideration for Tribune stock in the 2007 Leveraged ESOP Transaction and by causing the Tribune ESOP to engage in the prohibited transactions described in the paragraphs below.

191.    Defendants Zell, EGI-TRB, and EGI knowingly participated in the prohibited transactions alleged herein.

192.    Defendants Zell, EGI-TRB, and EGI profited in an amount to be proven at trial from the prohibited transaction by receiving more than adequate consideration for Tribune stock sold directly or indirectly to the Tribune ESOP in the 2007 Leveraged ESOP Transaction.

54

193.    Defendants Zell, EGI, and EGI-TRB profited in an amount to be proven at trial from the prohibited transactions alleged herein by receiving payment of approximately $5 million in expenses from Tribune pursuant to the Zell Entity Purchase Agreement, by receiving payment of interest on the $200 million promissory note given by Tribune as part of the Step One Transaction, and by receiving payment of interest on the $225 million promissory note given by Tribune as part of the Step Two Transaction.

194.    Defendants GreatBanc, Zell, and EGI-TRB engaged in a prohibited transaction in violation of ERISA § 406(a)(1)(D) because the Leveraged ESOP Transaction constituted a direct or indirect use of plan assets for the benefit of Zell, and EGI-TRB.  In addition, certain agreements that were component parts of the Leveraged ESOP Transaction constituted a direct or indirect use of ESOP assets for the benefit of Zell, and EGI-TRB including the Investor Rights Agreement. The Investor Rights Agreement, *inter alia*, required the Tribune ESOP to vote its Tribune stock in favor of two directors designated by EGI-TRB and Zell himself as a director, and vote against the removal of any EGI-TRB Director.

195.    Defendants GreatBanc, Zell, and EGI-TRB engaged in a prohibited transaction in violation of ERISA §§ 406(a) and 406(b), because of the consideration received by Zell and EGI-TRB as part of the Step Two Purchase Transaction, including but not limited to the repurchase of Tribune Company shares, synthetic equity grant, and payment of expenses associated with the Leveraged ESOP Transaction.

196.    Defendant GreatBanc caused millions of dollars of losses to the Tribune ESOP by the prohibited transactions in an amount to be proven more specifically at trial.

197.    Defendant GreatBanc is also liable as a co-fiduciary with respect to each fiduciary violation by any other fiduciary of the Tribune ESOP under ERISA § 405, 29 U.S.C. § 1105, to the extent that:  (a) any fiduciary has participated knowingly in, or has knowingly undertaken to conceal, an act or omission of any other fiduciary, knowing such action is a breach; (b) by his, her, or its failure to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), he, she, or it has

enabled such other fiduciary to commit a breach; or (c) if he, she, or it has had knowledge of a breach by any other fiduciary, unless he, she, or it has made reasonable efforts under the circumstances to remedy the breach.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against Defendants, and each of them, on each Claim for Relief and for the following relief:

**As to the First Claim for Relief:**

A.     Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23;

B.     Declare that Defendants, and each of them, have breached their fiduciary duties to the Plaintiff Class and/or knowingly participated in breaches of fiduciary duty;

C.     Enjoin Defendants, and each of them, from further violations of their fiduciary responsibilities, obligations, duties, and/or knowing participation in such violations;

D.     Issue a preliminary and permanent injunction removing Defendants, and each of them, as members of the Plan Committee or Trustees of the Tribune ESOP and/or barring Defendants, and each of them, from serving as members of the Plan Committee or Trustees of the Tribune ESOP in the future, and appointing independent fiduciaries as Trustees and members of the Plan Committee;

E.     Issue a preliminary and permanent injunction barring Defendants, and each of them, from serving as a fiduciary of any ERISA plan sponsored by Tribune for a period to be determined by the Court;

F.     Issue a preliminary and permanent injunction barring Defendants, and each of them, from serving as a fiduciary of any ERISA plan for a period to be determined by the Court;

G.     Order that Defendant GreatBanc and/or other fiduciaries make good to the Tribune ESOP and/or to any successor trust(s) the losses resulting from its breaches of fiduciary duty;

56

H.      Order that Defendants, and each of them, disgorge any profits that they have made through breaches of fiduciary duty or knowing participation in breaches of fiduciary duty, and impose a constructive trust and/or equitable lien on any funds received by any of the Defendants in the course of or as a result of fiduciary breaches or knowing participation in such breaches, including, but not limited to, professional fees, expense reimbursements, and interest payments;

I.      Order that Defendants, and each of them, provide other appropriate equitable relief to the Tribune ESOP, including but not limited to, by forfeiting their Plan accounts, providing an accounting for profits, or imposing a constructive trust and/or equitable lien on any funds wrongfully held by any of the Defendants;

