**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAN NEIL and ERIC BAILEY, individuals, on behalf of themselves and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 08 C 6833 |
| SAMUEL ZELL; GREATBANC TRUST COMPANY, a Delaware corporation; EGI-TRB, L.L.C, a Delaware corporation, | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Defendant, GreatBanc, trustee of the Tribune Employee Stock Ownership Plan ("ESOP"), oversaw the ESOP's purchase of $250 million worth of Tribune Company stock as part of a complex leveraged going-private transaction on April 1, 2007. Tribune Company has now entered bankruptcy and the stock is worthless. The court has ruled on summary judgment that GreatBanc breached its fiduciary duties to the ESOP by approving the stock purchase which, the court concluded, is a prohibited transaction under relevant regulations. Defendant now seeks partial summary judgment on the issue of damages, arguing that because the purchase was effectuated with a promissory note, the most Defendant GreatBanc can be liable for is the $2.8 million cash principal payment made on that note in 2008, or, alternatively, the principal and interest paid at that time, a total of $15.3 million in cash. For the reasons explained herein, Defendant's motion is denied.

**FACTUAL HISTORY[1]**

The Tribune Company's transition from a publicly-held to an employee-owned corporation is the product of a complex set of transactions in which the Tribune Company borrowed approximately $12 billion in order to buy back and retire its publicly-held shares and merge with a subsidiary of its newly-created ESOP. (56.1(a)(3) [240], Ex. B ("Tribune Company 10-K") at 23.) The transaction at issue in this opinion, described in more detail below, involved the ESOP's purchase of $250 million in Tribune Company stock. (*Id.* at 2.) The ESOP executed that purchase by giving the Tribune Company a promissory note, which was to be paid off over a thirty-year period by the ESOP, using cash contributions from the Tribune Company itself. (56.1(a)(3), Ex. A ("8-K"), Ex. 10.8 ("ESOP Note") at 1.) Each year, as the Tribune Company made contributions to the ESOP, the ESOP in turn paid back the Tribune Company. (*Id.* at 2.) After each payment, pledged shares would be released from the ESOP's "suspense account" and distributed to individual employee accounts. (8-K, Ex. 10.9 ("ESOP Pledge Agreement") at 1-2.)

On April 1, 2007, pursuant to a series of agreements executed that day, the ESOP purchased 8,928,571 shares of unregistered Tribune common stock at a price of $28 per share, for a total of $250 million. (8-K at 2.) The ESOP paid for the purchase by giving a promissory note to the Tribune Company, to be paid by the ESOP over thirty years using expected contributions from the Tribune Company. (*Id.*) The ESOP Note provides for the repayment of the principal amount of $250 million, and interest at an annual rate of 5.01 percent, by April 1, 2037. (ESOP Note at 1.) The note specifies that repayment shall come only from "employer contributions" or "dividends, earnings, or distributions" earned from the Tribune stock. (*Id.* at 2.) The 8,928,571 shares purchased by the ESOP on April 1, 2007, were converted into 56,521,739 shares of

---

[1]     The series of transactions that converted the Tribune Company from a publicly-held corporation into a privately held, employee-owned company have also been detailed in a previous opinion. *Neil v. Zell*, 677 F.Supp.2d 1010, 1016 (N.D. Ill. 2009).

common stock after the completion of the Tribune Company's merger with the ESOP subsidiary on December 20, 2007. (Tribune Company 10-K at 46-47.) Those shares represent the only outstanding shares of Tribune Company common stock. (*Id.*)

Also on April 1, 2007, Tribune Company entered into an agreement with Defendant GreatBanc in its role as the ESOP's trustee, providing for the merger of Tribune Company with Tesop Corp., a corporation owned by the ESOP. (*Id.* at 3.) Following the merger, the "[Tribune] Company [is] to continue as the surviving corporation wholly owned by the ESOP." (*Id.*) Preceding the merger, Tribune Company arranged debt financing in order to purchase all of the outstanding publicly-traded Tribune Company stock at $34 per share, for a total expenditure of $8.3 billion. (*Id.* at 46-47.)

The ESOP Pledge Agreement, also executed on April 1, 2007 between the Tribune Company and GreatBanc, explains the collateral arrangement and the workings of the suspense account–essentially an escrow account in which the ESOP's shares are held until paid for with the Tribune Company's annual contributions, at which point some shares are distributed to employee accounts. The ESOP "pledges, grants a security interest in and assigns to the Company all of the Trust's rights, title and interest in and to the Shares." (8-K, Ex. 10.9 ("ESOP Pledge Agreement") at 1.) Each year, at the end of the "Plan year," shares are released from the pledge equal to the number of outstanding shares still pledged multiplied by the fraction of the outstanding principal and interest that was paid in that year. (*Id.* at 2.) The Pledge Agreement remains in place "until all obligations due under the ESOP Loan Agreement have been paid in full and all the terms and conditions of the ESOP Note have been satisfied." (*Id.*)

The Tribune Company made a cash contribution of $15.3 million to the ESOP on April 1, 2008, which the ESOP immediately paid back to the Tribune. (56.1(a)(3), Ex. D, Declaration of John S. Marino ("Marino Declaration") ¶ 6.) The payment consisted of $2.8 million in principal and $12.5 million in interest. (*Id.*) On April 1, 2009, and April 1, 2010, the Tribune Company forgave

an additional $30.6 million in debt, consisting of $24.6 million in interest and $6 million in principal. (*Id.* ¶¶ 7, 8.)  Approximately five million shares have been released from the suspense account as a result of these payments, with 51.5 million shares remaining pledged.  (*Id.* ¶ 9.)

