**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAN NEIL and ERIC BAILEY, individuals, | ) | |
| on behalf of themselves and on behalf | ) | |
| of all others similarly situated, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | No. 08 C 6833 |
| | ) | |
| SAMUEL ZELL; GREATBANC TRUST | ) | Judge Rebecca R. Pallmeyer |
| COMPANY, a Delaware corporation; | ) | |
| EGI-TRB, L.L.C., a Delaware corporation, ) | | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Dan Neil and Eric Bailey, former employees of the Tribune Company, have brought this action under the Employee Retirement Income Security Act ("ERISA"). Neil and Bailey charge Defendants GreatBanc, Sam Zell, and EGI-TRB L.L.C., with breaches of fiduciary duty stemming from the leveraged buyout of the Tribune Company by the Employee Stock Ownership Plan ("ESOP") of which Plaintiffs were participants. Plaintiffs now move for certification of a class of ESOP participants. Defendants Zell and EGI-TRB have taken no position on the propriety of class certification, but Defendant GreatBanc objects, and all three Defendants challenge the adequacy of Neil and Bailey as class representatives. For the reasons explained herein, Plaintiffs' motion to certify the class is granted and Plaintiffs' counsel are appointed class counsel.

## BACKGROUND

Plaintiffs' claims arise out of a leveraged buyout that transformed the Tribune Company from a publicly-held corporation into an employee-owned company through the creation of an Employee Stock Ownership Plan ("ESOP") and the ESOP's purchase of the Tribune Company. The Tribune Company declared bankruptcy months after going private, and Plaintiffs allege that the stock held by ESOP participants is worthless.

As detailed in several opinions, Plaintiffs allege a number of claims against GreatBanc pursuant to ERISA § 409, 29 U.S.C. § 1109; ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2); and ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). (Third Am. Compl. ¶¶ 170, 171, 172, 186, 187, 188.) Section 502(a)(2) is the enforcement provision allowing a plan participant to bring a civil action against a fiduciary "to make good to such plan any losses to the plan resulting from . . . [a] breach" as specified in Section 409. ERISA § 409, 29 U.S.C. § 1109; ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2). Section 502(a)(3) provides for equitable relief "to redress [ERISA] violations" or "to enjoin any act or practice" which violates ERISA. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

In November 2010, the court granted summary judgment in favor of Plaintiffs on their claim that GreatBanc breached its fiduciary duty in approving the ESOP's purchase of $250 million worth of Tribune Company stock because that stock did not meet the Tax Code's definition of "qualifying employer security" as required by ERISA. *See* ERISA § 406(a)(1)(E), 29 U.S.C. § 1106(a)(1)(E); *Neil v. Zell*, No. 08 C 6833, ___ F. Supp. 2d ___, 2010 WL 4670895, at *9 (N.D. Ill. Nov. 9, 2010). The court previously limited any potential recovery from Zell and EGI-TRB to equitable relief because Zell and EGI-TRB did not become fiduciaries of the ESOP until after the ESOP's purchase of the Tribune Company, and thus could not have breached any fiduciary duty to the ESOP (or Plaintiffs) arising from the going-private transaction. *Neil v. Zell*, 677 F. Supp. 2d 1010, 1021-22 (N.D. Ill. 2009). The court also held that "all [equitable] claims for relief in the nature of returning property that originated with Tribune must be dismissed"–specifically, Plaintiffs' claim for disgorgement of payments made to Zell and EGI-TRB pursuant to § 502(a)(3). *Neil v. Zell*, No. 08 C 6833, 2010 WL 3167293, at *2 (N.D. Ill. Aug. 9, 2010). With respect to Defendant GreatBanc, however, the court has concluded that Plaintiffs have the necessary statutory and Article III standing to proceed here, and has rejected Defendant GreatBanc's motion for a ruling that would limit the amount of damages Plaintiffs could potentially receive to $2.8 million or $15.3 million. *See Neil v. Zell*, No. 08 C 6833, ___F. Supp. 2d ___, 2011 WL 722747 (N.D. Ill. Feb. 28, 2011).

Plaintiffs now ask the court to certify a class of "[a]ll individuals who are, or at any time on or after the 2007 Leveraged ESOP Transaction, were (1) participants in the Tribune ESOP who received or were entitled to receive an allocation to their ESOP Stock Account and/or ESOP Cash Account; or (2) beneficiaries of such participants." (Mot. for Class Cert. [259] ¶ 1.) The class would exclude "Defendants and their affiliates; the officers and directors of any Defendant or of any entity in which a Defendant has a controlling interest; and legal representatives, successors, and assigns of any such excluded persons." (*Id.* ¶ 2.) Defendant GreatBanc argues that the class should not be certified mainly because Neil and Bailey "are unsuitable class representatives." (GreatBanc Resp. at 2.) Specifically, GreatBanc argues that Neil and Bailey are driven by "personal animosity" toward Zell and "personal views" that the ESOP transaction "pose[s] a threat to the free press in America." (*Id.* at 2-3.) Further, GreatBanc argues that Neil and Bailey have economic interests adverse to those of the proposed class. (*Id.*) Though Zell and EGI-TRB do not take a "formal stance" on class certification, they do argue that Neil and Bailey "are abusing ERISA to pursue claims improperly against Zell/EGI-TRB for personal reasons that potentially conflict with and could impair the faithful performance of their duties as class representatives." (Zell Resp. [312] at 1-2.)