J.      Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

K.      Order Defendant Fiduciaries to pay prejudgment interest; and

L.      Award such other and further relief as the Court deems equitable and just.

**As to the Second Claim for Relief:**

A.      Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23;

B.      Declare that Defendants, and each of them, have breached their fiduciary responsibilities and/or duties as parties in interest to the Plaintiff Class;

C.      Enjoin Defendants, and each of them, from further prohibited transactions and violations of their fiduciary responsibilities, obligations and duties;

D.      Issue a preliminary and permanent injunction removing Defendants, and each of them, as members of the Plan Committee and/or Trustees of the Tribune ESOP and/or barring Defendants, and each of them, from serving as members of the Plan Committee or Trustees of

57

the Tribune ESOP in the future, and appointing independent fiduciaries as Trustees and members of the Plan Committee;

      E.      Issue a preliminary and permanent injunction barring Defendants, and each of them, from serving as a fiduciary of any ERISA plan sponsored by Tribune for a period to be determined by the Court;

      F.      Issue a preliminary and permanent injunction barring Defendants, and each of them, from serving as a fiduciary of any ERISA plan for a period to be determined by the Court;

      G.      Declare that Defendants, and each of them, engaged in prohibited transactions in violation of ERISA §§ 406(a)-(b), 29 U.S.C. §§ 1106(a)-(b), by causing the ESOP to purchase unregistered stock not readily tradable on any established securities market, to purchase Tribune stock for more than adequate consideration, and/or agreeing to restrict the ESOP's voting rights for shares held in the ESOP for the benefit of Zell, EGI-TRB and/or EGI;

      H.      Order Defendant GreatBanc and/or other fiduciaries to make good to the Tribune ESOP and/or to any successor trust(s) the losses resulting from its breaches of fiduciary duty;

      I.      Order that Defendants, and each of them, disgorge any profits that they have made through prohibited transactions, and impose a constructive trust and/or equitable lien on any funds received by any of the Defendants in the course of or as a result of prohibited transactions, including, but not limited to, professional fees, expense reimbursements, and interest payments.

      J.      Order that Defendants, and each of them, provide other appropriate equitable relief to the Tribune ESOP, including but not limited to, by forfeiting their Plan accounts, providing an accounting for profits, imposing a constructive trust and/or equitable lien on any funds wrongfully held by any of the Defendants, and/or tracing the Tribune ESOP's assets received by parties-in-interest;

      K.      Order Defendants to pay prejudgment interest.

L.      Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund; and

M.      Award such other and further relief as the Court deems equitable and just.


Dated: April 29, 2010                             Respectfully submitted,



                                        By:     /s/ *Michael M. Mulder*
                                                Michael M. Mulder
                                                Attorney for Plaintiffs and the Class


THOMAS R. MEITES                          JOSEPH W. COTCHETT
Trmeites@mmmglaw.com                      jcotchett@cpmlegal.com
MICHAEL M. MULDER                         PHILIP L. GREGORY, Pro Hac Vice
Mmmulder@mmmglaw.com                      pgregory@cpmlegal.com
PAUL W. MOLLICA                           **COTCHETT, PITRE & McCARTHY**
Pwmollica@mmmglaw.com                     San Francisco Airport Office Center
JAMIE S. FRANKLIN                         840 Malcolm Road, Suite 200
Jfranklin@mmmglaw.com                     Burlingame, CA 94010
HINA SODHA                                Telephone: (650) 697-6000
Hsodha@mmmglaw.com                        Facsimile: (650) 697-0577
**MEITES, MULDER, MOLLICA &**
**GLINK**
20 S. Clark Street, Suite 1500
Chicago, IL 60603
Telephone: (312) 263-0272
Facsimile: (312) 263-2942

DANIEL FEINBERG, Pro Hac Vice
dfeinberg@lewisfeinberg.com
TODD JACKSON, Pro Hac Vice
tjackson@lewisfeinberg.com
NINA WASOW, Pro Hac Vice
nwasow@lewisfeinberg.com
ANGELICA K. JONGCO, Pro Hac Vice
ajongco@lewisfeinberg.com
**LEWIS, FEINBERG, LEE, RENAKER &**
**JACKSON, P.C.**
1330 Broadway, Suite 1800
Oakland, California 94612
Telephone: (510) 839-6824
Facsimile: (510) 839-7839

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, certify that on May 7, 2010, a true and correct copy of the foregoing PLAINTIFFS' THIRD AMENDED COMPLAINT was filed electronically with the Clerk of the Court for the United States District Court for the Northern District of Illinois through ECF. ECF will send an e-notice on the following parties:

David J. Bradford
Craig Christopher Martin
Barry Levenstam
Douglas Sondgeroth
JENNER & BLOCK, LLP
353 N. Clark Street
Chicago, IL 60654

Charles C. Jackson
Theodore M. Becker
James E. Bayles, Jr.
Gregory P. Abrams
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Dr., 5th Floor
Chicago, IL 60601

<u>/s/ Michael M. Mulder</u>