The Tribune Company entered bankruptcy shortly after the completion of this two-step transaction, rendering the shares held by the ESOP essentially worthless.  Each of the bankruptcy reorganization plans currently under consideration calls for the termination of the ESOP and the cancellation of the common stock held by the ESOP.[2]  The Tribune Company-backed plan calls for the forgiveness of all unpaid principal and interest remaining on the ESOP Note.  (56.1(a)(3), Ex. C, § 6.8 at 47.)  The plan also calls for the cancellation of existing common stock of the type held by the ESOP.  (*Id.* at § 5.8.)  The process for termination is spelled out in Section 6.3 of the ESOP Loan Agreement.  It provides that "[i]n the event that the value of the Shares [ ] held in the suspense account [at the time of termination] is less than the unpaid principal remaining on the ESOP Note, any unpaid principal and interest so remaining shall be forgiven."  (8-K, Ex. 10.7 ("ESOP Loan Agreement") at 5.)  Plaintiffs do not dispute that the reorganization plans call for cancellation of the remaining payments, but note that no reorganization plan has yet been approved. (Response Br. at 17-18.)

## PROCEDURAL HISTORY

Plaintiffs allege that Defendant, GreatBanc, breached its duties of loyalty and prudence

---

[2]  There are three competing reorganization plans to the Tribune Company-backed plan, filed by rival groups of creditors.  *See* Reuters, "Creditors Pitch Rival Tribune Reorganization Plans," Nov. 10, 2010.  All three plans call for the termination of the ESOP, the extinguishing of the existing common stock held by the ESOP, and the forgiveness of the ESOP's outstanding debt. The Aurelius Reorganization Plan calls for termination of ESOP and the forgiveness of the outstanding debt on the ESOP note.  (Aurelias Reorganization Plan § 6.8 at 76-77.)  The plan also calls for the cancellation of "Old Common Stock" such as that held by the ESOP.  (*Id.* § 5.8 at 59-60.)  The King Street Plan includes an almost identical plan for termination of the ESOP (King Street Reorganization Plan § 6.8 at 82), and similarly calls for extinguishing the "Old Common Stock."  (*Id.* at § 5.8 at 63.)  The "Step One Senior Loan Claims" Reorganization Plan contains nearly identical provisions.  (Step One Reorganization Plan § 5.8 at 57-58; § 6.8 at 64.)

under ERISA § 404(a), 29 U.S.C. § 1004(a), as a result of the leveraged ESOP transaction. (Third Am. Compl. ¶ 173.) Plaintiffs also allege that Defendant engaged in a transaction prohibited by ERISA § 406(a)-(b), 29 U.S.C. § 1106(a)-(b), when it approved the purchase of unregistered stock from the Tribune Company at an amount less than "adequate consideration." (*Id.* ¶ 189, 190.) Plaintiffs ask that the court order Defendant to "make good to the plan any losses to the plan resulting from each such breach" and order "other equitable or remedial relief [that] the court may deem appropriate" as provided for by ERISA § 409, 29 U.S.C. § 1109; ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2); and ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). (*Id.* ¶¶ 170, 171, 172, 186, 187, 188.)

In a December 17, 2009 ruling, this court concluded that Plaintiffs had adequately alleged that Defendant GreatBanc failed to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" as required by ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). *Neil v. Zell*, 677 F.Supp.2d 1010, 1019-22 (N.D. Ill. 2009). The court further held that Plaintiffs adequately alleged that GreatBanc violated its fiduciary duties by agreeing to a stock purchase that was a prohibited transaction because the ESOP did not pay "adequate consideration" as defined by ERISA § 402(18), 29 U.S.C. § 1002(18), and because the stock it purchased was not a "qualifying employer security" as required by ERISA § 407(d)(4), 29 U.S.C. § 1107(d)(4). *Neil*, 677 F.Supp.2d at 1025-27. More recently, the court granted summary judgment in favor of Plaintiffs on their claim that GreatBanc breached its fiduciary duty when it approved the ESOP's April 1, 2007, $250 million purchase of Tribune Company stock. *Neil v. Zell*, No. 08 C 6833, 2010 WL 4670895, at *9 (N.D. Ill. Nov. 9, 2010). The court found that the stock purchase violated ERISA § 406(a)(1)(E), 29 U.S.C. § 1106(a)(1)(E), because the stock did not meet the Tax Code's definition of "qualifying employer securit[y]." *Id.* at *8.

Defendant GreatBanc moves for partial summary judgment on the issue of damages. (Pl.'s

Mem. in Supp. of Mot. for P. Summ. J. [241] [hereinafter "Damages Br."] at 2.)  GreatBanc argues that because the ESOP has paid only $15.3 million on the $250 million note, Defendant's maximum possible liability is that amount, or, alternatively, the $2.8 million of that amount that was paid as principal.  (Damages Br. at 1-2.)  In GreatBanc's view, Plaintiffs' "recovery cannot exceed the difference between what the ESOP *actually* paid for Tribune shares it acquired and the fair market value of Tribune stock on the date that it was acquired by GreatBanc." (*Id.* at 2.)  Plaintiffs respond that "[t]he fact that the shares were bought with a promissory note is irrelevant.  Contrary to GreatBanc's assertion, the ESOP did not promise to 'eventually' pay $250 million for the shares it bought – it paid $250 million using a loan from Tribune, and promised to pay that amount back to Tribune."  (Response Br. at 4.)

## ANALYSIS

Summary judgment should be granted if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  In considering a motion for summary judgment, the court draws "all reasonable inferences from the evidence in the light most favorable to the nonmoving party." *Williamson v. Indiana University*, 345 F.3d 459, 462 (7th Cir. 2003).  In addition, in determining the amount of loss (which Defendant asks us to do here), the court resolves ambiguities against the breaching fiduciary. *See, e.g.*, S*ecretary of U.S. Dept. of Labor v. Gilley*, 290 F.3d 827, 830 (6th Cir. 2002) ("[T]o the extent that there is any ambiguity in determining the amount of loss in an ERISA action, the uncertainty should be resolved against the breaching fiduciary."); *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 602 (8th Cir.1995) ("To the extent that there are ambiguities in determining loss, we resolve them against the trustee in breach."); *Kim v. Fujikawa*, 871 F.2d 1427, 1430-31 (9th Cir.1989) ("In determining the amount that a breaching fiduciary must restore to the [benefit fund] as a result of a prohibited transaction, the court should resolve doubts in favor of the plaintiffs.") (quotation marks omitted); *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir.1985) ("[O]nce a breach of trust is established,

uncertainties in fixing damages will be resolved against the wrongdoer.").