### DISCUSSION

Federal Rule of Civil Procedure 23 sets out the criteria for certification of a class action. First, the class must satisfy all four criteria of Rule 23(a): "numerosity, common questions of law or fact, typicality of claims or defenses, and adequacy of representation." *Spano v. The Boeing Co.*, ___ F.3d ___, 2011 WL 183974, at *8 (7th Cir. Jan. 21, 2011). The class must also satisfy one of the provisions of 23(b). Rule 23(b)(1) provides for a non-opt-out class action where individual actions could "establish incompatible standards of conduct for the party opposing the class" or "as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications." FED. R. CIV. P. 23(b)(1). Rule 23(b)(2) allows class certification for an action seeking "final injunctive relief or corresponding declaratory relief." FED. R. CIV. P. 23(b)(2).

Finally, Rule 23(b)(3) is appropriate for "a case in which the common questions predominate and class treatment is superior." *Spano*, 2011 WL 183974, at *8. If the requirements of Rule 23 have been satisfied, the court must certify the class action. "By its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 130 S.Ct. 1431, 1437 (2010).

I.      23(a)

        A.      Numerosity

        Plaintiffs estimate, based on plan documents, that the class contains 11,000 participants. (Class Br. at 8.) "Although there is no 'bright line' test for numerosity, a class of forty is generally sufficient to satisfy Rule 23(a)(1)." *McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002). Defendant GreatBanc does not dispute that sufficient numerosity exists for class certification (in fact, Defendant does not mention numerosity in its response brief). GreatBanc does suggest that the class should be narrowed because nearly 4,000 Tribune employees have signed releases waiving any ERISA claims. (GreatBanc Resp. at 2.) The court will address that issue below, but, even if those releases are effective, Plaintiffs have established that the class is sufficiently numerous to satisfy 23(a).

        B.      Commonality

        The commonality requirement may be satisfied by "a common nucleus of operative fact." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (quotation and citation omitted). "Common nuclei of fact are typically manifest where . . . the defendants have engaged in standardized conduct towards members of the proposed class." *Id.* Plaintiffs believe this requirement is "more than satisfied" because their allegations against Defendants "arise from the exact same common nucleus of operative facts, without factual variations between class members, and the legal claims are identical for all class members." (Class Br. at 9.) The court agrees. GreatBanc acknowledges, in passing, that "there are certain common questions of law or fact," (GreatBanc Resp. at 27), and

Plaintiffs' allegations all unquestionably stem from the same occurrence–the Tribune Company's going-private transaction. The questions of fact that will need to be answered as this litigation progresses are the same as to every member of the proposed Plaintiff class. The court finds the commonality requirement satisfied.

### C. Typicality

The typicality requirement "is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (quotation and citation omitted). The Seventh Circuit addressed the typicality requirement very recently (after this motion was briefed) in *Spano*. In that case, employee-participants in Boeing's ERISA investment plan charged that Boeing and others breached their fiduciary duties by causing the plan to pay excessive fees, offering imprudent investment options as part of the plan, and concealing information regarding these fees and investment options. 2011 WL 183974, at *1. The investment plan at issue in *Spano* differed significantly from the Tribune ESOP in that it offered various funds that participants could choose from in which to invest the employer's contributions, such as the "technology fund" or "Boeing stock fund." *Id.* at *11. The court found that the proposed class did not satisfy the typicality requirement because participants in the Boeing plan, whom Plaintiffs urged should comprise the class, were not all necessarily invested in the same funds. "[I]t seems that a class representative in a defined-contribution case would at a minimum need to have invested in the same funds as the class members. . . . [W]e think that there must be a congruence between the investments held by the named plaintiff and those held by members of the class he or she wishes to represent." *Id.* There is no dispute here that Neil and Bailey held the same investment as did all other members of the Tribune ESOP–the ESOP invested only in Tribune Company stock.

GreatBanc does raise one valid objection that implicates typicality concerns, which is that nearly 4,000 ESOP participants signed separation agreements or releases that might bar their

claims.  (GreatBanc Resp. at 24 n.14.)  The Seventh Circuit found a similar release did bar claims for breach of fiduciary duty.  *See Howell v. Motorola, Inc.*, ___ F.3d ___, 2011 WL 183966, at * 8 (7th Cir. Jan. 21, 2011) (a proposed class representative who signed a release "cannot now claim that his account would have been worth even more [post-release] had the defendants not breached a fiduciary duty").  A finding that the named plaintiffs have signed a release can defeat typicality. "The requirement that the proposed representatives not be subject to unique defenses can be seen as an offshoot of the requirement that the representative have circumstances that are sufficiently similar to those of the class."  *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 598 (3d Cir. 2009).  The *Spano* court cited *Schering Plough* in describing the typicality requirement, explaining that in *Schering Plough*, "[a]lthough [plaintiff's] legal claims appeared to be identical to those of the class she sought to represent, the release that she signed gave rise to a possible defense that was unique to her; indeed, it was possible that she might not have a monetary stake in the outcome at all."  *Spano*, 2011 WL 183974, at *9.  Defendant here does not argue that the proposed representatives, Neil and Bailey, themselves signed a release, however.  To the extent that the releases are determined to be valid, that would serve to whittle down the defined class, but does not defeat the named representatives' typicality.

Defendant GreatBanc does generally argue that "Plaintiffs' claims are not typical" but does not appear to offer any specific objections on the basis of typicality other than the release issue. (GreatBanc Resp. at 18.)  Instead, its other objections in this area appear mainly focused on adequacy of representation.  The court is satisfied that the proposed class satisfies the typicality requirement.