## **DISCUSSION**

Plaintiffs seek unspecified damages from GreatBanc for breaches of ERISA § 404(a), 29 U.S.C. § 1104(a), and ERISA § 406(a)-(b), 29 U.S.C. § 1106(a)-(b).  For each of these two breaches, Plaintiffs seek relief under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2); and ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).[3]

ERISA § 502(a)(2) permits a plan participant to bring a civil action for "appropriate relief" under ERISA § 409, 29 U.S.C. § 1109.  That section requires in part that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach."  ERISA § 409.

Remedies for ERISA violations rest within the discretion of the district court.  "The enforcement provisions of ERISA are intended to provide the Secretary [of Labor], as well as participants and beneficiaries, with broad, flexible remedies to redress or prevent statutory violations."  *Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 302 (7th Cir. 1985).  "ERISA grants the courts the power to shape an award so as to make the injured plan whole."  *Free v. Briody*, 732 F.2d 1331, 1337 (7th Cir. 1984) (discussing ERISA § 409).  "A district court is given wide latitude in compensating the participants in an ESOP when a breach of fiduciary duty has been shown. '[I]t is clear that Congress intended to provide the courts with broad remedies for redressing the

---

[3]     Defendant does not explicitly specify whether it seeks partial summary judgment as to damages under both of these provisions.  Defendant does recognize, however, that "Plaintiffs also seek various forms of equitable relief. . . .  GreatBanc does not presently seek a ruling on the availability of this relief."  (Damages Br. at 2 n.1.)  As ERISA § 502(a)(3) provides only for equitable relief, the court assumes Defendant meant the court to limit its inquiry to ERISA § 502(a)(2) and ERISA § 409.  In addition, relief may be superfluous under ERISA § 502(a)(3) where adequate relief has already been afforded under ERISA § 502(a)(2).  *See Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996) ("[W]e should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief [under ERISA § 502(a)(3)], in which case such relief normally would not be 'appropriate.'").

interests of participants and beneficiaries when they have been adversely affected by breaches of a fiduciary duty.'" *Chao v. Hall Holding Co.,* 285 F.3d 415, 443 (6th Cir. 2002) (quoting *Bierwith*, 754 F.2d at 1055 (quotation and citation omitted)).

The court has already ruled that Defendant permitted a transaction prohibited by ERISA § 406 when it approved the purchase by the ESOP of $250 million worth of unregistered Tribune Company common stock on April 1, 2007. The court has not yet resolved whether Defendant also breached its fiduciary duties under ERISA § 404. Since Defendant seeks partial summary judgment on damages, the court must construe the facts in the light most favorable to the non-moving party, meaning that the court must assume that Plaintiffs will also succeed in proving a breach of § 404. And, because ambiguities will be resolved against Defendant, summary judgment is appropriate only if the evidence unambiguously favors Defendant's position.

The issue before the court is whether Plaintiffs' damages are capped–either in the amount of $2.8 million, the principal cash paid by the Tribune Company to the ESOP as a result of ERISA violations, or, alternatively, at the level of the $15.3 million cash paid in interest and principal. Defendant urges this as the maximum measure of liability because it is the "total cash outlay . . . *actually paid*" paid by the ESOP. (Damages Br. at 5, 6 (emphasis in original).) Plaintiffs do not yet endorse a specific measure of damages, instead arguing that "ERISA grants the Court broad authority to fashion an appropriate remedy" and suggesting three possible measures, which are discussed below. *See infra* Section II.

This case presents a difficult question because, although the ESOP did purchase $250 million worth of Tribune Company stock, and that stock is now worthless, the remainder of the ESOP's indebtedness will, in all likelihood, be forgiven. Plaintiffs ask the court to view this as two separate transactions–first, the purchase of $250 million worth of stock with a loan, and the stock purchased as collateral on that loan; second, the forgiveness of the remaining debt on the loan in exchange for the tender of the (now worthless) stock collateral. In essence, Defendant asks the

court to view the purchase as a single transaction, one in which the trustee never spent $250 million because much of the assets purchased remained pledged and practically unavailable to the ESOP.[4] In the alternative, Defendant asks the court to view the purchase as an apparition–though it appeared that the ESOP purchased $250 million in Tribune Company stock, it did not, Defendant argues, because the stock was simply purchased with debt from the same company selling the stock.[5] Defendant presents several arguments in favor of its position, each addressed below.

## I.     The $250 Million Purchase Did Not Represent an Actual Expenditure

Defendant urges that the April 1, 2007 purchase of $250 million worth of Tribune common stock did not represent a $250 million purchase, but rather an illusory transaction that would be "paid" as installments on the ESOP Note were tendered. "On April 1, 2007, GreatBanc approved, as Plan Trustee, an agreement by which the ESOP, over a 30-year period, would *eventually* pay $250 million in principal for Tribune stock. . . . The single $15.3 million payment is the most the ESOP will ever pay for the stock or on the Note." (Damages Br. at 5-6.)

The transaction at issue here was novel and complex, but its individual components boil down to a series of commonplace transactions. Imagine that the purchaser of a home borrows, from the seller himself, $200,000 with which to buy that home. The purchaser provides the seller with a promissory note for $200,000, and the seller conveys the home to the purchaser. No one would seriously contend that the buyer did not purchase the home for $200,000, even if he borrowed the money for the transaction.

_____

[4]     "GreatBanc promised *eventually* to pay Tribune $250 million for the stock." (Damages Br. at 1.) "The reality here is that the Plan is *not* out of pocket $250 million for the Note. The most plaintiffs can claim in 'losses' to the ESOP is the $2.8 million in principal *actually paid* for Tribune stock." (*Id.* at 5.)