### D.    Adequacy

Defendant GreatBanc objects most strenuously to certification of the class on the ground that, GreatBanc contends, Neil and Bailey will not adequately represent the class.  Though Zell and EGI-TRB do not take a position on certification, they join GreatBanc in arguing that Neil and Bailey

should not be class representatives. Defendants' arguments regarding adequacy will be considered below.

### I.        Plaintiffs' Personal Animosity Toward Zell Renders Them Unsuitable

Defendant argues that the named Plaintiffs in this case, Neil and Bailey, are consumed by their "personal concerns and motivations" at the potential expense of the class claims. Neil and Bailey voiced those personal concerns in their depositions, Defendant claims, including their "animosity toward Zell," their desire to "make a statement about the alleged diminished stature of the *Los Angeles Times*," and their objections to "layoffs and corporate structure changes" imposed by Zell and the Tribune. (GreatBanc Resp. at 9-11, 18-21.)

Defendant is correct that a proposed representative may be inadequate when motivated by personal animus. "The trial court may properly consider the plaintiff's vindictiveness toward the defendant in determining whether the plaintiff is an adequate representative." *Smith v. Ayres*, 977 F.2d 946, 949 (5th Cir. 1992). In *Ayres*, for example, the proposed representative, Andrew Smith, brought a securities derivative suit against the general counsel of his family's closely-held corporation in litigation that the Fifth Circuit described as "another chapter in a protracted internecine feud." *Id.* at 947. The court held that Smith could not adequately represent the class: "[Plaintiff] has an unmistakable personal and professional dispute with Ayres. His brief is peppered with vituperative epithets, pugilistic metaphors, and descriptions of Ayres as 'satanic' and 'evil.' . . . [Plaintiff] has stated that he is committed to 'ruin ten years of [Ayres' life].'" *Id.* at 949.

In another case, proposed representatives Bernard Paul Parrish and Herbert Anthony Adderley brought breach of fiduciary duty and breach of contract claims against the National Football League Players Association in connection with "group licensing agreements" the Association arranged for retired players to license use of their names, images, and likenesses. *Parrish v. National Football League Players Assoc.*, No. C 07-00943 WHA, 2008 WL 1925208, at *1-2 (N.D. Cal. April 29, 2008). Parrish, in his deposition testimony, agreed with the statement that

the executive director of the NFLPA, also a defendant, could be compared to "Caesar, Napoleon, Idi Amin, Hitler, Stalin, Milosevic, [and] Saddam." *Id.* at *8. In that same case, Parrish announced in writing that he would "never make a deal" with defendants to settle the lawsuit, warning, "I am going to finish this fight no matter how dirty it gets or what it takes or where it goes." *Id.*

In yet another situation cited by Defendant, a court found that the proposed class representative for a securities derivative suit alleging underpayment in a tender offer had longstanding and inexplicable "spite" toward one of the defendants. "[P]laintiff had a 'gut feeling' that the tender offer was inadequate. He believed Sassower, a director, was 'not the type of individual who would protect the interests of the shareholders.' . . . [P]laintiff formed an adverse judgment of Sassower's character '[b]y looking at him,' apparently, by 'a sighting of him' at a bar mitzvah." *Norman v. Arcs Equities Corp.*, 72 F.R.D. 502, 506 (S.D.N.Y. 1976). The court concluded that "[i]t would be hard to justify selecting a person believing himself possessed of such occult powers, as a class representative." *Id.*

GreatBanc contends Neil and Bailey's circumstances are troublesome for three reasons reflected in Neil and Bailey's deposition testimony. First, Defendant notes that both worked as journalists for the *Los Angeles Times* and are, Defendant believes, more concerned with that paper than with the Tribune Company as a whole. "Neil's 'primary concern was the institution of the Los Angeles Times, not myself, and not Tribune, as a whole.'" (GreatBanc Resp. at 20 (quoting Ex B. ("Neil Deposition") at 31-32.).) Second, Defendant argues that, in Plaintiffs' eyes, "the issue here is not the harm that all Tribune ESOP participants have allegedly suffered, but rather the destruction of the traditional print industry." (GreatBanc Resp. at 20.) Third, and most significantly to GreatBanc,"Neil and Bailey are in this case because of their animosity towards Zell." (*Id.* at 18.)

The court acknowledges Neil and Bailey's apparent regional bias, but is not concerned about it in the context of this case. The court sees no way this action could be prosecuted solely for the benefit of Los Angeles-based ESOP participants without benefitting all Tribune Company

ESOP participants, and Defendants do not suggest any way that these concerns could realistically affect this action. To the extent that Defendants have concerns that this action is being prosecuted to make a larger point about print journalism, the court sees no evidence such an agenda has in any way affected these proceedings, and Defendants offer none.

The question of personal animus toward Zell is a closer one. For example, in a February 2010 e-mail to the 550-person *Los Angeles Times* editorial staff upon his departure, Neil discussed "the jackasses in Chicago who own us . . . . To them I say, with as much gusto as I can muster in an e-mail, f— y[ou]." (GreatBanc Resp. at 10.) This unprompted message does suggest animus on the part of Neil, but the court notes it came in the context of Zell's own very public use of profanity. In particular, Zell said "f— you" to an Orlando Sentinel photographer in an incident captured on video and widely publicized. Jason Garcia, *Zell Profanity Stirs Controversy*, Orlando Sentinel (Feb. 5, 2008).[1] Plaintiffs point to numerous excerpts from their depositions that refute the allegations that they are placing their animus above the concerns of the class as a whole. For example, when asked if he disliked Zell, Bailey said, "I wouldn't characterize it that way. . . . I wish he hadn't gone forward with this–with this deal that–with all the warning signs." (Reply at 8-9 (quoting Ex. 1 ("Bailey Deposition") at 188.).)