[5]     "The ESOP will never be out another dollar for the loan beyond the $15.3 million it has already paid because the Plan's liability with respect to the loan is specifically confined. There is no default if the Plan does not make a payment, because the Plan is obligated to make payments on the loan *only* if Tribune makes required contributions to provide the ESOP the funds necessary to make those payments." (Damages Br. at 3.)

Now imagine that the home burns down. The value of what is lost is not the value of the cumulative mortgage payments to the date of the home's destruction, but rather the loss of the entire purchase price (or the home's current fair market value). If the seller decides to forgive the remaining payments on the home after its destruction, that does not mean what was "lost" is only the sum total of the payments already made–the home no longer exists. Though in the context of this transaction, Defendant might urge that the value of the stock purchased was more illusory than that of a home,[6] ERISA precludes such a malleable valuation of plan assets. "To qualify as an employee benefit plan under ERISA . . . and to qualify for preferred tax status . . ., a plan must be created for the *exclusive benefit* of participating employees and also be structured to distribute benefits to participating employees at retirement. It is not proper to establish and administer an ESOP for the exclusive purpose of wringing tax benefits from the Government." *Reich v. Valley Nat. Bank of Arizona*, 837 F.Supp. 1259, 1286 (S.D.N.Y. 1993). The law requires a trustee to make an investment based on the value of the underlying asset, not to cut a stock price from whole cloth for the purposes of a purchase and to do so again when that initial purchase price no longer suits the trustee's needs.

The ESOP's assumption of indebtedness as part of this transaction likewise represents a real obligation, even if the ESOP's obligation is to pay money back to the lender using contributions from that same lender. As the Second Circuit has observed, for the purposes of calculating the loss on a transaction, it is immaterial whether the obligation was in the form of a promissory note. "[T]he assumption of indebtedness has immediate legal and economic consequences even before the borrower begins to repay the debt. For example, the borrower's plans for the future are now

---

[6]    In fact, Defendant does not urge that the fair market value of the shares purchased was their $250 million paper value. "Plaintiffs have put forth no evidence as to what the fair market value was on [the date of the purchase]." (Damages Br. at 2.) Defendant only suggests that the shares were not "worth zero" and that "[t]o the extent the stock had value above zero, plaintiffs' maximum potential recovery is further reduced." (*Id.* at 2-3.)

constrained by the obligation to commit future income streams to repaying the loan, and the borrower's ability to obtain future loans at a low rate decreases, because the borrower is now a greater credit risk." *Henry v. U.S. Trust Co.*, 569 F.3d 96, 99-100 n.4 (2d Cir. 2009). In other words, as contemplated by ERISA, the purchases made by an ESOP necessarily represent tangible, valuable assets, not merely figures on an accounting sheet imagined to facilitate some other transaction.

The court recognizes that the ESOP might not have existed at all if the plan trustee had refused to invest money loaned by the plan sponsor in that sponsor's company stock, based upon a finding that such a transaction was imprudent or illegal. This fact does not erode the trustee's fiduciary duty to assess the prudence and propriety of the investment. "The ESOP had assets and [the trustee's] decision to invest them was subject to ERISA's fiduciary standards, regardless of the fact that the ESOP was committed to this investment under the Plan documents before its receipt of any contribution." *Valley Nat. Bank*, 837 F.Supp. at 1286-87. The fiduciary of an ERISA plan is expected to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A)(I), ERISA § 404(a)(1)(A)(I). Such a duty recognizes that regardless of what benefits may accrue to the sponsor of an ERISA plan as the result of its creation, the ESOP itself must be administered for the benefit of employees. As such, the stock purchased for the plan and later distributed to employee accounts constitutes a genuine asset that necessarily represents other benefits to the employees foregone as the result of the ESOP arrangement. In a case similar to this one, the Secretary of Labor sued the ESOP trustee involved in a going-private leveraged buyout of Kroy, Inc., a printing and typography business, which collapsed shortly after the buyout. "The [ ] ESOP's assets were part of the overall benefits and compensation package offered to employees who participated in the Plan. . . . Employee benefits are not a mere gratuity, but a form of deferred wages. Clearly, if the ESOP's holdings in employer

securities are worthless, the employees have lost certain of these deferred wages." *Valley Nat.*
*Bank*, 837 F.Supp. at 1286-87.[7]

In fact, the Tribune did change its compensation structure based in part on the
implementation of the ESOP. "Employees do not contribute any money toward the plan. What
would have been discretionary company contributions to 401(K) accounts going forward are what's
financing the ESOP." (Third Am. Compl., Ex. A ("Tribune Newsletter") at 2.) Plaintiffs estimate that
prior to the ESOP's creation, the Tribune contributed $60 million annually to the 401(K) plan.
(Response Br. at 12-13 n.7.) The loss of deferred compensation is a genuine loss.

For this same reason, the court must reject Defendant's "no harm, no foul" argument. It is
true that, as Defendant points out, the Seventh Circuit generally recognizes that where there has
been no loss to an ERISA plan, there can be no recovery. *King v. National Human Resources*
*Committee, Inc.*, 218 F.3d 719, 724 (7th Cir. 2000) (denying recovery where "[t]he employees
suffered no damages" because the challenged investment in money market funds returned more
than individual investments selected by the employees); *Mira v. Nuclear Measurements Corp.*,
107 F.3d 466, 473 (7th Cir. 1997) (finding that where defendants "used the funds that should have
been applied to pay [ ] insurance premiums for the day-to-day expenses that were necessary to
keep the business afloat" there was no loss because "[a]t the end of the day, the plaintiffs got
exactly what they were promised under the terms of the employee benefit plan offered"). But in this
case, the trustee invested $250 million in stock that is now worthless. The fact that the money to
purchase the stock was borrowed does not mean that money was not lost.