The court concludes that Defendants have not established the type of animus or vindictiveness that would render Neil and Bailey inadequate class representatives. The court notes

---

[1] Neil does not tie this incident directly to the e-mail in his deposition testimony (he was not asked what prompted his use of the expletive). He does, however, discuss this incident in his deposition, in response to a question about public statements that have damaged the Tribune Company's reputation:

> There's one incident in particular that stands out that's relevant. Mr. Zell visited a newspaper in Florida, I think it was the Orlando Sentinel, and he was being questioned about these issues. . . . A photographer asked Mr. Zell a pointed question, to which Mr. Zell responded, fuck you. This was not the type of conduct that I would hope of a person in charge of one of the largest media companies in America.

(Feinberg Decl. in Supp. of Reply Br., Ex. 2 ("Neil Deposition") at 92.)

that Neil and Bailey had distinguished careers as professional journalists.[2] If Bailey and Neil speak passionately about the newspaper industry or love for the *Los Angeles Times* in their depositions, such passion can be expected from two dedicated longtime employees, and in the court's view, their language is not more inflammatory or pointed than one might expect from members of a class composed in substantial part of professional journalists. Indeed, anyone not similarly impassioned might not be willing to expend the same effort as have Bailey and Neil to prosecute this litigation. More importantly, Defendants have not identified any circumstances during the two years this case has already been pending where Plaintiffs' strong feelings about their profession, their paper, and Zell, have interfered with their efforts to seek relief on the part of the class as a whole.

Two additional factors appear to mitigate any concerns that plaintiffs are improperly motivated by animus against Zell. First, in an earlier decision, the court concluded that Zell and EGI-TRB, his holding company, are not liable for damages resulting from Plaintiffs' claims. Thus, as Zell himself acknowledges, "[b]ecause the possible exposure Zell/EGI-TRB now face in this action is confined to only limited equitable relief, whether the class is certified is largely immaterial to them." (Zell Resp. at 1.) Second, Zell has made it clear he does not expect to continue with the Tribune when it emerges from bankruptcy. "'I don't think that I envision that I am going to have any kind of a role going forward and so, as soon as we get it out of bankruptcy, I will wish whoever takes over a lot of good luck and they should enjoy being in the media business more than I did.'" *Zell Doesn't Criticize ex-CEO Michaels, says Tribune 'in dramatically better shape' than in '07*, online at http://newsblogs.chicagotribune.com/towerticker/2010/11/sam-zell-says-tribune-co-in-dramatically-better-shape-than-07-doesnt-criticize-ex-ceo-randy-michaels.html (Nov. 15, 2010) (last visited March 2, 2011). To the extent Defendants believe that Plaintiffs are pursuing a vendetta against Zell, it is difficult to see how the claims against GreatBanc, which currently make up the

---

[2]      Neil won a Pulitzer Prize for Criticism, and the Pulitzer board noted that his "one-of-a-kind reviews of automobiles . . . blend[] technical expertise with offbeat humor and astute cultural criticism." (Decl. of Dan Neil in Supp. of Mot. for Class Cert. ¶ 3.)

most substantial part of this action, will advance that agenda. The court concludes that the statements made by Plaintiffs in their depositions and in Neil's e-mail do not render them inadequate class representatives.

### ii.    Bailey's Position with the Consumer Attorneys of California

Plaintiff Bailey is currently employed as communication director for the Consumer Attorneys of California, which represents plaintiffs attorneys. GreatBanc urges that this position renders Bailey unfit to serve as class representative. The nature of Defendant's specific objection to Bailey's association with the organization is not explained, but Defendant does suggest that Bailey lacks knowledge about the specifics of the lawsuit, and attributes this lack of knowledge to Bailey's role with the CAOC. "Perhaps not surprisingly given Bailey's role in this case as an apparent mouthpiece for the CAOC, Bailey has little knowledge of, or interest in, staying on top of this litigation." (GreatBanc Resp. at 20 n.11.)

A class representative need not possess detailed knowledge of the lawsuit. The Seventh Circuit noted that in one "extreme case," class certification was allowed by the Supreme Court where "the named plaintiff did not understand her complaint at all, could not explain the statements in it, had little knowledge of what the lawsuit was about, did not know the defendants by name, nor even the nature of the misconduct of the defendants." *Eggleston v. Chicago Journeyman Plumbers' Local No. 130*, 657 F.2d 890, 896 (7th Cir. 1981) (discussing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 366 (1966)). "In legally complex actions . . . a plaintiff need not have expert knowledge of all aspects to qualify as a class representative. The reason people hire lawyers in the first place is to handle the legal niceties of the lawsuit, such as filing necessary papers and mastering the intricacies of the applicable law." *In re Discovery Zone Securities Litig.*, 169 F.R.D. 104, 110 (N.D. Ill. 1996) (citations omitted). In any event, it is a challenge for an experienced federal judge to make sense of the ERISA provisions and regulations–with their myriad cross-references and exceptions–relevant to the issues here. It would be disingenuous to suggest that any layperson,

regardless of his affiliation with the CAOC, could wrap his mind around the intricate details of this litigation, and no authority suggests that this degree of sophistication is required for a class representative. Defendants have put forth nothing suggesting that Neil or Bailey's alleged lack of knowledge about this case has in any way hindered its effective prosecution.