Finally, in its reply brief, Defendant urges that § 409 "authorized the recovery of a plan's

---

[7]     The *Valley National Bank* court further explained that, "the ESOP did in reality put
in something for the stock, a heavy dose of debt. While this debt was in the form of non-recourse
notes, the participants in the ESOP, the employees . . ., essentially deferred wages in order to be
Plan participants. These deferred wages were lost when [the company] collapsed, amounting to
a significant loss suffered by the ESOP participants." 837 F.Supp. at 1289 n.5.

actual 'losses,'" (Reply Br. at 4), and then cites to two cases that Defendant characterizes as supporting an award of "out of pocket" damages only. In the first of these cases, the Seventh Circuit explained that securities statutes "limit victims to 'actual damage', which courts routinely understand to mean 'out of pocket loss'." *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1551 (7th Cir. 1990). Notably, that case–which did not address damages for ERISA violations–does explain that victims of fraud can recover "the difference between what they paid for the stock and what it was worth." *Id.* The court was not distinguishing a debt obligation from lost cash, but rather was comparing actual expenditures with speculative lost profits. The second cited case, a district court decision, essentially rehashes the same standard for an overpayment of stock, and the court fails to see its relevance. *Gunter v. Novopharm USA Inc.,* No. 99 C 7496, 2001 WL 199829, at *12 (N.D. Ill. Feb. 28, 2001).

## II.  Any Award Must be Capped at $2.8 Million or $15.3 Million

ERISA § 409(a) calls for a breaching fiduciary "to make good to such plan any losses to the plan resulting from each such breach." Plaintiffs advance three possible measures of damage contemplated by § 1109(a): (1) the difference between the amount paid for the stock and its actual value at the time of purchase; (2) the difference between the performance of the ESOP investment and a hypothetical prudent investment; and (3) the total amount lost due to an improper investment. Defendant challenges these theories (none of which is specifically endorsed by Plaintiffs at this point), arguing either that they are impermissible or should result in recovery no greater than $2.8 million, or, alternatively, $15.3 million. The court considers whether GreatBanc is entitled to summary judgment on any of Plaintiffs' damages proposals.

### A.  Difference Between Price Paid and Market Value

Plaintiffs' first proposed measure of loss finds ample support in the case law: Where the "breach involved nothing more than paying too high a price for the stock," liability should be measured at "the difference between the price paid and the price that should have been paid."

13

*Valley Nat. Bank*, 837 F.Supp. at 1289. *See also Sawyer-Cleator Lumber Co.*, 61 F.3d at 603 ("[T]he only case in which there could be a loss under this 'snapshot' approach would be when the breach consisted of an overpayment by the ESOP. This measure of loss is appropriate where the loss is due to self-dealing or price manipulation."); *Bierwirth*, 754 F.2d at 1054 (where "the purchase price exceeds the market price[,] if the beneficiary were to attempt to sell the property, he would recover only the market value and the amount of the overpayment would be the loss"); *Horn v. McQueen*, 215 F.Supp.2d 867, 881 (W.D. Ky. 2002) (finding that if there has been a breach of ERISA § 406, "loss will be measured as the difference between what the ESOP paid for the [ ] stock and its fair market value at the time of the transaction, plus interest"). Defendant concedes that this would be an appropriate measure of loss, but urges that this measure can result in an award no greater than $15.3 million cash–the amount paid by the ESOP in April 2008. "[Plaintiff's] recovery cannot exceed the difference between what the ESOP *actually* paid for Tribune shares it acquired and the fair market value of Tribune stock on the date that it was acquired by GreatBanc." (Damages Br. at 2.)

Even at $28 per share–well below the $34 per share the Tribune paid to repurchase its common stock–Plaintiffs insist that the price paid by the ESOP was excessive. "As was widely reported by industry analysts, the price paid for Tribune stock by the ESOP during the Leveraged ESOP Transaction was too high given the debt burden imposed on the Company by Zell." (Compl. ¶ 9.) Plaintiffs point to a Lehman Brothers report on the newspaper industry issued in November 2007 that concludes the fair market value of unredeemable shares like those purchased by the ESOP was much lower than $28: "Should the Tribune privatization deal break and not occur, we believe that fair value on the stock, if it were to remain an ongoing public entity, would be significantly less than the current stock price. Given the added $7 billion in debt to repurchase 126 million shares in the tender offer, we think fair value on the stock would be $7-$8 per share based on our detailed sum-of-the-parts analysis." (Compl., Ex. B at 6.) If the evidence establishes that

the ESOP paid $28 per share for 8,928,571 shares of stock that were, at the time, worth only $8 per share, Plaintiffs have lost more than $178 million.

As noted, GreatBanc acknowledges that the difference between the value of the stock and the amount paid for it could be a fair measure of damages. Even using this measure, however, Defendant urges that liability must be capped at $2.8 million or $15.3 million. At least one Court of Appeals has addressed an argument along these lines. In *Henry*, the Second Circuit examined the implications of debt forgiveness as a measure of overpayment. The ESOP in that case had initially purchased 540,000 shares of CommutAir for $60 million, including $9 million in cash and $51 million in promissory notes issued to three sellers. 569 F.3d at 97. Several years later, the ESOP sold its shares back to CommutAir in exchange for the cancellation of $14.5 million in outstanding debt on the purchase. *Id.* at 99. The district court concluded that the amount the ESOP actually paid, for purposes of its overpayment analysis, was reduced from $60 million to $45.5 million. *Id.* The Second Circuit found this logic faulty. "If an investor pays $100 for 20 shares of stock and later sells those shares back to the original seller for $25, the result is not that the investor paid only $75 for the shares. Rather, the result is that the investor lost $75 on that investment." *Id.* at 100. The court concluded that "[w]hether the ESOP ultimately was overcharged depends not only on the purchased shares' price, but also on their value." *Id.* The loss must be measured, the court concluded, by the difference between the amount paid at the time of the initial purchase (which included $51 million in promissory notes) and the shares' value at the time of the initial purchase, which could not be determined on the record before the court.[8] Another court urged a similar measure in these circumstances, calling it "irrelevant how the ESOP got the $35.5