### iii. Neil and Bailey's Economic Interests Conflict With Those of the Class

Defendant GreatBanc next argues that Neil and Bailey have economic interests that are at odds with those of the rest of the class. GreatBanc asserts that because Tribune employees received $34 per share in the creation of the ESOP, they benefitted to the tune of $452 million. (GreatBanc Resp. at 3.) "[B]ecause the class benefited so greatly through a transaction that Neil and Bailey seek to have declared unlawful and equitably 'remedied,' the economic interests of the class could not be more diametrically opposed to [their] interests." (*Id.*) According to GreatBanc, a total of 8,164 ESOP participants were paid for their shares or options in the going-private transaction. (GreatBanc Resp., Ex. A, Decl. of Michael Bourgon, Tribune Company Vice President of Human Resources ¶¶ 10-12.) At the time of the ESOP's inception, there were 13,441 participants. (*Id.* ¶ 13.) (The court is not certain whether Neil and Bailey themselves received payments in these transactions.)

Plaintiffs respond that they "seek to recoup losses to the Tribune ESOP; they have not asked the court to order rescission of the Transaction." (Reply at 16.) Further, Plaintiffs argue that while some shareholders "may have benefitted from their status as ordinary shareholders of Tribune . . . these same people were harmed by the ESOP's overpayment for the stock held by the ESOP." (*Id.*) Plaintiffs point out that the remedy they seek would result in a recovery for the ESOP, which would then be distributed to ESOP participants. "Such a recovery will in no way harm those ESOP participants who also happen to have received consideration for Tribune shares tendered at some point in the Transaction. They will not have to give back the money they received in exchange for their shares." (*Id.* at 17.)

Defendant points to a number of cases in which class representatives were found inadequate due to conflicting economic interests with the class they sought to represent. For example, one court found a representative inadequate when he wanted rescission of a merger, while 80 percent of his fellow minority shareholders had already tendered their shares in support of the merger. *Issen v. GSC Enterprises, Inc.*, 508 F.Supp. 1278, 1296 (N.D. Ill. 1981). The court noted that his "interests are clearly different from and even antagonistic to those of the majority of the class he seeks to represent." *Id.* As Plaintiffs are not seeking rescission, it is difficult to determine where any similar conflict exists in this case. If Plaintiffs do succeed on their claims, the payments made to employee-shareholders for the purchase of outstanding publicly-traded shares in the early stages of this transaction will not be reclaimed by the ESOP or Plaintiffs.

Defendant also points to a case in which the Eleventh Circuit reversed and remanded a certification order for a class of all those who had purchased the drug Hytrin (terazosin hydrochloride) during a 17-month period directly from Abbott Laboratories (many of those who purchased directly were drug wholesalers). The court did so because it was unsure whether the district court properly "evaluate[d] whether the 'adequacy of representation' requirement could be satisfied by the named representatives despite the fact that the most significant members of the certified class arguably experienced [increased profits] from the conduct alleged to be illegal by the named representatives." *Valley Drug Co. v. Geneva Pharm., Inc.,* 350 F.3d 1181, 1187-88 (11th Cir. 2003). The manufacturer had entered into anti-competitive agreements to delay production of a generic version of its drug, and the defendant argued that due to inelastic demand and the cost-plus sales arrangement, national wholesalers made more profit selling the branded drug than they would have had the drug gone generic. *Id.* at 1191. The court fails to see the similarity to the instant case–while ESOP participants did unquestionably benefit from the sale of their shares, many, if not all, have since suffered because of the economic troubles afflicting the Tribune Company. Further, these were two separate transactions, and since Plaintiffs do not seek

rescission, it is not apparent that any ESOP participants (aside from Defendants) have an antagonistic interest to the named Plaintiffs.

Relevant case law suggests that the conflicting economic interest necessary to render a representative inadequate must be of the type that, if that plaintiff succeeds, would result in identifiable harm to some member of the class. The Seventh Circuit upheld the district court's decision not to certify a class, for example, brought on behalf of an estimated 300,000 "residents of northern Illinois adversely affected by noise" associated with an O'Hare Airport expansion. *Bieneman v. City of Chicago,* 864 F.2d 463, 464-65 (7th Cir. 1988). "Some of these [people] undoubtedly derive great benefit from increased operations at O'Hare, which make the area attractive for business and may increase the value of land, even as they make land less attractive for residential purposes." *Id.* No such conflict exists here–unlike in *Bieneman*, where if the class succeeded, the damages awarded presumably could reduce the very activity benefitting some members of the class, any recovery to ESOP from GreatBanc would in no concrete way adversely affect the economic interests of any member of the Plaintiff class.

A recent case in this district examined *Bieneman*, evaluating this same conflict-of-interest argument. *In re Evanston Northwestern Healthcare Corp. Antitrust Litig.*, 268 F.R.D. 56 (N.D. Ill. 2010) was a class action filed by a class of healthcare purchasers who alleged they were harmed by an anti-competitive merger of several hospitals. The court acknowledged that some members of the proposed class may have received better services, in part, because of the merger. The court nevertheless agreed that class certification was appropriate because "[u]nlike *Bieneman*, where some putative class members 'undoubtedly' benefited from the alleged wrongful conduct such that they likely would have opposed the class action, here, the court is not convinced that class members who received services of increased quality due to the merger would oppose the instant action." *Evanston Northwestern*, 268 F.R.D. at 64. The *Evanston Northwestern* court's observation brings GreatBanc's argument into relief–the question is not whether some might have benefitted

14

from parts of the occurrence now being challenged, but whether, going forward, some members of the Plaintiff class would be harmed by the relief being sought. In *Evanston Northwestern*, the potential harm to members of the plaintiff class is in fact far more concrete; these class members would presumably still receive health care from that hospital, and might face higher rates or reduced services if the hospital were hit with a financial penalty stemming from the merger. In the circumstances of this case, in contrast, as Tribune Company is not a party, the only potential harm to any member of the Plaintiff class is significantly more speculative–perhaps fewer ESOPs will be created, or there will be fewer persons or organizations willing to serve as trustees, or they will charge more to do so–all circumstances whose impact would be on employees or employers involved in some other ESOP, at some other time, in some other context.