_____

[8] As Defendant notes, on remand, the district court in *Henry* awarded no damages. (Reply Br. at 9.) The basis for that decision, however, was the district court's determination that the ESOP had paid less than fair market value for the stock. *Henry v. Champlain Enterprises, Inc.*, No. 1:01 CV 1681, 2010 WL 2038841, at *2 (N.D.N.Y. May 21, 2010). Notably, in calculating the amount paid, the district court did include the $51 million in promissory notes.

million in cash in regard to the question of whether the ESOP paid more than fair market value for the stock." *Valley Nat. Bank*, 837 F.Supp.at 1274.[9] The *Horn* court similarly rejected an argument that the ESOP had not "paid" for company stock because it did so with a loan rather than cash.[10] *Horn*, 215 F.Supp.2d at 879-80.

As these cases show, where a business transaction is completed with the aid of debt financing, the purchase price includes the full amount of the debt incurred. That purchase price does not change as the debt is paid off. Whether measuring losses against that price would result in an impermissible windfall is discussed below. For now, the court observes that GreatBanc has offered no support for its assertion that in assessing loss, the purchase price paid by the ESOP is capped at the amount of debt paid off one year after the transaction.

### B.    Difference Between the Stock Purchase and Hypothetical Prudent Investment

Planitiffs' second proposed measure of loss "requires a comparison of what the Plan actually earned on the [ ] investment with what the Plan would have earned had the funds been

---

[9]    The *Valley National Bank* court does use a measure of damages similar to the measure that Defendant here proposes. The ESOP transaction at issue in that case was the purchase of company stock with $35.5 million in promissory notes. 837 F.Supp. at 1270. The ESOP eventually sold its shares of the company stock for just $250,000. *Id.* at 1271. The Secretary of Labor, plaintiff in the suit, calculated the plan's losses at $17.25 million, representing the $17.5 million debt remaining to be paid by the ESOP, minus the proceeds of the stock sale. *Id.* The court acknowledged this was a valid calculation, and without determining a specific amount of loss, rejected defendant's argument that "no loss" had occurred. *Id.* at 1288-89. The measure of loss implicitly sanctioned by the *Valley National Bank* court was the measure urged by the Secretary, and the court did not explain why it chose not to take the full $35.5 million into account. Absent such an explanation, this court is unwilling to assume that Plaintiffs here are limited to the Secretary's rendering of the proper measure of damages in that case.

[10]    Both Plaintiffs and Defendant devote a considerable portion of their briefs to the *Horn* case. Defendant argues that it is distinguishable from the circumstances here because in *Horn* the stock was purchased with a third-party loan, which was then paid back with contributions from the company to the ESOP, whereas "[h]ere, in contrast, delivery of the ESOP Note was only evidence of a *promise* to pay the purchase price in the future . . . and *not* payment itself." (Damages Br. at 8.) The court is not persuaded by this distinction, for which GreatBanc offers no authority. As explained earlier, indebtedness, whether in the form of a promissory note payable to the company or to a third-party, represents actual consideration with concrete financial implications as well as foregone employee benefits.

available for other Plan purposes." *Bierwirth*, 754 F.2d at 1056. This measure derives from the trust law on which ERISA is based.[11] The Restatement of Trusts presents one measure of damages for a breach of trust: "Any profit which would have accrued to the trust estate if there had been no breach." Restatement (Second) of Trusts § 205 (1959). As explained by the *Bierwirth* court,

> In determining what the Plan would have earned had the funds been available for other Plan purposes, the district court should presume that the funds would have been treated like other funds being invested during the same period in proper transactions. Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these. The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them.

*Id.*

Defendant argues that this method of measurement "makes no sense in the ESOP context since ESOPs are explicitly designed to invest primarily or exclusively in employer stock. . . . Thus, it would be inappropriate to evaluate the ESOP's investment performance against the performance of an investment it was never permitted or intended to hold." (Reply Br. at 8.) *Valley National Bank* squarely rejected this very argument. In that case, the Secretary of Labor sued Valley National Bank, an ESOP trustee, alleging that under its watch the ESOP overpaid for stock in a leveraged buyout of Kroy, Inc., which shortly thereafter "self-destructed in debt." 837 F.Supp. at 1270. "Once made, contributions to the ESOP plan become Plan assets . . . subject to ERISA's fiduciary duty standards. . . . [The sponsor's] loan to the ESOP was a transaction entirely separate and apart from the ESOP's decision to acquire employer securities. . . . The ESOP had assets and [the trustee's] decision to invest them was subject to ERISA's fiduciary standards, regardless of the fact that the

---

[11] "Congress invoked the common law of trusts in enacting ERISA, and this Court has thus repeatedly looked to trust law in order to determine the particular duties and powers of ERISA plan administrators." *Conkright v. Frommert*, 130 S.Ct. 1640, 1658 (2010) (quotation marks and citation omitted).

ESOP was committed to this investment under the Plan documents before its receipt of any contribution." 837 F.Supp. at 1286-87. The court went on to suggest that the entire amount of money lost due to the investment, plus interest, is the appropriate amount of damages "if the breach constitutes some misfeasance other than simply paying too high a price for the property." *Id. Valley National Bank* characterized defendant's argument as "bizarre," noting that it "would apparently immunize from money damages all trustees of ESOPs created by LBOs or ESOPs where the trustees' actions were contemporaneous or involved with the creation of the ESOP, regardless of the conduct of those trustees, and regardless of the consequences of that conduct." *Id.* at 1284.