At the time the ESOP was established, some class members who had been Tribune shareholders may indeed have received a premium over the market price for their shares. In the court's view, that premium does not create a conflict fatal to class certification. There are no members of the proposed class who would, for any reason, prefer that Defendants not pay damages. Nor is there any basis to fear that any shareholders would be required to pay back the money they were given in exchange for their Tribune Company stock. As Plaintiffs point out, the Tribune's creditors "seeking to pursue fraudulent conveyance claims in the Delaware Bankruptcy Court have stated they only seek to recoup money from the largest former Tribune shareholders–such as Zell–and not from Tribune employees who had small investments in Tribune stock in their 401(k) or Stock Purchase Plan accounts." (Reply at 17.) Furthermore, even if those creditors did seek to recoup money from those shareholders, that action is entirely separate from this one, and any recovery gained as a result of this action would only serve to help those shareholders meet their obligations to Tribune creditors.

Defendant GreatBanc makes one additional argument about conflicting economic interests; that it is in the named Plaintiffs' interests to halt any additional grants of shares to existing

employees.  Any such distributions would dilute the shares of persons who, like Neil and Bailey, have left the company and will not receive additional shares.  (GreatBanc Resp. at 24-25.)  Plaintiffs have not asked the court to halt additional share distributions, however.  More importantly, GreatBanc itself acknowledges in its memorandum that "there will be no further payments from Tribune," (GreatBanc Resp. at 7), and Defendant admits that the shares will be worthless when the Tribune Company emerges from bankruptcy.  *See, Neil v. Zell*, 2011 WL 722747, at *2 n.2.  As Plaintiffs note, "GreatBanc has repeatedly represented to the Court that the Tribune ESOP is on the verge of being terminated and there will be no future allocations of stock to the ESOP."  (Reply at 18 (citing [241] at 3, 6-7; [309] at 2.)  The court sees nothing to suggest this speculative conflict-of-interest is in any way driving Plaintiffs' case or otherwise disqualifies Neil and Bailey from serving as adequate class representatives.

## II.       23(b)

Plaintiffs contend that this class may be certified pursuant to Rule 23(b)(1), (b)(2), or (b)(3), but urge that (b)(1) or (b)(2) would be most appropriate.  The practical difference between the subsections is that 23(b)(1) and 23(b)(2) do not require absent class members be given notice and an opportunity to opt-out of the class action, while 23(b)(3) does.  "A court should endeavor to select the most appropriate subsection, not just the first linguistically applicable one in the list. When substantial damages have been sought, the most appropriate approach is that of Rule 23(b)(3), because it allows notice and an opportunity to opt out."  *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (7th Cir. 1999).

### A.       23(b)(1)

Certification under Rule 23(b)(1) is appropriate if

prosecuting separate actions . . . would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
(B) adjudications with respect to individual class members that, as a

practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. . . .

FED. R. CIV. P. 23(b)(1)(A), (B).

ERISA class actions are commonly certified under either or both subsections of 23(b)(1) because recovery for a breach of the fiduciary duty owed to an ERISA plan, as is the predominant claim here, will inure to the plan as a whole, and because defendant-fiduciaries are entitled to consistent rulings regarding operation of the plan. Essentially, in an ERISA action in which relief is being sought on behalf of the plan as a whole (as it is here), a plaintiff's victory would necessarily settle the issue for all other prospective plaintiffs. "Courts have held that, in light of the derivative nature of Section 1132(a)(2) claims, breach of fiduciary duty claims brought under this statutory provision are 'paradigmatic examples of claims appropriate for certification as a Rule 23(b)(1) class.'" *George v. Kraft Foods Global, Inc.*, 270 F.R.D. 355, 369 (N.D. Ill. 2010) (quoting *Schering Plough*, 589 F.3d at 604); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 453 (S.D.N.Y. 2004) ("Because of ERISA's distinctive 'representative capacity' and remedial provisions, ERISA litigation of this nature presents a paradigmatic example of a (b)(1) class.") (quotation and citation omitted). Numerous ERISA actions in this district have been certified under 23(b)(1). *See, e.g., Kraft Foods*, 270 F.R.D. at 362, 363, 369 (certifying 23(b)(1) class alleging breach of fiduciary duty by trustee for "deficient investment policies" and "paying unreasonable and excessive [management] fees"); *Brieger v. Tellabs, Inc.*, 245 F.R.D. 345, 348, 357 (N.D. Ill. 2007) (certifying a 23(b)(1) class based on the allegation "that defendants permitted the Plan to invest in Tellabs stock when they knew or should have known Tellabs stock was an imprudent investment for retirement savings due to material undisclosed information"); *Loomis v. Exelon Corp.*, No. 06 C 4900, 2007 WL 2060799, at *1, 5 (N.D. Ill. June 26, 2007) (certifying 23(b)(1) class alleging breach of fiduciary duty for charging excessive fees and making imprudent investment decisions); *Baker v. Kingsley*, No. 03 C 1750, 2007 WL 1597654, at *5 (N.D. Ill. May 31, 2007) ("Because the relief