Whether the misfeasance alleged by Plaintiffs has occurred, and whether it consists of any conduct other than simply paying too high a price for company stock, remain undetermined questions of fact. Plaintiffs allege that "GreatBanc never considered whether it was in the ESOP's best interest to halt the Merger," (Compl. ¶ 107), and that "Tribune was insolvent when the Merger closed, which would have been obvious to GreatBanc if it had obtained a Bring-Down opinion." (Compl. ¶ 109.) Plaintiffs allege a host of other breaches on Defendant's part as well. (Compl. ¶ 173.) For purposes of this motion, the court must assume that the misfeasance alleged did occur. And assuming that it did, this second measure of damages is a legitimate one, recognized by the ERISA case law and the common law of trusts on which it is based.

Here, again, the court considers Defendant's argument that the difference between the stock purchase in this case and the hypothetical prudent investment under this methodology is limited to the $2.8 million cash paid in principal by the ESOP in 2008 or the $15.3 million cash paid in principal and interest. In Defendant's view, the cancellation of the remaining debt must offset its potential liability. The court is less certain. Trust law requires that each transaction resulting from a breach of trust be viewed in isolation. "The trustee who has incurred liability by reason of a breach of a duty regarding investments cannot reduce that liability by proving that he has made a

profit for the trust by other legal or illegal conduct in the trust administration."  G.G. Bogert and G.T. Bogert, *The Law of Trusts and Trustees* § 708, at 249-51 (2d Rev. Ed. 1982).  The Seventh Circuit has also commented on this issue.  "[W]here fiduciaries breach their duty of loyalty by making individual investments with an eye toward some goal other than the creation of a proper portfolio for their clients, a court may return the favor, viewing the investments in isolation to determine damages."  *Leigh v. Engle*, 858 F.2d 361, 368 (7th Cir. 1988) (reviewing a case in which defendants, as ERISA fiduciaries, "invest[ed] trust assets in corporate control contests with which defendants were associated").

At this stage in the litigation, the court cannot say that Defendant would be liable for the entire difference between the hypothetical prudent investment and the now-worthless investment of $250 million in Tribune Company stock.  No fiduciary breach aside from the unregistered stock transaction has yet been proved.  But neither can the court say there is some amount less than the total investment–$2.8 or $15.3 million–to which the facts and law limit recovery.

### C.      Difference Between Price Paid and Current Market Value

The third measure of damages urged by Plaintiffs would be the difference between the $250 million paid for the stock and the current, fair-market value of the stock.  Because the current value of the stock is zero, this method would suggest a $250 million recovery.[12]  Plaintiffs suggest such a measure of damages is supported by general trust law principles and is appropriate when a trustee makes an illegal, improper, or unauthorized investment.  Indeed, the Restatement of Trusts explains that one measure of liability for a trustee in breach is "[a]ny loss or depreciation in value

---

[12]      Assuming that the stock purchased by the ESOP is now worthless, the second and third methods produce similar measures of damage.  To see the difference in these calculations, imagine that the stock is now worth $10 per share, and that a hypothetical prudent investment would have produced a return of 5 percent simple interest. The second method would award plaintiffs the difference between the $89.2 million that the stock is now worth ($10 per share x 8,928,571 shares) and the $262.5 million that would have been returned by a hypothetical prudent investment ($250 million + ($250 million x .05)).  The third method would simply be the difference between the $250 million paid and the $89 million the stock is now worth.

of the trust estate resulting from the breach of trust." Restatement (Second) of Trusts § 205(1).

This measure of damages would result in a calculation similar to the second method described above. Defendant again argues such a method would be improper because GreatBanc has not actually "paid" $250 million, and therefore the amount lost by the trust estate cannot exceed the amount "actually paid" for the same reasons previously described. This argument fails for the same reasons previously described: the trustee invested $250 million for stock that Plaintiffs believe is now worthless. The debt cancellation does not, based on the facts as alleged, warrant an offset that would reduce the liability by the amount of that cancellation.

III.    **Recovery Greater Than $15.3 Million Would Result in a Windfall**

Defendant argues that any recovery greater than the single cash contribution made by the Tribune Company to the ESOP would result in an impermissible windfall. A number of cases do recognize that windfall recoveries are prohibited by ERISA. *See, e.g., Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 148 (1985); *Harzewski v. Guidant Corp.*, 489 F.3d 799, 804 (7th Cir. 2007); *Leister v. Dovetail, Inc.*, 546 F.3d 875, 881 (7th Cir. 2008). As the court reads these cases, however, they address the unavailability of extra-contractual or punitive damages, which are not at issue here.

The single Supreme Court decision Defendant cites is not helpful. It holds that "in § 409(a), Congress did not provide, and did not intend the judiciary to imply, a cause of action for extra-contractual damages caused by *improper or untimely processing of benefit claims*." *Massachusetts Mut. Life Ins. Co.*, 473 U.S. at 148 (emphasis added). Claims processing is not at issue here.

As Defendant emphasizes, the Seventh Circuit has also stated that "extracontractual damages are prohibited," but in doing so, the court was addressing the recovery of punitive or compensatory damages, which Plaintiffs do not seek in their § 1109 claim. *Harzewski*, 489 F.3d at 804. The *Harzewski* court recognized that plaintiffs could sue for the benefits denied them by

the alleged breach: "The benefit in a defined-contribution pension plan is, to repeat, just whatever is in the retirement account when the employee retires or *whatever would have been there had the plan honored the employee's entitlement*, which includes an entitlement to prudent management." *Id.* at 804-05. Plaintiffs here seek the exact remedy contemplated by *Harzewski*: the benefits that would have been available had the trust been properly managed. The amount to which they would have been entitled has not been established in this case, but neither has it been limited to $2.8 or $15.3 million.[13]

In another Seventh Circuit case cited by Defendant in support of the windfall argument, the court again explained that "the benefits to which [plaintiff] was entitled were the assets that would have been in her 401(k) account had the defendants complied with their fiduciary duties." *Leister*, 546 F.3d at 881. The court took issue not with an award based on that standard, but instead with the particular method of calculating the benefits. Specifically, the court noted that the method used "was based not on the average performance of the investment vehicles in which the contributions might have been placed but on the performance of the best of those vehicles, as improperly determined ex post." *Id.*