sought by plaintiffs involves the recovery and distribution of plan assets, separate actions by individual plaintiffs would impair the ability of other class members to protect their interests. Plaintiffs therefore meet the requirements of 23(b)[(1)(B)].”); *Smith v. Aon Corp.*, 238 F.R.D. 609, 613 (N.D. Ill. 2006) (certifying ESOP class action under 23(b)(1) based on “allegedly unethical and illegal schemes” that sunk the price of Aon stock in which the ESOP invested); *Rogers v. Baxter Int’l. Inc.*, No. 04 C 6476, 2006 WL 794734, at *1, 11 (N.D. Ill. March 22, 2006) (certifying ERISA class action under 23(b)(1) based on allegations that fiduciaries allowed investment in Baxter stock, when they knew or should have known value was inflated).  Defendant does not cite any case in which a court has declined to certify an ERISA class pursuant to 23(b)(1).  (GreatBanc Resp. at 26.)

Plaintiff argues that certification pursuant to 23(b)(1)(A) is appropriate because absent class certification, “the claims against Defendants alleging the same breaches of fiduciary duty arising from their conduct related to the ESOP would result in contradictory directions to the ESOP’s fiduciaries . . . mak[ing] it practically impossible for Defendants to comply, because they would be operating under conflicting orders.”  (Class Br. at 15.)  Defendant does not address this argument–instead arguing that because Bailey and Neil have interests that are “inimical to those of the rest of the class,” certification under this rule is not appropriate.  “[T]he conflict among the class is so stark, and such conflicts should override any concern of ‘inconsistent or varying adjudications.’” (GreatBanc Resp. at 26.)  Though the bulk of Plaintiffs’ pending claims do not seek the type of equitable relief that would require GreatBanc, Zell, or EGI-TRB to take or not take specific actions, such claims (*e.g.* barring Zell as a fiduciary) remain part of the case and render certification pursuant to 23(b)(1)(A) appropriate.  GreatBanc’s argument that the risk of inconsistent directions to those fiduciaries is outweighed by conflicts among the class members is unavailing; 23(b) factors are not meant to be weighed against 23(a) factors, such as the typicality of the class, which appears to be GreatBanc’s concern.  The court has already determined that any conflict

among the class members is not of the type that should defeat certification.

Plaintiffs contend that certification under 23(b)(1)(B) is appropriate as well, because the claims at issue here–breach of fiduciary duty and engaging in a prohibited transaction–must be brought in a representative capacity on behalf of the entire plan. (Class Br. at 15.) "Therefore, a decision in this case will affect not only the named Plaintiffs in this case, but all participants and beneficiaries of the ESOP." (*Id.*) GreatBanc again responds by making an argument that has already been addressed by this court–that because many ESOP participants benefitted from the stock purchase that took place as part of the ESOP's formation, there is no "shared interest" that would support certification under Rule 23(b)(1)(B). (GreatBanc Resp. at 26.) For reasons previously explained, the court concludes that Plaintiffs' claims are typical of those of other class members and indeed are paradigmatic ERISA claims suitable for certification pursuant to 23(b)(1)(B) because a victory on these claims by one plan member would necessarily be a victory for all plan members. The court finds that Plaintiffs have satisfied 23(b)(1)(B).

**B.    23(b)(2)**

Certification under Rule 23(b)(2) is appropriate if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). Defendant argues that it is appropriate to certify a class under this provision only if the monetary damages being sought are "incidental to the equitable remedy." (GreatBanc Resp. at 26 (quoting *Ingersoll Int'l*, 195 F.3d at 898).

In *In re Allstate Ins. Co.*, 400 F.3d 505 (7th Cir. 2005), plaintiff insurance agents alleged they were constructively terminated in favor of independent contractors. Plaintiffs sought in a 23(b)(2) action the amount they would have received from their ERISA accounts had they been fired, rather than quit. *Id.* at 507. The Seventh Circuit explained that the damages sought were "incidental" because "the computation of damages is mechanical, without the need for individual calculation"

and individual damages suit would therefore "be a waste of resources." *Id.* "The present case is one of incidental damages because if the plaintiffs get the declaration they are seeking, the benefits to which the ERISA plan entitles them will simply be read off from the plan." *Id.* Similarly, in *Berger v. Xerox Corp. Retirement Income Guarantee*, 338 F.3d 755 (7th Cir. 2003), former employees alleged that upon retirement they had been underpaid benefits when opting to take a lump sum payment from their cash-balance retirement plans rather than receiving a pension at age 65. *Id.* at 760. The court found a non-opt-out 23(b)(2) class appropriate because individual plaintiffs had no reason to maintain individual suits once the underpayment had been established. *Id.* at 764. "The declaration [of underpayment] established the right of each of the class members, and the computation of the damages due each followed mechanically." *Id.* at 764.

On several occasions, courts in this district have certified ERISA class actions pursuant to both 23(b)(1) and 23(b)(2). *See, e.g.*, *McDaniel*, 2003 WL 260704, at *6; *Aon Corp.*, 238 F.R.D. at 618 (noting that "[m]onetary relief in a plan-wide action brought under ERISA section 502 is incidental, and flows from relief to the plan"). The court finds that certification of the proposed class in this case would also be appropriate under 23(b)(2) because of the equitable relief sought and because the incidental damages sought can be calculated mechanically as in *Allstate* and *Xerox*.