None of the methods for measuring damage that have been proposed by Planitiffs here will necessarily result in a "windfall" as contemplated by the ERISA case law. The maximum recovery would simply put employees in the place they would have been in had the $250 million been

---

[13]     The court does not settle on the proper measure of damages in this opinion, principally because neither Defendant nor Plaintiffs have specified a preferred measure (other than the $2.8 or $15.3 million that Defendant urges and the court today rejects). The court observes, however, that *Harzewski* provides a useful guidepost. A reasonable measure of damages might be the amount that would have been disbursed or available to ESOP participants had the three years of contributions to the ESOP (in cash and debt forgiveness) been properly invested. Put another way, Plaintiffs could claim that they lost the $250 million, and the earnings that would have been generated by those funds in a wise investment, reduced by the sum of debt forgiveness at the time the ESOP terminates. This, of course, is only one possible measure, and "ERISA grants the courts the power to shape an award so as to make the injured plan whole." *Free*, 732 F.2d at 1337. In shaping an award, the court must be mindful of the "windfall" concerns Defendant has expressed and that the ESOP investment represents actual foregone compensation.

prudently, properly, and legally invested. Plaintiffs do not specifically seek punitive, compensatory, or extra-contractual damages under § 1109, ERISA's enforcement provision. They seek only what they would have received from the plan had Defendant not been in breach. "[Section 1109] provides . . . that any person who is a fiduciary with respect to a plan and who breaches . . . shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate." (Compl. ¶¶ 170, 186.) Although the amount of loss has not yet been determined, properly calculated it (and any other remedial relief) would result in a "make-whole" recovery, not a windfall recovery.

## IV. Standing

Finally, Defendant challenges Plaintiffs' standing to bring this suit. Plaintiffs are no longer employed by the Tribune Company and thus, according to Defendant, "not eligible under the Plan to receive any further contributions to their Plan accounts." (Damages Br. at 9.) *Harzewski* involved a similar situation, and the district court concluded that plaintiffs lacked standing because they had retired from the company and received their benefits prior to the filing of the complaint. *Harzewski*, 489 F.3d at 801. The Seventh Circuit vacated and remanded, finding that if plaintiffs were to prevail, even as retirees they would be entitled to more benefits than they received because of the breach of the trustee, Guidant:

> [T]he question comes down to whether, if the plaintiffs win their case by obtaining a money judgment against Guidant, the receipt of that money will constitute the receipt of a plan benefit. It will. . . . Suppose Guidant had stolen half the money in a plan participant's retirement account and a suit by the participant resulted in a judgment for that amount; the suit would have established the retiree's eligibility for the larger benefit. There is no difference if instead of stealing the money from the account, Guidant by imprudent management caused the account to be half as valuable as it would have been under prudent management.

*Id.* at 804. The court's opinion suggested that plaintiffs would indeed have standing if "Guidant knew that the price of its stock was overvalued but took no measures to protect the participants in the

pension plan." *Id.* Any such standing might be defeated on the facts of the case, however, because Guidant eventually sold the stock for a profit. "[The district court] will have to take a very careful look at the plaintiffs' theory of how they were injured . . . . It seems exceedingly speculative to suppose that Guidant in its capacity as plan fiduciary should and would have found a substitute investment that would have turned out as well as the sale of Guidant to Boston Scientific turned out." *Id.* That same issue is not relevant here–it is far from "exceedingly speculative" that a plan fiduciary could have found an investment that would have yielded a return more favorable than a 100 percent loss. See *also Spano v. Boeing Co.*, Nos. 09-3001, 09-3018, ___ F.3d ___, 2011 WL 183974, at *15 (7th Cir. Jan. 21, 2011) (noting that plan members would have standing to sue as a class on behalf of an injury to the plan if "the plan has been reckless in its selection of investment options for its employees, offering nothing but junk-rated bonds or highly leveraged packages").

Defendant suggests that Plaintiffs here lack standing because they were paid out whatever was in their account at the time of their retirement, and therefore are entitled under the plan to nothing.[14] But the Seventh Circuit explained in *Harzewski* that they are also entitled to what *should have been* in the account at the time of retirement absent the breach of trust. That is what Plaintiffs are seeking in this case as well. In addition, Plaintiffs are suing on behalf of a class that, if certified, would include current as well as former ESOP participants.

Defendant's contention that Plaintiffs have not suffered a constitutional injury-in-fact also fails. Defendant cites to *Kendall v. Employees Retirement Plan of Avon Products,* 561 F.3d 112 (2d Cir. 2009), where the court found that the plaintiff lacked standing to pursue several of her claims. The Second Circuit distinguished Kendall's circumstances from those in other cases in

---

[14]     Defendant also argues that "plaintiffs cannot sue based on any allocations from the ESOP other than the one in 2008, as that was the only allocation for which the ESOP made a cash payment." (Reply Br. at 13.)  The court has addressed the substance of that argument in this opinion, and found it lacking.  Because the court is denying Defendant's motion for summary judgment on this issue, Plaintiffs' standing to sue is not limited to the 2008 cash contribution.

which "plaintiffs could point to an identifiable and quantifiable pool of assets to which they had colorable claims." *Id.* at 121. The court found that, even if Kendall prevailed on her claims, there was no guarantee she would have received additional benefits. *Id.* This case is clearly distinguishable–Plaintiffs allege that they, and other plan participants, would have the benefit of an ESOP with $250 million worth of assets had Defendant abided by ERISA's requirements, while today, due to Defendant's breach, that ESOP has nothing. Plaintiffs have alleged an injury-in-fact and have standing to pursue their claim.

## CONCLUSION

Defendant's motion for partial summary judgment as to damages [239] is denied.

ENTER:

Dated: February 28, 2011

_____
REBECCA R. PALLMEYER
United States District Judge