## C.      23(b)(3)

Defendant's challenge to certification under Rule 23(b)(3) again echoes an argument that court has already addressed. Specifically, Defendant contends a 23(b)(3) class would be "prohibitively problematic . . . because the Court would have to delve into individualized inquiries as to whether individual class members would be willing to jeopardize their substantial payouts from the ESOP Transaction." (GreatBanc Resp. at 27.) Again, this argument anticipates problems that would arise from a rescission remedy when none has been requested, and is unsupported by authority in this situation.

The Seventh Circuit has suggested that 23(b)(3) certification might be appropriate for an

ERISA class action, but in circumstances different from those presented here. Former employees brought a class action against Allstate, alleging that they were constructively terminated in violation of ERISA in order to prevent them from obtaining severance benefits. *In re Allstate*, 400 F.3d at 506. The district court certified that class action pursuant to 23(b)(2), but the Seventh Circuit found that it should have been certified under 23(b)(3), if at all. *Id.* at 508. The court reasoned that the class members needed to receive notice because their entitlement to recovery turned on their individual circumstances, such as whether they actually were constructively terminated or had resigned voluntarily. *Id.* The court recognized that making such determinations might require individualized hearings, but concluded that class treatment might nevertheless be suitable; hearings on a sub-issue would still be more efficient than individual suits on all the disputed issues for the same number of people. *Id.* Class certification under 23(b)(3) was warranted in that case because "when, though the suit is for declaratory relief, the effect of the declaration on individual class members will vary with their particular circumstances, they should be given notice of the class action so that they can decide whether they would be better off proceeding individually." *Id.*

Apart from the release issue, no individualized determinations will need to be made in this case. The court concludes certification under Rule 23(b)(1) or 23(b)(2) is appropriate and therefore declines to certify this class pursuant to 23(b)(3).

### III.    Appointment of Class Counsel

Plaintiffs also ask that their current attorneys be appointed class counsel. (Class Br. at 18-19.) Three firms currently represent Plaintiffs: Lewis, Feinberg, Lee, Renaker & Jackson, P.C.; Meites, Mulder, Mollica, & Glink; and Cotchett, Pitre & McCarthy. (Decl. of Daniel Feinberg in Supp. of Pls.' Mot. for Class Cert. [263] [hereinafter "Feinberg Declaration"] at 1.) Rule 23(g) requires the court to consider four factors in appointing class counsel: the work counsel has done fleshing out the class claims; counsel's experience in class actions, complex litigation, and the applicable law; "counsel's knowledge of the applicable law"; and "the resources counsel will commit to representing

the class." FED. R. CIV. P. 23(g)(1)(A)(I)-(iv).

Neither Defendant responds to Plaintiffs' request that their counsel be appointed class counsel. (GreatBanc Resp. [311]; Zell Resp. [312].) The court has on its own reviewed counsel's declarations addressing the Rule 23(g) criteria, and finds them satisfactory. In his declaration, Feinberg of Lewis, Feinberg, Lee, Renaker & Jackson, P.C., details the work his firm has done to investigate Plaintiffs' claims, (Feinberg Decl. ¶ 3), lists ERISA class actions and other cases in which he and his firm have participated, (*id.* ¶ 5, 6, 7), explains his education and ERISA-related publications, (*id.* ¶¶ 8-11), as well as the qualifications of co-counsel at his firm, (*id.* ¶¶ 12-14), and notes that counsel has "already incurred considerable expense in litigating the case . . . [and has] the means to pay for whatever additional expenses are necessary." (*Id.* ¶ 4.) Michael Mulder, a partner with Meites, Mulder, Mollica, and Glink, also submitted a declaration explaining that his firm has been involved in this litigation since December 2008, and that he and his firm have litigated numerous class actions and several ERISA cases. (Decl. of Michael M. Mulder in Supp. of Mot. for Appt. as Class Counsel [266] ¶¶ 4-7.) Finally, Philip Gregory, a partner with the law firm Cotchett, Pitre & McCarthy, has similarly filed a declaration. (Decl. of Philip L. Gregory in Supp. of Mot. to Appoint Class Counsel [267].) Gregory outlines the experience he and his firm have in complex litigation, (*id.* ¶¶ 3-15), affirms that "[o]ur Firm is willing, able and committed to the successful prosecution of this action" and that it has the necessary resources to do so, (*id.* ¶¶ 16, 18, 19), and summarizes the research his firm has undertaken in prosecuting this case. (*Id.* ¶¶ 20-21.)

The court is satisfied by these declarations, the work undertaken by counsel in this case thus far, and the lack of any objection to appointment of class counsel by Defendants that Plaintiffs' current counsel satisfy Rule 23(g) and should be appointed class counsel.

## CONCLUSION

For the aforementioned reasons, Plaintiffs motion to certify the class [259] is granted, and

Plaintiffs' attorneys will be named class counsel.  The court hereby certifies a class composed of

all individuals who are or, at any time on or after the 2007 Leveraged ESOP Transaction, were (1)

participants in the Tribune ESOP who received or were entitled to an allocation to their ESOP Stock

Account and/or ESOP Cash Account; or (2) beneficiaries of such participants.  Excluded from the

class definition are Defendants and their affiliates; the officers and directors of any Defendant or

of any entity in which Defendant has a controlling interest; and legal representatives, successors,

and assigns of any such excluded persons.

ENTER:

Dated:  March 4, 2011

_____
REBECCA R. PALLMEYER
United States District Judge